IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FRED GORSTEIN and AVIVA CORSTEIN, H/W,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHONY GLENN, and<br><br>AMERICAN SELECT INSURANCE COMPANY D/B/A WESTFIELD, and<br><br>WESTFIELD INSURANCE GROUP A/K/A WESTFIELD INSURANCE COMPANY, INC. AND WESTFIELD INSURANCE COMPANY,<br><br>Defendants | CIVIL ACTION<br><br>NO: |

## DEFENDANTS' PETITION FOR REMOVAL

Defendants, American Select Insurance Company D/B/A Westfield, and Westfield Insurance Group A/K/A Westfield Insurance Company, Inc. and Westfield Insurance Company (collectively, "Westfield"), by counsel, Fowler Hirtzel McNulty & Spaulding, LLP, hereby petitions to remove this action, which was pending in the Court of Common Pleas of Delaware County under Docket No. CV-2022-003741, to the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1332, and 28 U.S.C. § 1441 *et seq.*, and in support thereof, avers as follows:

{W1252401.1}

## I.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

1.    This is an Underinsured Motorist ("UIM") case.

2.    Plaintiffs, Fred Gorstein and Aviva Corstein, initiated this matter by complaint filed on May 31, 2022, filed in the Delaware County Court of Common Pleas, at docket no. CV-2022-003741. A copy of Plaintiffs' complaint is attached hereto as **Exhibit "A."**

3.    It is alleged that, on April 30, 2021, Plaintiff Fred Gorstein was involved in an automobile accident caused by Anthony Glenn, who was allegedly "impaired on drugs" at the time of the accident. Id. at ¶¶ 5-8.

4.    It is alleged that Plaintiffs reside at 3307 Parkview Dr., Haverford, PA. Id. at ¶ 1.

5.    It is alleged that Defendant Glenn resides in Philadelphia, PA. Id. at ¶ 2.

6.    Defendant, Westfield Insurance Company is an Ohio business corporation having a registered business address and principal place of business of One Park Circle, Westfield Center, OH 44251.

7.    Plaintiff claims that Westfield breached an insurance policy which provided Plaintiffs with $250,000 in UIM coverage. See **Exhibit "A,"** at ¶ 5.

8.    Plaintiffs pray for $250,000 in damages from Westfield. See id. at ¶ 33 (WHEREFORE …).

## II.    LEGAL ARGUMENT

### A.    <u>Statement of Authority</u>

9.      "[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . . to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441.

10.      "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."  28 U.S.C. § 1332(a)(1).

11.      This Honorable Court's original jurisdiction is based upon diversity of citizenship under 28 U.S.C. §1332 insofar as (1) all non-fraudulently joined parties are of diverse citizenship at all times material hereto; and (2) Plaintiff's alleged damages are in excess of $75,000.

### B.    <u>All Non-Fraudulently Joined Parties are of Diverse Citizenship</u>

12.      For individuals, "[c]itizenship is synonymous with domicile, and 'the domicile of an individual is his true, fixed and permanent home and place of habitation. It is the place to which, whenever he is absent, he has the intention of returning.'" McCann v. George W. Newman Irrevocable Tr., 458 F.3d 281, 286 (3d Cir. 2006) (quoting Vlandis v. Kline, 412 U.S. 441, 454 (1973)).

13.    Plaintiffs allege that they are citizens of Pennsylvania, residing in Haverford, Delaware County, Pa. See **Exhibit "A,"** at ¶ 1.

14.    A corporation is a citizen of the states in which it is incorporated and in which its principal place of business is located. 28 U.S.C. § 1332(c)(1).

15.    Defendant, Westfield Insurance Company, is an Ohio corporation with its principal place of business in Ohio.

16.    As Plaintiffs are citizens of Pennsylvania and Defendant is a citizen of Ohio, the diversity of citizenship requirement under 28 U.S.C. §1332 has been met.

17.    Defendant Glenn has no real interest in this matter because his liability is undisputed, and his insurer, GEICO, is willing to pay his $15,000 limit of liability.

18.    However, Plaintiffs have refused to accept the limit of Defendant Glenn's liability coverage because they wanted to join him in this action, for the sole purpose of preventing Westfield from invoking the Court's diversity jurisdiction.

19.    Plaintiffs have no serious intention of pursuing claims against Defendant Glenn.  Rather, the purpose is to string him along in the litigation in order to avoid diversity.

20.    Plaintiffs are aware that it is improper to join an action against a UIM carrier with an action against a tortfeasor. See Sehl v. Neff, 26 A.3d 1130, 1134 (Pa. Super. 2011) (driver of underinsured vehicle was not a joint tortfeasor with UIM carrier).

21.    Therefore, Glenn has been joined in bad faith, and his joinder meets the standards for "fraudulent joinder," and so his citizenship is not considered in determining if there is complete diversity.

**C.    The Amount in Controversy Exceeds $75,000.00**

15.    In addition to complete diversity, the amount-in-controversy must exceed $75,000.00. See 28 U.S.C. §1332(a).

16.    When a case is removed on the basis of diversity jurisdiction,

> the sum demanded in good faith in the initial pleading shall be deemed to be the amount in controversy, except that the notice of removal may assert the amount in controversy if the initial pleading seeks . . . a money judgment, but the State practice either does not permit demand for a specific sum or permits recovery of damages in excess of the amount demanded[.]

28. U.S.C. § 1446(c)(2)(A)(ii).

17.    "[R]emoval of the action is proper on the basis of an amount in controversy asserted under [28 U.S.C. § 1446(c)(2)(A)(ii)] if the district court finds, by the preponderance of the evidence, that the amount in controversy exceeds" $75,000.00, exclusive of interest and costs (for purposes of this case). 28 U.S.C. § 1446(c)(2)(B).

18.    "The amount in controversy is not measured by the low end of an open ended claim, but rather by a reasonable reading of the value of the rights being litigated." Werwinski v. Ford Motor Co., 286 F.3d. 661, 666 (3d. Cir. 2002).

22.    Plaintiffs pray for judgment against Westfield in the amount of $250,000. See **Exhibit "A,"** at ¶ 33 (WHEREFORE …).

19.    Because the amount in controversy exceeds $75,000.00 and complete diversity exists among the non-fraudulently joined parties, this Court has diversity jurisdiction under 28 U.S.C. § 1332(a); and removal is proper.

**D.**    **Removal to this Court is Proper.**

20.    A case must be removed to the district court and division thereof which embrace the place where the state-court action is pending. 28 U.S.C. § 1441(a).

21.    Delaware County is within the Eastern District of Pennsylvania; therefore, this Court is the proper Court for removal of this action.

**E.**    **The Procedural Requirements for Removal are Met.**

22.    A notice of removal must be filed within 30 days after receipt of the "initial pleading setting forth the claim for relief upon which such action or proceeding is based[.]" 28 U.S.C. § 1446(b); see Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 221-23 (3d Cir. 2005).

23.    This Notice of Removal is timely, because it is filed less than 30 days after service of the Complaint. See 28 U.S.C. § 1446(b)(3).

24.    Accordingly, the procedural requirements to remove this matter are met.

## III.   JURY TRIAL DEMAND

25.    Under Fed.R.Civ.P. 38(b)(1), Defendant demands trial by jury on all issues so triable.

## IV.   RELIEF REQUESTED

36.    As there is diversity of citizenship and the amount in controversy is in excess of $75,000.00, removal is proper under 28 U.S.C. §§ 1332 and 1441.

WHEREFORE, under 28 U.S.C. § 1441, Defendant respectfully petitions the Court for removal of the matter pending in the Delaware County Court of Common Pleas, at docket no. CV-2022-003741.

FOWLER HIRTZEL McNULTY & SPAULDING, LLP

Dated:  June 24, 2022       By: _____
                                BY: GREGORY S. HIRTZEL, ESQ.
                                I.D. #:  56027
                                E-MAIL: ghirtzel@fhmslaw.com

Exhibit "A"

**ECKELL, SPARKS, LEVY, AUERBACH, MONTE,**
**SLOANE, MATTHEWS & AUSLANDER, P.C.**
By:  Leonard A. Sloane, Esquire
I.D. No. 21271
300 W. State Street, Suite 300
P.O. Box 319
Media, PA 19063
Phone:  (610) 565-3700
Email:  lsloane@eckellsparks.com                    **ATTORNEY FOR PLAINTIFFS**

---

**COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA**
**CIVIL ACTION - LAW**

| | | |
|---|---|---|
| **FRED GORSTEIN and** | : | |
| **AVIVA GORSTEIN, H/W** | : | NO. |
|        **Plaintiffs** | : | |
|      v. | : | |
| | : | **JURY TRIAL DEMANDED** |
| **ANTHONY GLENN** | : | |
|     **and** | : | |
| **AMERICAN SELECT INSURANCE** | : | |
| **COMPANY, D/B/A WESTFIELD** | : | |
|     **and** | : | |
| **WESTFIELD INSURANCE GROUP,** | : | |
| **A/K/A   WESTFIELD INSURANCE** | : | |
| **COMPANY, INC., A/K/A** | : | |
| **WESTFIELD INSURANCE COMPANY** | : | |
|      **Defendants** | : | |

## <u>NOTICE</u>

You have been sued in Court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the Plaintiffs.  You may lose money or property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.**

*Lawyers' Referral Service*
*Delaware County Bar Association*
*Front and Lemon Streets, Media, PA  19063*
*(610) 566-6627*

**ECKELL, SPARKS, LEVY, AUERBACH, MONTE,**
**SLOANE, MATTHEWS & AUSLANDER, P.C.**
By:  Leonard A. Sloane, Esquire
I.D. No. 21271
300 W. State Street, Suite 300
P.O. Box 319
Media, PA 19063
Phone:  (610) 565-3700
Email:  lsloane@eckellsparks.com                                    **ATTORNEY FOR PLAINTIFFS**

---

**COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA**
**CIVIL ACTION - LAW**

| | | |
|---|---|---|
| **FRED GORSTEIN and** | : | |
| **AVIVA GORSTEIN, H/W** | : | NO. |
|     **Plaintiffs** | : | |
|     v. | : | |
| | : | **JURY TRIAL DEMANDED** |
| **ANTHONY GLENN** | : | |
|     **and** | : | |
| **AMERICAN SELECT INSURANCE** | : | |
| **COMPANY, D/B/A WESTFIELD** | : | |
|     **and** | : | |
| **WESTFIELD INSURANCE GROUP,** | : | |
| **A/K/A  WESTFIELD INSURANCE** | : | |
| **COMPANY, INC., A/K/A** | : | |
| **WESTFIELD INSURANCE COMPANY** | : | |
|     **Defendants** | : | |

## COMPLAINT

1.      Plaintiffs, FRED GORSTEIN and AVIVA GORSTEIN, are adult individuals residing at 3307 Parkview Drive, Haverford, Delaware County, Pennsylvania.  Plaintiff, Fred Gorstein, was 90 years old at the time of the subject accident.

2.      Defendant, ANTHONY GLENN, is an adult individual residing at 6607 Cedarhurst Street, Philadelphia, Pennsylvania.

3.      Defendants, AMERICAN SELECT INSURANCE COMPANY, D/B/A WESTFIELD,  and WESTFIELD INSURANCE GROUP, A/K/A WESTFIELD INSURANCE COMPANY, INC., A/K/A WESTFIELD INSURANCE COMPANY, are a conglomerate group of insurance companies within the WESTFIELD INSURANCE GROUP with the trade name "Westfield."  At all times material and relevant hereto, each was acting in its individual capacity and/or as agent, and/or parent or subsidiary of Defendant, Westfield Insurance Group, (all

Copying Prohibited

hereinafter called "Westfield Defendants").   All are licensed to transact business in the Commonwealth of Pennsylvania with offices situated, inter alia, at One Park Circle, Westfield Center, OH, 44251.

4.      At all times material and relevant to the allegations in this Complaint, the Westfield Defendants through American Select Insurance Company issued an automobile policy with underinsured motorist coverage for the benefit of Plaintiffs and acted or failed to act by or through their duly designated officers, principals, representatives, subsidiaries, ostensible agents, employees, workers, servants, licensed insurance agencies, licensed insurance agents or contractors.  See copy of the American Select Insurance Company and the Westfield Defendants' insurance policy attached hereto and marked as Exhibit "A".

5.      At all times material and relevant hereto, Defendant, Anthony Glenn, controlled, and/or operated a 2003 Honda Accord.

6.      On or about April 30, 2021, Plaintiff, Fred Gorstein, was operating his BMW vehicle eastbound on West Chester Pike, near its intersection with Lawrence Road in Havertown, Delaware County, Pennsylvania, and was stopped in the left turn lane for a red signal.

7.      At that same time and place, Defendant, Anthony Glenn, was impaired on drugs and was operating his motor vehicle westbound on West Chester Pike, approaching Lawrence Road, when, due to his impaired condition, he lost control of his vehicle, proceeded through the intersection, struck the concrete median, catapulted  over it and striking the vehicle being operated by Plaintiff, Fred Gorstein.  See diagram from Police Report and pictures from the scene of the crash below:

*Diagram from Police Accident Report*





Copyrighted

8.    At all times material and relevant hereto, Defendant, Anthony Glenn, was impaired on drugs and recklessly operating his vehicle without any regard for the position of other drivers on the highway.

9.    Shortly after the collision, the Haverford Township police arrived at the scene and conducted an investigation of the accident. While Haverford Police Officer Christopher Viola was speaking with the Defendant, Anthony Glenn, who was standing next to his open driver's side door, the police officer detected a strong odor of marijuana emanated from the Glenn vehicle. The officer also noted that the Defendant appeared lethargic and was slow to respond to questions.

10.     The police officer also noted that the Defendant, Anthony Glenn, had glassy, red pupils and questioned him whether he had ingested any marijuana.  The Defendant stated he smoked a blunt prior to the accident.  Thereafter, Defendant, Anthony Glenn, was administered field sobriety tests which he failed.

11.     As a result of the police investigation at the scene of the collision, Defendant, Anthony Glenn, was apprehended, arrested, and charged with the following offenses:  Driving Under the Influence of a Controlled Substance Impaired Ability – Second Offense  (hereinafter "DUI") 75 PA CSA §3802(d)(2); Possession of Marijuana 35 §780-113 §§A31; Use/Possession of Drug Paraphernalia 35 §780-113 §§A31.

12.     On March 14, 2022, Defendant, Anthony Glenn, pled guilty to Count I – DUI Tier 3 – 2nd Offence and received a prison sentence of 90 days to 23 months with probation for 3 consecutive years and required 32 hours of community services.

> §3802(d)(2):
> …*(d) Controlled Substance*…
>    *(2)  The individual is under the influence of a drug or combination of drugs to a degree which impairs the individual's ability to safely drive, operate, or be in actual physical control of the movement of the vehicle."*

13.     In view of the above conviction, especially since he was a repeat offender for driving while impaired, the elements for negligence, recklessness, and driving while impaired, all Defendants are estopped to deny Anthony Glenn was negligent, reckless, and driving while impaired in the subject civil claim involving serious injuries to the Plaintiffs.

<div align="center">

**COUNT I – NEGLIGENCE**

**<u>Plaintiff, Fred Gorstein vs. Defendant, Anthony Glenn</u>**

</div>

14.     The preceding paragraphs are hereby incorporated by reference as though fully set forth at length herein.

15.     At the time of the subject accident,  Defendant, Anthony Glenn, had an extensive history involving an intentional and reckless, premeditated pattern of becoming impaired on drugs or alcohol and driving a motor vehicle while impaired.  In the past he plead guilty to the following offenses:

**Arrest Date: 11/07/1995**
- 35 §780-113 §§A16 -  Int. Possession of Controlled Substance
Disposition:  Guilty Plea

**Arrest Date: 09/01/1996**
- 35 §780-113 §§A16 – Int. Possession of Controlled Substance
Disposition:  Guilty Plea – Confinement

**Arrest Date: 11/10/2002**
- 18 §6106 §§A1 – Firearm Not to be Carried Without License
- 35 §780-113 §§ A30 – Possession With Intent to Deliver

**Arrest Date:  05/12/2000**
- 35 §780-113 §§ A30 – Possession With Intent to Deliver
- 35 §780-113 §§ A16 – Int. Possession of Controlled Substance

**Arrest Date:  05/17/2007**
- 35 §780-113 §§ A30 – Possession With Intent to Deliver
- 35 §780-113 §§ A16 – Int. Possession of Controlled Substance

**Arrest Date:  03/21/11**
- 75 §3802 §§C – DUI: Highest Rate of Alc. (BAC. 16+)

16.     At all times material and relevant hereto, the negligent and/or careless acts and/or reckless acts, and/or omissions of Defendant, Anthony Glenn, consisted of, but were not limited to, the following:

(a)    Operating his motor vehicle while under the influence of drugs;

(b)    Intentionally driving while impaired, not only in the subject accident, but also on a habitual basis;

(c)    Driving while unfit to drive as a result of drug consumption;

(d)    Driving while too impaired to maintain proper control of his vehicle;

(e)    Operating a motor vehicle with negligent and/or careless disregard for the rights and safety of others therein upon the roadway;

(f)    Operating a motor vehicle at an excessive rate of speed under the circumstances and conditions on the roadway;

(g)    Failure to keep said motor vehicle under proper and adequate control;

(h)    Failure to operate the vehicle with due care under the existing circumstances;

(i)    Failure to pay attention to the flow of traffic;

(j)    Failure to conform driving speed and/or control to road conditions;

(k)     Failure to keep a proper lookout for other motorists;

(l)     Operating the vehicle so as to create an unreasonable risk of bodily harm to another to a degree of probability that substantial harm could result;

(m)     Violating 75 Pa.C.S.A. 3802, pertaining to driving or operating a vehicle while under the influence of alcohol or drugs;

(n)     Violating 75 Pa.C.S.A. 2705, pertaining to recklessly endangering another person;

(o)     Failure to observe the rules of the road, Acts of Assembly and local ordinance, in such cases made and provided; and

(p)     Violating the Statutes of the Commonwealth of Pennsylvania and other local ordinances with regard to the operation of motor vehicles.

17.     As a direct and proximate result of the negligent and/or careless acts, impairment, and/or omissions of the Defendant, Anthony Glenn, as hereinbefore alleged, Plaintiff, Fred Gorstein, who was 90 years old at the time of the accident, sustained serious personal injuries which were either caused by, and/or aggravated by, the collision, including but not limited to:

- Bilateral median neuropathy severe right more so than left requiring surgery consisting of right hand median neurolysis and flexor tenosynovectomy.
- Low-grade ulnar neuropathy right more so than left.
- Bilateral CMC osteoarthritis.
- Aggravation of pre-existing of tears of the supraspinatus and infraspinatus tendons with proximal retraction and partial tearing of the subscapularis tendon of the right shoulder.
- Cervical sprain superimposed on pre-existing C3-C4 and C6-C7 cervical spondylosis with mild to moderate central spinal canal stenosis and abutment of the spinal cord ventrally and dorsally.
- C6-C7 right radiculopathy.
- Balances due and payment of certain medical bills.
- Loss of ability to perform tasks related to his side business.

18.     As a further result of the injuries caused in the subject accident, Plaintiff was unable to engage in his routine endeavors, e.g., the Plaintiff, Fred Gorstein, had a part-time business which involved repairing and restoring ink fountain pens which required intricate use of his hands and

fingers.[1]  However, due to the injuries to his hands, he has not been able to perform the fine finger and hand motor skills required to restore and repair fountain pens and has had to outsource his work.

19.     As a further proximate cause of this accident, Plaintiff, Fred Gorstein, has been or will be obligated to receive, and undergo medical attention and care, and/or to expend various sums of money and/or to incur various expenses which have and/or may exceed the sums recoverable under the limits in 75 P.S. Section 1711, and/or may be obligated to continue to expend such sums and/or incur such expenditures for an indefinite time in the future.

20.     At the time of the aforesaid accident, Plaintiff, Fred Gorstein, had full tort coverage. In addition, as a result of the negligence and/or carelessness of the Defendant, Anthony Glenn, as set forth above, Plaintiff, Fred Gorstein, has sustained serious personal injuries, including, but not limited to, physical pain, suffering, mental anguish and inconvenience and will continue to endure such physical pain, suffering, mental anguish and inconvenience for an indefinite time in the future, all to her great detriment and loss.

**WHEREFORE**, Plaintiffs, Fred Gorstein, demands judgment in his favor and against the Defendant, Anthony Glenn, individually, jointly and/or severally with the other named Defendants herein, in an amount in excess of Fifty Thousand ($50,000.00), together with interest, costs and delay damages.

### COUNT II – BREACH OF CONTRACT
### Plaintiffs, Fred Gorstein and Aviva Gorstein, h/w vs. Westfield Defendants

21.     Plaintiff hereby incorporate by reference the preceding paragraphs as though fully set forth at length herein.

22.     The Westfield Defendants regularly conduct insurance business in the Commonwealth of Pennsylvania and have been authorized by the Pennsylvania Insurance Commissioner to write, offer, sell and/or issue policies of automobile insurance in the Commonwealth of Pennsylvania.

---

[1] "Repairs and restoration of vintage/antique fountain pens and other writing instruments require of the following operations that Fred Gorstein has been unable to perform:
1. Examination and evaluation:  full disassembly with separation of all parts, remove cap and barrel, heat and open section, remove nib, examination/removal of the filling system using ultrasound and heat exposure.
2. Replace any defective parts such as sac reservoir, piston or other filling parts
3. Nib straightening, fine tune, polish to specifications
4. Reassembly of pen
5. Final cleaning and polishing

23.    At all times material and relevant hereto, Plaintiffs were insured through an automobile insurance policy with one or more of the Westfield Defendants, i.e., Policy No. WNP 3780329 providing underinsured motorist coverage pursuant to the requirements of the Pennsylvania Motor Vehicle Financial Responsibility Law (hereinafter called the "MVFRL").

24.    At all times material and relevant hereto, the aforesaid policy provided underinsured motorists coverage of $250,000.00 per person, stacked (no other vehicles on the policy to stack), for a total of $250,000.00 in underinsured motorist coverage. *See insurance policy attached hereto and marked Exhibit "A".*

25.    Plaintiffs, Fred Gorstein and Aviva Gorstein, are the named insureds under the aforesaid policy.

26.    As a direct and proximate result of the negligent and/or careless acts and/or omissions of Defendant, Anthony Glenn, as herein alleged, Plaintiff, Fred Gorstein, sustained serious personal injuries, including, but not limited to:

- Bilateral median neuropathy severe right more so than left requiring surgery consisting of right hand median neurolysis and flexor tenosynovectomy.
- Low-grade ulnar neuropathy right more so than left.
- Bilateral CMC osteoarthritis.
- Aggravation of pre-existing of tears of the supraspinatus and infraspinatus tendons with proximal retraction and partial tearing of the subscapularis tendon of the right shoulder.
- Cervical sprain superimposed on pre-existing C3-C4 and C6-C7 cervical spondylosis with mild to moderate central spinal canal stenosis and abutment of the spinal cord ventrally and dorsally.
- C6-C7 right radiculopathy.
- Balances due and payment of certain medical bills.
- Loss of ability to perform tasks related to his side business.

27.    As a further result of this accident, Plaintiff, Fred Gorstein, who is now 91 years old, has been or will be obligated to receive and undergo medical attention and care and/or to expend various sums of money and/or to incur various expenses which have and/or may exceed the sums recoverable under the limits in 75 P.S. Section 1711, and/or may be obligated to continue to expend such sums and/or incur such expenditures for an indefinite time in the future in that Plaintiff was unable to engage in his prior routine endeavors in that prior to sustaining the injuries in the subject accident, e.g., the Plaintiff, Fred Gorstein, had a part-time business which involved repairing and

---

6.    Testing operations and writing

restoring ink fountain pens which required intricate use of his hands and fingers.[2]  However, due to the injuries to his hands, he has not been able to perform the fine finger and hand motor skills required to restore and repair fountain pens and has had to outsource his work.

28.    As a result of the injuries sustained in the subject accident, Plaintiff, Fred Gorstein, has been prevented from performing his usual and customary duties and occupation from the date of the accident through the present in that he has missed time when his symptoms were too painful to work, and may also continue to be unable to perform his occupation in the future resulting in loss and reduction in earning power.

29.    As a result of the negligence and/or carelessness of the Defendant as set forth herein, Plaintiff, Fred Gorstein, has sustained serious personal injuries, including, but not limited to, physical pain, suffering, mental anguish and inconvenience and will continue to endure such physical pain, suffering, mental anguish and inconvenience for an indefinite time in the future, all to his great detriment and loss.

30.    As such, Plaintiffs believe and therefore aver, that the limits of any applicable automobile liability insurance policies will be insufficient to pay the losses damages that Plaintiff is entitled to recover as a result of this accident.

31.    Under the terms and conditions of the applicable insurance policy, the Westfield Defendants are obligated to pay to Plaintiffs up to the amount of any and all losses and damages that exceed the limits of any automobile liability insurance policy or policies covering legally responsible Defendants with respect to this accident.

32.    It is believed and, therefore averred, that the applicable insurance policy contains an arbitration clause, but only applicable if both sides agree to arbitration, otherwise, suit must be filed. It is averred that neither side has agreed to arbitration.

33.    Therefore, Plaintiffs believe and therefore aver, that they are entitled to underinsured motorist benefits from the Westfield Defendants pursuant to the terms and conditions of the aforesaid policy.

---

[2] "Repairs and restoration of vintage/antique fountain pens and other writing instruments require of the following operations that Fred Gorstein has been unable to perform:
7.    Examination and evaluation:  full disassembly with separation of all parts, remove cap and barrel, heat and open section, remove nib, examination/removal of the filling system using ultrasound and heat exposure.
8.    Replace any defective parts such as sac reservoir, piston or other filling parts
9.    Nib straightening, fine tune, polish to specifications
10.    Reassembly of pen
11.    Final cleaning and polishing

WHEREFORE, Plaintiffs, Fred Gorstein and Aviva Gorstein, h/w, demand judgment on their behalf and against the Westfield Defendants for underinsured motorists benefits in the amount of the stacked policy limits of Two Hundred Fifty Thousand Dollars ($250,000.00), plus §8371 damages as set forth below.

<div align="center">

**COUNT III – PUNITIVE DAMAGES**
**Plaintiffs, Fred Gorstein and Aviva Gorstein, h/w vs. Defendant, Anthony Glenn**

</div>

34.     The preceding paragraphs are hereby incorporated by reference as though fully set forth at length herein.

35.     On or about April 30, 2021, Plaintiff, Fred Gorstein, was operating his vehicle eastbound on West Chester Pike, near its intersection with Lawrence Road in Havertown, Delaware County, Pennsylvania, and was stopped in the left turn lane for a red signal.

36.     At that same time and place, Defendant, Anthony Glenn, was an impaired driver who was operating his motor vehicle westbound on West Chester Pike, approaching Lawrence Road, when he proceeded through the intersection, struck the concrete median, traveling over it and striking the vehicle being operated by Plaintiff, Fred Gorstein.

37.     Defendant, Anthony Glenn, was seriously impaired due to being under the influence of marijuana and he intentionally drove his vehicle, causing the subject collision.  Thereafter, he pled guilty to:  Driving Under the Influence of a Controlled Substance – Second Offense  (hereinafter "DUI") 75 PA CSA §3802(d)(2); Possession of Marijuana 35 §780-113 §§A31; and Use/Possession of Drug Paraphernalia 35 §780-113 §§A31.

38.     Defendant, Anthony Glenn, pled guilty to the above charges and was sentenced to a minimum of 90 days to 23 months in prison.

39.     At the time of the subject accident, Defendant, Anthony Glenn, had an extensive history of becoming impaired and intentionally and recklessly driving while impaired on a habitual basis and being in collisions.  In the past he pled guilty to the following offenses:

> Arrest Date: 11/07/1995
> - 35 §780-113 §§A16 -  Int. Possession of Controlled Substance
> Disposition: Guilty Plea - Confinement
>
> Arrest Date: 09/01/1996
> - 35 §780-113 §§A16 – Int. Possession of Controlled Substance
> Disposition: Guilty Plea – Confinement

---

12.  Testing operations and writing

Arrest Date: 11/10/2002
- 18 §6106 §§A1 – Firearm Not to be Carried Without License
- 35 §780-113 §§ A30 – Possession With Intent to Deliver

Disposition: Guilty Plea - Confinement

Arrest Date: 05/12/2000
- 35 §780-113 §§ A30 – Possession With Intent to Deliver
- 35 §780-113 §§ A16 – Int. Possession of Controlled Substance

Disposition: Guilty Plea - Probation

Arrest Date: 05/17/2007
- 35 §780-113 §§ A30 – Possession With Intent to Deliver
- 35 §780-113 §§ A16 – Int. Possession of Controlled Substance

Disposition: Guilty Plea - Confinement

Arrest Date: 03/21/11
- 75 §3802 §§C – DUI: Highest Rate of Alc. (BAC. 16+)

Disposition: Nolo Contendere – Confinement

40.     The misconduct of the Defendant, Anthony Glenn, by habitually becoming impaired and driving while impaired, constituted outrageous, willful, and/or wanton misconduct, and manifested a reckless indifference to the rights of others sufficient to support an award of punitive damages.     See   Focht v. Rabada, 268 A.2d 157 (Pa. Super. 1970); Minkus v. Sethman, 72 Pa. D.&C.4th 177 (C.P. Allegheny, 2005); Kuehn v. Morgan, 62 Pa. D.&C.4th 509 (C.P. Lehigh, 2002); and Shetler v. Zeger, 4 Pa. D.&C.4th 564 (C.P. Franklin, 1989), McConnell v. Dean, No. 10595 CV 2013 (C.P. Monroe County, 4/29/14) (Zulick, J.), Stemrich v. Zabiyaka, No. 1:12-CV-1409, 2014 U.S. Dist. LEXIS 21606 (M.D. Pa. Feb. 21, 2014), Jenkins v. Krivosh, No. 11212 of 2012, C.A. (C.P. Lawrence, 5/6/13), Marta v. Mark, 3599 Civil 2012 (C.P. Monroe, 10/23/2012), Minkus v. Sethman, 72 Pa. D.&C. 4th 177 (C.P. Allegheny, 3/21/2005), Rossi v. Fuchs, 59 Pa. D.&C. 4th 307 (C.P. Butler, 3/7/2002), Drauch v. Applegate, 5 Pa. D.&C. 5th 572 (C.P. Centre, 10/17/2008), Brueckner v. Stewart, 82 Pa. D.&C. 4th 454 (C.P. Lawrence, 12/20/2006).

WHEREFORE, Plaintiffs pray this Honorable Court enter judgment for punitive damages in their favor and against Defendant, Anthony Glenn, individually, jointly and severally, in an amount in excess of Fifty Thousand Dollars ($50,000.00).

**COUNT IV – §8371 BAD FAITH**

**Plaintiffs, Fred Gorstein and Aviva Gorstein, h/w vs. The Westfield Defendants**

41.     Plaintiffs hereby incorporate by reference the preceding paragraphs as though fully set forth at length herein.

42.     As the insurer of Plaintiffs, Fred Gorstein and Aviva Gorstein, the Westfield Defendants have contractual, fiduciary, and statutory duties towards Plaintiffs to fairly evaluate and pay the underinsured motorist benefits claim in good faith, in order to arrive at a prompt, fair and equitable resolution.

43.     Shortly after the collision in April 20, 2021, Plaintiffs provided prompt notification to the Westfield Defendants of the subject automobile collision; thereafter, Plaintiffs delivered claims documentation to the Westfield Defendants and fully cooperated with the Westfield Defendants in all ways required by the insurance policy.

44.     Plaintiffs, at all times relevant and material hereto, fully complied with the terms and conditions of the subject policy of insurance and all conditions precedent and subsequent, in connection with Plaintiffs' right to recover underinsured motorist benefits.

45.     The Westfield Defendants never advised the undersigned counsel or anyone that they intended to contest the cause of, or the nature and extent of, the injuries the enumerated above.  To the contrary, the Westfield Defendants paid all medical bills until PIP coverage was exhausted.

46.     Nonetheless, the Westfield Defendants have now refused to offer a reasonable amount to compensate Plaintiff for, *inter alia*, the following injuries, including, but not limited to:

- Bilateral median neuropathy severe right more so than left requiring surgery consisting of right hand median neurolysis and flexor tenosynovectomy.
- Low-grade ulnar neuropathy right more so than left.
- Bilateral CMC osteoarthritis.
- Aggravation of pre-existing of tears of the supraspinatus and infraspinatus tendons with proximal retraction and partial tearing of the subscapularis tendon of the right shoulder.
- Cervical sprain superimposed on pre-existing C3-C4 and C6-C7 cervical spondylosis with mild to moderate central spinal canal stenosis and abutment of the spinal cord ventrally and dorsally.
- C6-C7 right radiculopathy.
- Balances due and payment of certain medical bills.
- Loss of ability to perform tasks related to his side business.

47.    Prior to sustaining the injuries in the subject accident, Plaintiff, Fred Gorstein, had a part-time business which involved repairing and restoring ink fountain pens which required intricate use of his hands and fingers.[3]  However, due to the injuries to his hands, the Plaintiff has been unable to perform the fine finger and hand motor skills required to restore and repair fountain pens and had to outsource his work.

## FACTS OF ACCIDENT AND ARREST AND CONVICTION OF ANTHONY GLENN:

48.    On April 30, 2021, as set forth above, Fred Gorstein's vehicle was in the left- hand turn lane of West Chester Pike at its intersection with Lawrence Road in Havertown, Delaware County, Pennsylvania and was stopped at a red traffic signal.  At the same time, a vehicle being driven by Anthony Glenn was traveling west on West Chester Pike, approaching its intersection with Lawrence Road.  Anthony Glenn, who was impaired by drugs, lost control of his vehicle and then proceeded through the intersection.  His vehicle then struck the concrete median traveling over it, crashing into the Gorstein vehicle.

49.    The Haverford Township Police arrived at the scene. The investigating officer describes the encounter with Anthony Glenn in his Affidavit of Probable Cause as follows:

---

[3] "Repairs and restoration of vintage/antique fountain pens and other writing instruments require of the following operations that Fred Gorstein has been unable to perform:
  13. Examination and evaluation:  full disassembly with separation of all parts, remove cap and barrel, heat and open section, remove nib, examination/removal of the filling system using ultrasound and heat exposure.
  14. Replace any defective parts such as sac reservoir, piston or other filling parts
  15. Nib straightening, fine tune, polish to specifications
  16. Reassembly of pen
  17. Final cleaning and polishing
  18. Testing operations and writing

## AFFIDAVIT of PROBABLE CAUSE

(1)
Your affiant, employed by the Township of Haverford, due hereby affirm that the information contained is true and correct to the best of my knowledge.

(2)
At 1703 hours, Friday, 04/3/2021 your affiant was dispatched to West Chester pk and Lawrence rd. for the report of an accident.
Upon my arrival, I observed Ofc. Viola administering field sobriety test to the operator of one of the vehicles. The operator's name was Anthony Glenn.

This is Officer Viola's statement:
While speaking with the operator, next to his open drivers door, a strong odor of marijuana emanated from the vehicle. The operator, now known as Anthony Glenn, was leaning against the rear passenger door on the drivers side. He appeared lethargic and was slow to respond to my questions.

He also displayed glassy, red pupils and was questioned about whether he had ingested any marijuana and he stated that he smoked a blunt approximately one hour ago. Based on Glenn's admission of ingesting marijuana approximately one hour ago. I requested he submit to a series of Standardized Field Sobriety Tests (SFST) to which he affirmed.
I instructed Mr. Glenn on the Horizontal Gaze Nystagmus test and asked if he understood the directions and he stated yes. Glenn's eyes displayed equal tracking. Glenn's eyes displayed a lack of smooth pursuit and nystagmus was present at maximum deviation. I observed no clues of nystagmus prior to 45 degrees.

Secondly, I instructed Glenn on the walk and turn test. While giving the instructions Glenn began the test too soon and missed heel to toe on steps 4, 5, 6, 7, 9. Glenn performed 10 actual steps and then began his second 9 steps by "Moonwalking" backwards and after counting 10 backward steps, he then began to take another 9 steps forward and was stopped.

Lastly, I instructed the One Leg Stand test. During this test I did not observe any clues. There was a strong wind which I believe was making Glenn sway.

Based on the evidence I observed through my training and experience I believed Anthony Glenn to be under the influence of drugs and/or alcohol and was unfit to safely operate a motor vehicle. He was handcuffed behind the back and placed into the rear of vehicle 17. Officer Patrick read Glenn the DL-26 form and he did refuse a chemical test of blood. He was transported back to police headquarters where Lt. Scott did speak with Glenn (See supplement).

This is Lt. Scott's statement:
Lieutenant Craig Scott, a drug recognition expert certified by the International Association of Chiefs of Police, DRE #20166, responded to the processing room to perform a Drug Evaluation and Classification examination.á Upon arrival Lieutenant Scott did read the defendant, Anthony Glenn the Miranda warnings.á Glenn did waive and sign the Miranda at 1748 hours. Anthony Glenn did also consent to the evaluation.á Upon completion of the evaluation Lieutenant Scott did determine Anthony Glenn to be under the influence of a combination of CNS Depressants and Marijuana to a degree that rendered him áincapable of safely operating or being in physical control of a motor vehicle.

Ofc. Viola searched ANTHONY GLENN's vehicle incident to arrest, prior to the tow and discovered 4 containers containing a green leafy substance, suspected marijuana. The marijuana was field tested, positive. The suspected marijuana was packaged and sent for further testing.

(3)
Your affiant request the following charges be approved against the defendant:
75 3802 (D2), 35 780-113(16) & (32)

<table>
<tr><td>Inchoate Offense</td><td>☐ Attempt 18 901 A</td><td>☐ Solicitation 18 902 A</td><td>☐ Conspiracy 18 903</td><td>Number of Victims Age 60 or Older  <u>0</u></td></tr>
</table>

| ☒ Lead? | 1 | 3802 | D2 | of the | 75 | 1 | M | | |
|---|---|---|---|---|---|---|---|---|---|
| | Offense # | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data (if applicable) | Accident Number | F3005730 | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|

Statute Description (include the name of statute or ordinance):
**DRIVING UNDER THE INFLUENCE CONTROLLED SUBSTANCE**

Acts of the accused associated with this Offense:
DRIVING UNDER THE INFLUENCE OF ALCOHOL OR CONTROLLED SUBSTANCE -Conrolled SUBSTANCE
75 Pa. C.S. ° 3802(d)(2).
On or about 04/30/2021, the actor,Anthony GLENN, unlawfully drove, operated or was in actual physical control over the movement of a vehicle in the area of West Chester pk and Lawrence rd, Delaware County, Pennsylvania, while under the influence of any drug or combination of drugs to a degree which impaired the actor's ability to drive safely.

<table>
<tr><td>Inchoate Offense</td><td>☐ Attempt 18 901 A</td><td>☐ Solicitation 18 902 A</td><td>☐ Conspiracy 18 903</td><td>Number of Victims Age 60 or Older  <u>0</u></td></tr>
</table>

| ☐ Lead? | 2 | 780-113 | A16 | of the | 35 | 1 | M | | |
|---|---|---|---|---|---|---|---|---|---|
| | Offense # | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data (if applicable) | Accident Number | | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|

Statute Description (include the name of statute or ordinance):
**INT POSS CONTR SUBST BY PER NOT REG**

Acts of the accused associated with this Offense:
INT POSS CONTR SUBST BY PER NOT REG The Actor, ANTHONY GLENN, on or about, 04/30/2021, in the County of Delaware ,The following acts and the causing thereof within the Commonwealth are hereby prohibited:  Knowingly or intentionally possessing a controlled or counterfeit substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, unless the substance was obtained directly from, or pursuant to, a valid prescription order or order of a practitioner, or except
as otherwise authorized by this act, that is to say the actor, Anthony Glenn, in violation of Section 780-113  (A) (1) of the Pennsylvania Vehicle Code, Act of June 17, 1976, as amended, 18 Pa.C.S. 780-113  (A) (1)

<table>
<tr><td>Inchoate Offense</td><td>☐ Attempt 18 901 A</td><td>☐ Solicitation 18 902 A</td><td>☐ Conspiracy 18 903</td><td>Number of Victims Age 60 or Older  <u>0</u></td></tr>
</table>

| ☐ Lead? | 3 | 780-113 | A32 | of the | 35 | 1 | M | | |
|---|---|---|---|---|---|---|---|---|---|
| | Offense # | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data (if applicable) | Accident Number | | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|

Statute Description (include the name of statute or ordinance):
**USE/POSS OF DRUG PARAPH**

Acts of the accused associated with this Offense:
USE/POSS OF DRUG PARAPH The Actor, Anthony Glenn, on or about, 04/30/2021, in the County of Delaware ,The following acts and the causing thereof within the Commonwealth are hereby prohibited:  The use of, or possession with intent to use, drug paraphernalia for the purpose of planting, propagating, cultivating,
growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packing, repacking, storing, containing, concealing, injecting, ingesting, inhaling or otherwise introducing into the human body a controlled substance in violation of this act, that is to say the actor, Anthony Glenn, in violation of Section 780-113  (A) (3) of the Pennsylvania Vehicle Code, Act of June 17, 1976, as amended, 18 Pa.C.S. 780-113  (A) (3)

50.     On September 29, 2021, Anthony Glenn entered a guilty plea to the charge of DUI, Tier 3, 2nd offense, and he was sentenced to prison on March 14, 2022:

**Certificate of Sentencing**

**DELAWARE COUNTY COURT OF COMMON PLEAS**
**CERTIFICATE OF IMPOSITION OF SENTENCE**

NGP ✓ Open GP____ Jury Trial____ Non-Jury Trial____ Nolo____ Amended____ Gagnon II____

COMMONWEALTH vs. Anthony Glenn
CASE DOCKET # 3767-21 OTN #: X 391773-4
DOB 09-13-75 SEX (M) F RACE B SID__________ BAC__________

**CONFINEMENT**

| Count | Charges | Grading | Minimum | Maximum | DCP | SCI | Fine |
|---|---|---|---|---|---|---|---|
| 1 split | DUI Tier 3 2nd Offense | M1 | 90 days | 23 months | ✓ | | $1,500 |

**RRRI – BOOT CAMP – STATE DRUG TREATMENT PROGRAM**

| RRRI | Boot Camp | State Drug Treatment Program |
|---|---|---|
| Court – Agree____ Objects____ | Court – Agree____ Objects____ | Court – Agree____ Objects____ |
| Cmwlth – Agree____ Objects____ | Cmwlth – Agree____ Objects____ | Cmwlth – Agree____ Objects____ |

The aggregate period of confinement is a term of not less than 90 days and not more than 23 months

**PROBATION / PROBATION WITH RESTRICTIVE CONDITIONS**

| Count | Charges | Grading | Term | County | State | Fine |
|---|---|---|---|---|---|---|
| 1 split | DUI Tier 3 2nd Offense | M1 | 3 years (consecutive to confinement) | ✓ | | |

The aggregate term of probation is 3 years

**RESTITUTION**

| Name | Address | Amount |
|---|---|---|
| Joint & Several with: | | |

2022 MAR 14 PM 5:3_

**REQUIREMENTS/RESTRICTIONS**

Immediate Parole-this case only ____
Domestic Violence/Anger Management ✓
DNA Testing ____
Electronic Home Monitoring ____
Cost Assessment $ 100
No Contact w/ Victim ____
Community Service Hours 32
Serve____ 48-hour periods starting________ at________ AM/PM.
Comply with rules and regulations governing Probation and/or Parole ✓
General Rules ✓ DUI ✓ EMP____ Sex Offender____ Substance Abuse Unit____ Mental Health Unit____

Complete & Follow recommendations: ✓
CRN/Safe Driving Classes ✓
Substance Abuse Evaluation ____
Psychiatric Evaluation ____
Psychological Evaluation ____
Psychosexual Evaluation ____
Megan's Law Registration-Tier____ ____
Credit for any completed conditions ____

Other: Must complete 32 hours of community service. Supervision may be transferred to Philadelphia. Must report to DCP on 03/17/22 at 6pm.

The Defendant shall receive such credit for time served as he/she is entitled by the laws of the Commonwealth of Pennsylvania.
Costs of prosecution are imposed on the (✓) Defendant ( ) Delaware County

____ ALL OUTSTANDING DEFENSE and/or COMMONWEALTH MOTIONS ARE WITHDRAWN
✓ DISMISS REMAINING CHARGES PURSUANT TO PLEA AGREEMENT
✓ APPEAL RIGHTS GIVEN

Date: 03/14/22 Sentencing Judge: Brennan [signature]
ADA: Jen Glackin Defense Atty: Ben McCready
9/2020

Copying Prohibited

The Gorstein vehicle was a total loss paid by Westfield in the amount of $17,072.06. **This was <u>not</u> a "low impact" collision.** In view of the above, there is 100% liability against Anthony Glenn.

*Gorstein Vehicle Damage*



Copying Prohibited

**EXTENSIVE MEDICAL TREATMENT:**

51.    After the collision on April 30, 2021, Plaintiff, Fred Gorstein, was a 90-year-old, semi-retired physician,  was examined at the scene by EMS and was told that he could contact his wife and have her drive him to the hospital.  Fred Gorstein telephoned his wife who came to the scene of the accident.  Mrs. Gorstein took Fred Gorstein to Lankenau Hospital Emergency Department for treatment.

52.    In the Emergency Department Fred Gorstein provided a history that he was a restrained driver stopped at a red light when his car was struck by an oncoming vehicle which flew over the concrete median and striking his vehicle head-on.  All of his airbags deployed at the time of the collision, striking Fred Gorstein.  At that time, he was complaining of right shoulder pain and right-sided neck pain every time he moved his head from side to side.  Fred Gorstein was given a Lidocaine patch and Ibuprofen and told to follow up with his primary care physician.

53.    On May 3, 2021, Fred Gorstein was examined by his primary care physician, Dr. David Targan.  After his physical examination, and because of severe pain, Dr. Targan prescribed MRI studies of the cervical spine, right shoulder and right thumb.  He also instructed Fred Gorstein to begin rehabilitation treatment with Dr. Angela D'Orsi, a physical rehabilitation physician.  Dr. Targan also instructed him to make an appointment with an orthopaedic surgeon after the MRI studies were performed.

54.    On May 6, 2021, Dr. Angela D'Orsi of Lower Merion Rehabilitation examined Fred Gorstein who described the mechanics of the accident telling her his head hit the area of the windshield which was protected by the airbag.  The impact occurred on the front left side of his vehicle.  He immediately felt pain in his right shoulder and also felt right-sided cervical pain.  He was also experiencing a severe right frontal occipital headache and had been unable to sleep due to pain in his shoulder, right arm and hands.  He was taking 4 tablets of Advil per day.

55.    Dr. D'Orsi's physical examination noted cervical pain bilaterally, radiating into the right shoulder and into the right thumb with numbness and tingling into the right 4th and 5th digits.  He could not make a fist and had severe pain in his hand and thumb.  Cervical extension and right rotation caused increased pain and limited left rotation.  Severe pain was noted with right lateral bending and palpation over the right greater than left paracervicals and tenderness over the upper trapezius.  Mild ecchymosis was noted over the right anterior shoulder and severe pain over the right scapula.  Fred Gorstein was positive for drop arm and impingement with tenderness over the anterior and lateral joint line and tenderness along the biceps tendon.  He could not tolerate passive range of

motion at that time with tenderness over the right clavicle and subclavicular region.  His right thumb exhibited increased pain over the CMC and CMP, including pain with palpation, movement and pain with grasp.  At that time, there were also complaints of lower extremity pain and weakness.

56.     Dr. D'Orsi then reviewed the cervical MRI study noting severe multilevel cervical spondylosis worse at C5-C6 with what appeared to be some fusion.  At that time, Dr. D'Orsi expressed concern that there was aggravation of pre-existing cervical stenosis present because Fred Gorstein had pain, weakness and dysesthesias in the right arm and radiation of pain into the right lower extremity.  Dr. D'Orsi prescribed a soft cervical collar on and off during the day to calm down his symptoms, including use of Lidocaine patches, Tylenol, heat and ice.  In addition, a MRI of the right shoulder was ordered along with x-rays of the right scapula and x-rays of right thumb.

57.     On May 7, 2021, Dr. David Targan re-examined Fred Gorstein since he was complaining of decreased flexion and extension of the cervical spine and limited range of motion in the right shoulder with positive Hawkins and Neers tests.  He was also complaining of right thumb pain.  Dr. Targan instructed him to hold off on physical therapy until the MRI studies were completed and to continue taking Ibuprofen for pain.

58.     In addition, on May 10, 2021, a shoulder MRI performed by Main Line Health MRI revealing the following:

> *"Impression:  Complete or near complete tears of the supraspinatus and infraspinatus tendons with proximal retraction.  Moderate atrophy of the supraspinatus and infraspinatus muscles.  Partial tearing of the subscapularis tendon.  Long head of the biceps tendon is attenuated but likely grossly intact.  Likely partial tearing along the long head of the biceps tendon."*



Supraspinatus and Infraspinatus rotator cuff tears



**Partial Tear Long Head of Biceps Tendon**

59.      On May 10, 2021, Fred Gorstein underwent a cervical MRI study at Main Line Health MRI with the findings below:

> *"Impression:*
> 1. *Multilevel cervical spondylosis most pronounced at C3-C4 where there is mild to moderate central spinal canal stenosis and abutment of the spinal cord ventrally and dorsally. No spinal cord compression or spinal cord abnormality at any level.*
> 2. *No edema-like signal abnormality within the prevertebral or paravertebral soft tissues to suggest ligament injury."*

61.      On September 16, 2021, the x-rays and the MRI studies of Fred Gorstein's right shoulder were reviewed by expert radiologist, Malgorzata Goralczyk, M.D., who set forth the following in her report:

> *"Radiographs of the right shoulder dated 4/30/21 and 5/10/21 demonstrate no fracture or dislocation. There is a high-riding humeral head, consistent with full thickness tear of the rotator cuff. There is remodeling of the inferior surface of the acromion, consistent with chronic full thickness tear of the rotator cuff. MRI of the right shoulder dated 5/10/21 demonstrates no fracture or dislocation.*
> *There are degenerative changes of the acromioclavicular joint with inferior spurring. Fluid in the subacromial subdeltoid bursa is consistent with full thickness component of rotator cuff tear.*
> *There are complete tears of supraspinatus and infraspinatus tendons, retracted to the level of the glenohumeral joint. Fatty atrophy of the supraspinatus, infraspinatus and teres minor muscles are consistent with chronic rotator cuff tears. There is acute tearing at the myotendinous junction of the teres minor tendon. There is moderate effusion of the glenohumeral joint.*

*The long head of the biceps tendon is in the bicipital groove.  There is no labral tear.*
***To a reasonable degree of medical certainty, it is my opinion that myotendinous junction tear of the teres minor tendon seen on MRI of the right shoulder dated 5/10/21 is posttraumatic and caused by injury on 4/30/21."*** Emphasis added.

62.     On May 19, 2021, Fred Gorstein was examined by Dr. David Rubenstein, who is an Orthopaedic Surgeon with The Rothman Institute.  Dr. Rubenstein reviewed the right shoulder MRI study noting that it clearly showed a high-riding humeral head with loss of acromiohumeral distance which would indicate that the rotator cuff had been torn prior to the MRI study, but Fred Gorstein was doing well symptomatically by his history prior to the automobile accident.  He was able to perform activities such as weightlifting and was able to get his arm over 90 degrees.  Fred Gorstein indicated that prior to the accident he was able to perform workout activities with his right arm. Since the accident, he has been unable to perform those activities.  Fred Gorstein also indicated to Dr. Rubenstein he was having difficulty performing activities of daily living and hobby activities such as restoring old fountain pens.  Dr. Rubenstein recommended an injection and physical therapy. Dr. Rubenstein did not recommend surgery because the surgery would have to be a shoulder replacement which was not recommended at his age, i.e.,  90 years old, unless it is absolutely necessary.

63.     On May 24, 2021, Fred Gorstein began receiving physical therapy treatment at Excel Physical Therapy from May 24, 2021, through July 19, 2021, for a total of 10 visits. During this course of physical therapy, his treatment included range of motion exercises, trunk stabilization, stretching, upper back and shoulder girdle strengthening.  Therapeutic procedures included hot packs, ice packs, strengthening exercises for upper extremities, therapeutic exercises, neuro re-education, soft tissue mobilization and manual therapy.

64.     On May 25, 2021, at his follow up examination with Dr. D'Orsi, Fred Gorstein indicated he was feeling better because of the medication.  He was taking 100 mg of Gabapentin to help with the paresthesias, but he was still having pain in the base of his right thumb CMC joint.  Fred Gorstein indicated that Dr. Rubenstein administered an injection to his right shoulder, and he was able to get his arm overhead.  He also indicated there was still mild pain in his neck, but the stiffness and decreased range of motion was the bigger issue.  He was having difficulty sleeping due to right shoulder pain.  His headaches had improved, but he was still tender at the base of his skull.  Dr. D'Orsi reviewed the MRI and x-ray studies noting severe spinal stenosis worse at C3-C4 and C6-C7. She instructed Fred Gorstein to continue physical therapy and continue taking Gabapentin.



65.     On June 16, 2021, Orthopaedic Surgeon, Dr. Rubenstein, again examined Fred Gorstein noting that his impression was that of rotator cuff tearing with strain and sprain superimposed on pre-existing rotator disease.  He recommended continued physical therapy.

66.     On June 24, 2021, Fred Gorstein saw Dr. D'Orsi for a follow up examination noting that he was still experiencing neck and upper trapezius pain with pain in the upper arm into the elbow.  He also noted pain in the shoulder joint anteriorly and pain in the wrist at the base of the thumb.  The CMC joint was very painful with numbness and tingling in digits 2, 3, and 4.  Fred Gorstein also exhibited poor grasp with weakness in the right hand and poor fine motor weakness.  Dr. D'Orsi noted that Fred Gorstein indicated his whole left hand was painful.  He was taking Gabapentin at night but wakes up with pain in the right shoulder with discomfort down his upper arm.  The doctor also noted severe bilateral wrist and thumb pain causing weakness in his hands, right worse than left.  Both hands were on the steering wheel at the time of the accident.

67.     Dr. D'Orsi's physical examination revealed cervical pain with flexion, left rotation was limited more than right, pain in the right paracervical with right rotation, limited range of motion, and tenderness over the upper trapezius.  Examination of the right shoulder indicated drop arm with pain upon abduction, positive impingement and Hawkins signs, tenderness over the anterior and lateral joint line, tenderness over the AC joint and biceps tendon with guarded range of motion.  The doctor recommended that Fred Gorstein return to Dr. Rubenstein for a second steroid injection to see if he could get the pain under better control.  She also instructed him to see Dr. A. Lee Osterman, who is a world-renowned hand surgeon at the Philadelphia Center for Hand and Shoulder Surgery because of his painful right hand and thumb and undergo an EMG study.



68.    Thereafter, on June 30, 2021, Fred Gorstein had a consultation with a hand surgery specialist, Dr. A. Lee Osterman.  He examined Fred Gorstein noting his shoulder motion was limited on the right with abduction and forward flexion to 90 compared to 170 on the left.  The doctor noted he could internally rotate at 90 degrees of abduction to 20 degrees and externally rotate to 80 degrees on the right.  Weakness was noted to the infraspinatus teres minor and supraspinatus muscles but had strong subscapularis strength.  Fred Gorstein's shoulder also exhibited pain with a positive click, impingement, and Yergason's, but also had a positive drop arm.  Pain was also indicated with resisted wrist and finger extension on the right and resisted pronosupination on the right.  Crepitus was present with Watson's on the right.  Dr. Osterman also noted limited composite fist motion on the right, with a positive CMC grind test.

Thumb CMC Grind Test



69.    During this examination, Dr. Osterman also noted a positive Tinel's sign at the carpal tunnels and positive Durkan's, Phalen's, and reverse Phalen's bilaterally.  Significantly diminished median nerve response was greater than ulnar vibratory sensation.  Further testing on the right was difficult due to shoulder weakness and pain.  Dr. Osterman came to the conclusion after his examination and testing and because he was having significant nocturnal discomfort that Fred Gorstein would require surgical decompression of the median nerve and flexor tenosynovectomy on the right.  At that time due to the aggravated thumb pain, Dr. Osterman administered an injection in his thumb.  He was also fitted with a bilateral carpal gel orthosis.



**CMC Thumb Injection**

70.    Dr. Osterman reviewed the electrical studies performed on August 4, 2021 which showed right C6-C7 cervical radiculopathy.  Significant median neuropathy was indicated bilaterally with denervation and slight ulnar neuropathy more on the right than the left.  Fred Gorstein was followed by Dr. Osterman on October 14, 2021, and November 9, 2012, with no relief of his symptoms.

71.    On July 16, 2021, Dr. Angela D'Orsi re-examined Fred Gorstein who indicated that he was experiencing neck pain on rare occasions.  He was scheduled to see Dr. Rubenstein the following week for another shoulder injection.  Fred Gorstein indicated that his shoulder had better movement with pain during abduction and he was still working with therapy.  He was still experiencing bilateral wrist pain with any movement and abduction of fingers increased pain with ulnar side of wrist and bilateral first CMC joints in his thumbs being the most painful.  When he tried to make a right-handed fist there was a lot of difficulty.  Due to weakness in both intrinsics Fred Gorstein was having difficulty opening up twisting objects and difficulty using fine tools with fountain pens which he could perform prior to the accident without difficulty.  He was taking 300

mg. of Gabapentin at night and 100 mg. of Gabapentin in the morning which gives him a "buzzed" feeling. Dr. D'Orsi indicated that the Gabapentin may be helping and controlling neuropathic pain, but hand pain continued. At that time, it was noted that there was a lot of swelling in his hands. Also, his shoulder had better range of motion but persistent pain.

72.     Dr. David Rubenstein, the shoulder doctor, performed a follow up examination on July 21, 2021, noting that Fred Gorstein was still experiencing shoulder discomfort. He instructed him to continue physical therapy and he prescribed a Medrol DosePak and asked him to return in six weeks.

73.     On July 28, 2021, Fred Gorstein began a course of physical therapy with Zarett Rehab and Fitness for his shoulder pain and limitations, including paresthesia in the distal upper extremity, weakness, and poor fine motor control in his hand. He was also experiencing moderate to significant pain and limitations in elevation and rotation of his shoulder that was interfering with his daily activities. He required skilled physical therapy consisting of therapeutic exercises, neuromuscular rehabilitation, manual therapy and patient education. Fred Gorstein received physical therapy treatment from July 28, 2021, through August 11, 2021, attending 5 therapy sessions. He stopped physical therapy treatments because after he left each session, his pain was "tremendous."

74.     On August 27, 2021, Dr. D'Orsi performed a follow up examination noting that Fred Gorstein had been examined by Dr. Osterman who recommended surgery for his ulnar and median nerve symptoms. She also noted that the EMG study revealed C6-C7 right radiculopathy. Fred Gorstein stated that the thumb injection by Dr. Osterman did not help his symptoms at all. He still had pain and paresthesias in the 2nd, 3rd, 4th, and 5th digits which constantly awakened him at night. Fred Gorstein explained that he cancelled the rest of his physical therapy appointments with Zarett Rehabilitation and wanted to return to Excel Physical Therapy for treatment. It was also noted that Fred Gorstein saw Dr. Rubenstein for his shoulder which was feeling better. He was performing shoulder exercises at home and working out on his own three times a week. Dr. Singer prescribed hand therapy which consisted of massage and trying to get increased activity in his hand. At that time, he could make a full fist with his left hand and the CMC pain had resolved. On the right he still could not make a full fist and his hand was painful. He was still taking Gabapentin. Dr. D'Orsi's physical examination revealed that the left cervical rotation was more than the right with limited range of motion throughout, no shooting pain into his arm and no pain with bilateral lateral bending. Shoulder pain was noted abduction at 90 degrees, positive impingement and Hawkins, tenderness over the right biceps tendon, lateral and posterior joint lines. With regard to his hands

Copying Prohibited

and wrist there was increased edema bilaterally, but overall improvement.  Fred Gorstein's bilateral thumbs were still painful over the right CMC with pain on palpation and movement, pain in left wrist and right thumb with range of motion and pain over the right Tinel.  He also exhibited decreased grasp bilaterally, but the right is worse than the left.  Injection of the right thumb did not provide relief.  Fred Gorstein was instructed to follow up with Dr. Rubenstein and Dr. Osterman.



74.    On August 31, 2021, Dr. Rubenstein performed a follow up examination wherein he noted that Fred Gorstein had undergone aggressive physical therapy which irritated his neck, and he was still experiencing symptoms in his right upper extremity and right shoulder girdle.  He was also experiencing significant nighttime pain with numbness and tingling in his hand and achiness in his cervical area.  Fred Gorstein indicated that the steroid injection relieved his hand pain, but pain had returned in his right shoulder girdle.  Dr. Rubenstein administered a right shoulder injection of 80 mg. of Depo-Medrol and 8 cc of 1% Lidocaine in the subacromial space.  The doctor instructed that he should apply ice to the shoulder for three days.

75.    During Dr. Rubenstein's examination of October 20, 2021, he noted that Fred Gorstein had been performing exercises at home and working on his deltoid, but still could not externally rotate his shoulder.  He was also experiencing pain, difficulty with repetitive activity, night pain and numbness and tingling with impingement findings.  Dr. Rubenstein could not recommend shoulder surgery for Fred Gorstein because of the risks involved and his advanced age.

76.    Faced with the possibility of surgery, on November 1, 2021, Fred Gorstein consulted for a second opinion with Orthopaedic Surgeon, Dr. Todd Albert, in connection with his cervical symptoms.  Dr. Albert noted that Fred Gorstein was complaining of bilateral, right greater than left, numbness throughout the pads of all fingers and pain in the radial three digits bilaterally.  He also

complained of occasional pain and tingling in his small fingers. Fred Gorstein explained that his symptoms started after the auto accident of April 2021, in which he also suffered a right rotator cuff tear. Since the accident Fred Gorstein had been experiencing pain in his cervical spine radiating to his shoulders, deltoid area, and down into his digits, sometimes encompassing all five digits. Fred Gorstein indicated the right was worse than the left.

77.    Dr. Albert's physical examination revealed numbness predominantly in the medial nerve distribution, occasionally at night in both median and ulnar distribution. Driving aggravated his symptoms. Dr. Albert reviewed the EMG study which indicated signs of C6-C7 radiculopathy, bilateral carpal tunnel syndrome, chronic ulnar neuropathy. He also noted positive Tinel's, Durkan's, and Phalen's testing.



78. Dr. Albert also reviewed the cervical MRI noting severe central, paracentral stenosis of C3-C4 with effacement of CSF, some mild cord flattening, no cord signal change, and severe bilateral paracentral and foraminal stenosis at C6-C7. At the time of the examination, Dr. Albert's impression was cervical radiculopathy in the setting of cervical spondylosis, as well as superimposed medial and ulnar neuropathy bilaterally.



79.     After his physical examination and review of imaging studies, Dr. Albert concluded that Fred Gorstein had symptomatic levels at C3-C4 and C6-C7 accounting for the shoulder, arm, digit pain and numbness based on the symptoms and imaging.  Dr. Albert also noted a mixture of symptoms related to his median and ulnar nerve compression which was shown on the EMG study. He recommended addressing the hand symptoms first to see if his symptoms and pain improved.  Dr. Albert instructed Fred Gorstein to follow up with Dr. Osterman for his hands and they would continue to monitor the severe stenosis for developing signs of myelopathy.

**SURGERY:**

80.     On December 3, 2021, Dr. Osterman performed surgery consisting of a median nerve decompression and flexor tenosynovectomy on the right, as follows:

> *"…Procedures:*
> 1. *Complete median neurolysis, forearm to fingers, right.*
> 2. *Flexor tenosynovectomy, bursectomy, complete, right wrist.*
> 3. *Median block by surgeon…*
>
> *…Procedure in Detail: This patient had severe median neuropathy proven clinically and electrically with some non-recordable numbers.  He also had flexor tenosynovitis.  Our plan was to surgically decompress the area.  The nature of the surgery, expected outcomes, risks, complications and alternatives were discussed.  A well-padded tourniquet wsa applied to the right upper arm, the arm and hand were prepped and draped in standard fashion.  Loupe mafnification was used for all dissection.  A median block was given by the surgeon.  Sedation by anesthesia.  The prepped limb was exanguinated and the tourniquet inflated to 250 mmHg pressure.  An incisiion parelleling thenar crease was made and carried to the distal wrist crease.  Skin flaps were carefully elevated. All bleeding controlled with clamp and microcautery.  An ulnar branch to palmar cutaneous nerve was identified and protected throughout.  Palmar fascia incised.*
>
> *We identified the median nerve distally and released the transverse carpal ligament in a distal to proximal fashion.  There was marked adherence of the nerve with pseudoneuroma formation and marked narrowing.  This extended up to the palmar incision.  Because of that, we extended the incision across the wrist going up the distal third of the forearm.  Skin flaps were elevated, all bleeding controlled with clamp and microcautery.  The forearm fascia was released. The underlying muscles were viable.  We identified the median nerve where it exited beneath the sublimis muscles and identified and freed up the main branch of the palmar cutaneous nerve.  We*

Copying Prohibited

*now finished the release of the transverse carpal ligament and antebrachial fascia.  The nerve itself as mentioned showed a large carpal ligament.  At this point, the tourniquet was let down, vascularly fully intact through radial and ulnar arteries.  Wounds copiously irrigated and closed in lawyers with a vertical mattress closure.  Sterile dressings applied and because of the extent of the tenosynovectomy, a splint supporting fingers, hand, wrist and forearm was done.  The patient tolerated the procedure well."*



**Endoscopic carpal tunnel release**

81.      On December 8, 2021, Fred Gorstein began receiving hand therapy at the Philadelphia Hand to Shoulder Center.  The initial post-surgical examination revealed swelling with numbness in the median nerve distribution.  The therapist adjusted the orthosis and instructed Fred Gorstein in therapeutic exercise and issued a tubigrip.  He was also instructed in a home exercise program including tendon gliding and edema control.  Fred Gorstein attended hand therapy sessions from December 8, 2021, through February 4, 2022, attending nine (9) therapy sessions.

82.      On January 5, 2022, Dr. Osterman performed a post-surgical examination noting that Fred Gorstein had noticed a decrease in numbness in the median distribution.  The doctor also noted his right thumb CMC arthritis was about the same.  His grip strength had improved.  It was also noted that Fred Gorstein was able to sleep through the night on the right side, though he still had symptoms on the left as well as ongoing shoulder problems.  Dr. Osterman's plan was to use a splint relative to his thumb and start a gentle therapy program.

83.      Although this did not cause a substantial amount of income loss, it did significantly interfere with his ability to feel productive which is very important to a 90-year-old elderly person.

84.      On or about March 29, 2022, Plaintiff's attorney forwarded to the Westfield Defendants a comprehensive demand letter detailing all of the facts and circumstances involving Plaintiffs' claims.  In addition, the Plaintiffs' attorney indexed and organized all of the medical records, reports, bills, including a spreadsheet of medical payments. See Index attached hereto, made a part hereof and marked Exhibit "B".  Also, Plaintiffs' attorney further advised the Westfield Defendants that GEICO Insurance Company, on

behalf of Defendant, Anthony Glenn, had offered to tender its policy limits of only $15,000.00.

**LOSS OF CONSORTIUM:**

85.    <u>Plaintiff, Aviva Gorstein, has been married to Fred Gorstein for over 67 years</u>.  Plaintiff, Aviva Gorstein, is entitled to be compensated for the past, present and future loss of Fred Gorstein's services to her and the past, present and future loss of companionship of her loving spouse.

> *"Point for Charge 7.140  Loss of Consortium*
> *The plaintiff's spouse is entitled to be compensated for the past, present and future loss o the injured party's services to [him][her] and the past, present and future loss of companionship of [his][her] spouse.  Consortium claims are losses arising out of the marital relationship.  Consortium is the marital fellowship of a husband and a wife which includes the company, society, cooperation, affection, and aid of the other in the marital relationship.  Such claim include a loss of support, comfort, and assistance, the loss of association and companionship, and the loss of ability to engage in sexual relations."*

86.    Loss of consortium is recoverable in an underinsured motorist claim.  Loss of consortium claims are losses arising out of the marital relationship.  Consortium is the marital fellowship of a husband and a wife and includes the company, society, cooperation, affection, and aid of the other in the marital relationship.  The elements of damage in a loss of consortium claim are:  loss of services, loss of society, companionship and affection.  Consortium between husband and wife has been defined as:  aid, assistance, comfort, society, conjugal affection, conjugal fellowship, cooperation, affection, aid, services, maintenance, support of the household, companionship, love, acts, deeds that one provides for the other to secure the success and happiness of a normal married relationship.

87.    The following are comments from Fred Gorstein's wife, Aviva Gorstein, as to how this accident has affected their lives:

> *He does not have full use of his hands.  He cannot make a fist and it has become painful and tedious to work with his hands while he tries to pursue his passionate love of pen repair and restoration.  He is often in pain in his neck, his shoulders, his hands and his back.  He can no longer sleep in our bed because it is painful to lie flat on the bed.  Instead, he sleeps in an adjustable lounge chair where he can alter the position of his legs and back areas.  He tires easily and sits and falls asleep three to four times a day in the lounge chair.  After helping with cooking (which he loves) he often has to go and sit back in his lounge chair for a while before we eat, and if he helps with the dishes after meals, he has to stop after a little while and sit back in the chair.*

**UNREASONABLE OFFER:**

88.    No representative, agent or employee of the Westfield Defendants have ever met with, or even requested an interview with Plaintiff, Fred Gorstein or his wife, Aviva Gorstein.

89.    On or about May 5, 2022, a claim representative from the Westfield Defendants called Plaintiffs' attorney for the first time, and offered only $50,000.00 to settle the Plaintiffs' claims, despite the comprehensive medical and factual information previously provided to the Westfield Defendants as set forth above, including surgery.

90.    The Westfield Defendants never took a statement under oath from Plaintiffs.

91.    The Westfield Defendants never even had a medical examination performed on Plaintiff, Fred Gorstein.

92.    It is believed, and therefore averred, that the Westfield Defendants did not conduct a proper investigation regarding the above claim, nor did they explain or discuss the method for deciding they were only going to pay $50,000.00 to satisfy their contractual obligations with Plaintiffs. The only reason given was that allegedly "Fred Gorstein had pre-existing conditions." Despite the fact the under Pennsylvania law, even if there were pre-existing conditions, a plaintiff is entitled to recover for any aggravation of said conditions.[4] In this case, Fred Gorstein had surgery!

93.    The Westfield Defendants, through their representatives, agents and/or employees, did not have a reasonable basis for offering only $50,000.00 in benefits under their policy and, thereby concluding that Plaintiffs' losses and damages, including loss of consortium, would amount to a total of only $65,000.00, and have acted wantonly and recklessly with a lack of any reasonable basis for offering only $50,000.00 over and above the $15,000.00 from GEICO, and have further breached their duty to their insureds to act in good faith by the following actions:

a.    Refusing to pay underinsured motorist benefits claim without conducting a reasonable investigation and evaluation based upon all available information;

b.    Not attempting in good faith to effectuate prompt, fair and equitable coverage

---

[4] Point for Charge 7.70  Preexisting Condition or Injury
Damages should be awarded for all injuries caused by the [accident] [occurrence] even if:
    1.   the injuries caused by the [accident] [occurrence] were more severe than could have been foreseen because of the plaintiff's prior physical condition; or
    2.   a preexisting medical condition was aggravated by the [accident] [occurrence].

of claims;

c.  Failing to evaluate and determine Plaintiffs' entitlement to benefits based upon the terms of the policy that was entered into, compelling Plaintiffs to institute litigation to recover amounts due under said policy with Defendants;

d.  Failing to objectively and fairly evaluate Plaintiffs' claims including failure to make a reasonable offer;

e.  Failing to properly investigate;

f.  Engaging in dilatory claims handling;

g.  Failing to consider medical documentation;

h.  Failing to adopt or implement reasonable standards in evaluating Plaintiffs' claims; (See <u>Kelly v. Progressive Advanced Ins. Co</u>., 2016 WL 427355 (E.D. Pa. 2/4/2016)

i.  Not attempting in good faith to effectuate a prompt, fair and reasonable settlement of Plaintiffs' claims in which the Defendant's liability under the policy is clear;

j.  Subordinating the interests of its insured to its own financial monetary interest;

k.  Failing to promptly offer reasonable payment to Plaintiffs;

l.  Failing to reasonably and adequately investigate Plaintiffs' claims;

m.  Violating its fiduciary duty owed to Plaintiffs;

n.  Acting unreasonably and unfairly by withholding underinsured motorist benefits justly due and owing to Plaintiffs; and

o.  Failing to make an honest, intelligent and objective settlement offer based on Plaintiff's medical treatment, including surgery and permanency.

94.    The Westfield Defendants have undertaken a course of action which is wanton and reckless, having been designed to unilaterally, and without justification, permit the Westfield Defendants to refuse to honor their contractual obligations of fairly evaluating and paying underinsured motorist claims under the subject policy, in contradiction to the terms of the insurance policy, the Pennsylvania Motor Vehicle Financial Responsibility Law, and the case law of the Commonwealth of Pennsylvania.

---

If you find that the plaintiff did have a preexisting condition that was aggravated by the defendant's negligence, the defendant is responsible for any aggravation caused by the [accident] [occurrence].

Copying Prohibited

95.     As insurer, the Westfield Defendants have a fiduciary, contractual and statutory obligation to act in good faith to their insureds, such as Plaintiffs.

96.     At all times relevant and material hereto, Plaintiffs fully complied with the terms and conditions of the subject policy and all conditions precedent and subsequent to their right to recover under the policy.

97.     The actions of the Westfield Defendants, as described above, constitute willful and/or wanton and/or reckless and/or outrageous conduct towards Plaintiffs, Fred Gorstein and Aviva Gorstein, and to their welfare, interest and rights.

98.     The actions of the Westfield Defendants, as described above, constitute a breach of a known duty and conduct, importing a dishonest purpose through some nature of self-interest or ill-will.

99.     §§8371 provides as follows:

> **§ 8371.   Actions on insurance policies.**
> **In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:**
> **(1)   Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.**
> **(2)   Award punitive damages against the insurer.**
> **(3)   Assess court costs and attorney fees against the insurer.**

100.    For the reasons set forth above, including but not limited to the fact that the Westfield Defendants have violated 42 Pa. C.S.A. §8371, the Westfield Defendants are liable for interest on the claim from the date the claim was made in an amount equal to the prime rate of interest plus 3%, court costs, attorneys' fees and punitive damages.

        **WHEREFORE**, Plaintiffs, Fred Gorstein and Aviva Gorstein, demand judgment in their favor and against the Westfield Defendants in an amount in excess of Fifty Thousand ($50,000.00), which amount includes the above-mentioned interest, costs, attorneys' fees and punitive damages.

Copying prohibited

## COUNT V – LOSS OF CONSORTIUM

### Plaintiffs, Aviva Gorstein, h/w vs. Defendants, Anthony Glenn And the Westfield Defendants

101.    Plaintiff hereby incorporate by reference the preceding paragraphs as though fully set forth at length herein.

102.    Plaintiff, Aviva Gorstein, avers that she is the wife of Plaintiff, Fred Gorstein

103.    As a result of the Westfield Defendants' negligent and/or careless acts and/or omissions resulting in injuries to her husband, including breach of contract as set forth above, the Plaintiff, Aviva Gorstein, has been deprived of the assistance, society and consortium of the Plaintiff, Fred Gorstein, her husband, all of which has been to her great detriment and loss.

104.    As a result of the accident aforementioned, Plaintiff, Aviva Gorstein, has been obligated to expend various sums of money and to incur various expenses.  Plaintiff will be obligated to continue to expend such sums and/or incur such expenditures for reasonable and necessary medical care for an indefinite time in the future.

105.    Loss of consortium is recoverable in an underinsured motorist claim.  Loss of consortium claims are losses arising out of the marital relationship.  Consortium is the marital fellowship of a husband and a wife and includes the company, society, cooperation, affection, and aid of the other in the marital relationship.  The elements of damage in a loss of consortium claim are:  loss of services, loss of society, companionship and affection.  Consortium between husband and wife has been defined as:  aid, assistance, comfort, society, conjugal affection, conjugal fellowship, cooperation, affection, aid, services, maintenance, support of the household, companionship, love, acts, deeds that one provides for the other to secure the success and happiness of a normal married relationship.

> *"Point for Charge 7.140  Loss of Consortium*
> *The plaintiff's spouse is entitled to be compensated for the past, present and future loss o the injured party's services to [him][her] and the past, present and future loss of companionship of [his][her] spouse.  Consortium claims are losses arising out of the marital relationship.  Consortium is the marital fellowship of a husband and a wife which includes the company, society, cooperation, affection, and aid of the other in the marital relationship.  Such claim include a loss of support, comfort, and assistance, the loss of association and companionship, and the loss of ability to engage in sexual relations."*

106.    This cause of action for Loss of Consortium applies to Defendant, Anthony Glenn, and is also recoverable contractually from the Westfield Defendants.

WHEREFORE, Plaintiff, Aviva Gorstein, demands judgment in her favor and against all of the Defendants in an amount in excess of Fifty Thousand ($50,000.00) Dollars, together with interest, costs, delay damages and any other relief the Court believes is appropriate.

**ECKELL, SPARKS, LEVY, AUERBACH, MONTE, SLOANE, MATTHEWS & AUSLANDER, P.C.**

BY: _____

**Leonard A. Sloane, Esquire**
**Attorney for Plaintiffs**

Copying Prohibited

## VERIFICATION

I, Fred Gorstein, verify that I am the named Plaintiff in the within action and that the averments in the attached document are true and accurate to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities.

_FRED GORSTEIN_

Date: _May 23, 2022_

Copying Prohibited

Copying Prohibited

# EXHIBIT "A"

**W E S P A K   P O L I C Y**
*DECLARATIONS PAGE*

⬡ **WESTFIELD**

1 Park Circle, P.O. Box 5001
Westfield Center, OH 44251-5001
www.westfieldinsurance.com

**RENEWAL OF POLICY WNP 3780329**
RENEWAL DECLARATION   EFFECTIVE 04/02/21
SUPERSEDES ANY PREVIOUS DECLARATION BEARING
THE SAME POLICY NUMBER FOR THIS POLICY PERIOD

| POLICY NUMBER | POLICY PERIOD FROM | TO | COMPANY PROVIDING COVERAGE | AGENCY | P |
|---|---|---|---|---|---|
| WNP 3780329 | 04/02/21 | 04/02/22 | AMERICAN SELECT INSURANCE COMPANY | 3704411 | JDW |

| NAMED INSURED AND ADDRESS | AGENCY |
|---|---|
| FRED & AVIVA GORSTEIN<br>3307 PARKVIEW DR<br>HAVERFORD PA 19041-2010 | THE WRIGHT AGENCY<br>TELEPHONE 610-269-6115<br>1142 HORSESHOE PIKE<br>DOWNINGTOWN PA 19335-1366 |

THIS POLICY PROVIDES FULL TORT COVERAGE FOR LIABILITY
------------------------------------------------------------
------------------------------------------------------------
PERSONAL AUTO

SECTION VI - DAMAGE TO YOUR AUTO PROVIDES COLLISION DAMAGE  TO RENTAL VEHICLES
UNDER THE DEFINITION OF A "NON-OWNED AUTO". COVERAGE IS LIMITED BY THE
PROVISIONS AND EXCLUSIONS THAT APPLY TO SECTION VI. NO COVERAGE IS PROVIDED:
(1)IF WE DO NOT PROVIDE COLLISION COVERAGE FOR ANY "YOUR COVERED AUTO" SHOWN IN
THE DECLARATIONS; (2)FOR LOSS OF USE OF THE RENTED VEHICLE; OR (3)FOR VEHICLES
RENTED ON A REGULAR BASIS OR FOR MORE THAN 30 DAYS. DEPENDING ON THE TERMS OF
THE RENTAL CONTRACT, ADDITIONAL LIMITATIONS ON COVERAGE MAY APPLY.
------------------------------------------------------------
CREDITS/DISCOUNTS

GOLD LOYALTY DISCOUNT:
 8% DISCOUNT APPLIES ON UNIT 01

30% PASSIVE RESTRAINT DISC APPLIES TO UNIT 01

15% ANTI-THEFT DEVICE DISC APPLIES TO UNIT 01

 5% ANTI-LOCK BRAKING SYSTEM DISCOUNT APPLIES TO UNIT 01
------------------------------------------------------------

UNIT:001 LOCATION FACTOR BASED ON CENSUS TRACT 408400

VEHICLES COVERED

| UNIT | ST | TER | YR | MAKE-DESCRIPTION | VEHICLE ID NUMBER | COST | NEW | CLASS |
|---|---|---|---|---|---|---|---|---|
| | | | | | | CMP SYM | COL SYM | |
| 001 | PA | 041 | 15 | BMW 335I XDRIVE | WBA3B9G59FNR93794 | 54 | 55 | 8KW100 |

DRIVERS

| DRIVER 01 | | BIRTHDATE | DRIVER 02 | | BIRTHDATE |
|---|---|---|---|---|---|
| FRED GORSTEIN | | 07/16/30 | AVIVA GORSTEIN | | 11/19/32 |

PERSONAL AUTO INSURANCE IS PROVIDED ONLY WHERE A PREMIUM OR "INCL" IS SHOWN
FOR THE COVERAGE

| COVERAGE | LIMITS OF LIABILITY | | PREMIUMS |
|---|---|---|---|
| | | UNIT | 1 |
| SECTION-IV | | | |
| G. LIABILITY | | | |
| BODILY INJURY- | $250,000 EA PERSON   $500,000 EA ACC | | 360 |
| PROPERTY DAMAGE- | $250,000 EACH ACCIDENT | | 305 |
| SECTION-V | | | |
| UNINSURED MOTORISTS- STACKED | | | |
| BODILY INJURY- | $250,000 EA PERSON   $500,000 EA ACC | | 43 |
| UNDERINSURED MOTORISTS- STACKED | | | |
| BODILY INJURY- | $250,000 EA PERSON   $500,000 EA ACC | | 197 |

CONTINUED ON NEXT PAGE

Copying Prohibited

# W E S P A K   P O L I C Y
## DECLARATIONS PAGE

**WESTFIELD**

1 Park Circle, P.O. Box 5001
Westfield Center, OH 44251-5001
www.westfieldinsurance.com

RENEWAL OF POLICY WNP 3780329
RENEWAL DECLARATION    EFFECTIVE 04/02/21
SUPERSEDES ANY PREVIOUS DECLARATION BEARING
THE SAME POLICY NUMBER FOR THIS POLICY PERIOD

*0000C0WNP3780329374411932*

| POLICY NUMBER | POLICY PERIOD FROM | TO | COMPANY PROVIDING COVERAGE | AGENCY | P |
|---|---|---|---|---|---|
| WNP 3780329 | 04/02/21 | 04/02/22 | AMERICAN SELECT INSURANCE COMPANY | 3704411 | JDW |

| NAMED INSURED AND ADDRESS | AGENCY |
|---|---|
| FRED & AVIVA GORSTEIN<br>3307 PARKVIEW DR<br>HAVERFORD PA 19041-2010 | THE WRIGHT AGENCY<br>TELEPHONE 610-269-6115<br>1142 HORSESHOE PIKE<br>DOWNINGTOWN PA 19335-1366 |

PERSONAL AUTO INSURANCE IS PROVIDED ONLY WHERE A PREMIUM OR "INCL" IS SHOWN
FOR THE COVERAGE

| COVERAGE | LIMITS OF LIABILITY | UNIT 1 | PREMIUMS |
|---|---|---|---|

FIRST PARTY BENEFITS:                                                     149
   ADDED MEDICAL EXPENSE BENEFIT-   $100,000

EXTRAORDINARY MEDICAL EXPENSE BENEFITS- $1,000,000                         26

SECTION-VI
  K. DAMAGE TO YOUR AUTO
    OTHER THAN COLLISION- ACV LESS    $500 DED              164
    COLLISION- ACV LESS $1,000 DEDUCTIBLE                    892

TRANSPORTATION EXPENSES-   $50 PER DAY/$1,500 MAXIMUM                        7

$100 ROADSIDE ASSISTANCE                                                    9

WESPAK AUTO PACKAGE COVERAGES:                                           INCL
  $5,000/$2,000 DEATH BENEFIT
  $500 PERSONAL CONTENTS COVERAGE
  $150 PER DAY/$600 MAX. TRIP INTERRUPTION COVERAGE
  LOAN/LEASE COVERAGE
  $1,000 LIMITED CUSTOMIZING EQUIPMENT COVERAGE
  $2,500 AIRBAG REPLACEMENT COVERAGE
  $150 LOCKSMITH SERVICE
  1-YEAR REPLACEMENT COST ON NEW AUTOS

                      TOTAL PREMIUM BY UNIT 2152

ACCIDENT FORGIVENESS ELIGIBLE: ENDORSEMENT ACTIVITY AFTER THE DATE INDICATED ON
THE UPPER RIGHT CORNER OF THIS PAGE MAY AFFECT ELIGIBILITY.

            SECTION IV, V, VI TOTAL PREMIUM  $2,152.00
--------------------------------------------------------------------------------

Copyright Prohibited

CONTINUED ON NEXT PAGE



**WESTFIELD®**

# Wespak Coverage Summary

## Home - Included Coverage

| | |
|---|---|
| Coverage B - Other Structures | 10% of Coverage A |
| Coverage C - Personal Property | 75% of Coverage A |
| Coverage D - Loss Of Use | 50% of Coverage A |
| Coverage E - Personal Liability | $300,000 |
| Coverage F - Medical Payments | $1,000 |

### Section II - Property - Included Coverage

Specified Additional Amount of Coverage for Coverage A
Replacement Cost Personal Property
$1,000 Money
$5,000 Securities
$2,500 Watercraft and Trailer
$2,000 Trailers (not watercraft)
$10,000 Theft of Jewelry, Watches, Furs
$10,000 Theft of Firearms
$10,000 Theft of Silver
$10,000 Business Property on Premises
$1,500 Business Property Off Premises
$1,500 Portable Electronic Equipment in a Motor Vehicle
$1,500 Electronic Equipment used for Business not
  in Motor Vehicle
$500 Limited Coverage on Pets
$1,000 Debris Removal - Includes Wind
$1,000 Fire Department Service Charge
$10,000 Credit Card, Electronic Fund Transfer

### Optional Coverage

$100,000 Equipment Breakdown Coverage
  ($500 Deductible Applies)
$10,000 Service Line Coverage
  ($500 Deductible Applies)
Special Form - Personal Property
$20,000 Identity Theft (no Deducible Applies)
$25,000 Cyber Protection ($500 Deductible Applies)

### Section II - Property - Included Coverage

$10,000 Loss Assessment (Section II)
$2,500 Landlord's Furnishings
$5,000 Grave Markers
$1,000 Arson Reward
$10,000 First Party Mold Coverage
$10,000 Damage to Freezer Contents
$10,000 Rented Golf Carts
$1,000 Lock Replacement
$1,000 Water Damage
$10,000 Land
$10,000 Computer
$1,000 Theft Reward
$5,000 Property in Transit

### Section III - Liability

Personal Injury Liability Coverage
  (same as Covereage E Limit)
$2,000 Damage to Property of Others
$10,000 Loss Assessment
$50,000 Third Party Mold Coverage

## Auto

### Section IV - Liability - Included Coverage

$5,000 Death Benefits - Named Insured
$2,000 Death Benefits - Family Members

### Section VI - Physical Damage - Included Coverage

$500 Personal Contents Coverage
$40 per day/$1,200 per occurrence Transportation
  Expense
$150 Trip Interruption Coverage per day/$600
  per occurrence
Loan/Lease Coverage
$1,000 Customizing Equipment (pickups & vans)
$150 Locksmith Service
$2,500 Airbag Replacement Coverage

### Section VI - Physical Damage - Included Coverage

$1,000 Electronic Equipment (not
  installed where intended)
1-Year Replacement Cost on new autos
$2,000 Non-Owned Trailers
Waiver of Collision Deductible in Certain
  Circumstances
Roadside Assistance

*This is a summary of the coverage included in your policy. It is not part of your policy. For more specific information, refer to the policy form or contact your independent agent.*

AD 90 83 (07-20)

One Park Circle • PO Box 5001 • Westfield Center OH 44251-5001 • 1.800.243.0210 • fax 330.887.0840 • www.westfieldinsurance.com

Copying Prohibited



WNP 3780329   07

## NOTICE TO INSURED
### (INVOICE OF MINIMUM REQUIRED COVERAGES)

The laws of the Commonwealth of Pennsylvania, as enacted by the General Assembly, only require that you purchase Liability and First Party Medical Benefits Coverages.

Any additional coverages or coverages in excess of the limits required by law are provided only at your request, as enhancements to basic coverages.

| MINIMUM REQUIRED COVERAGES AND LIMITS: | | FULL TORT OPTION | LIMITED TORT OPTION |
|---|---|---|---|
| Bodily Injury Liability: | $15,000 each person/$30,000 each accident | $ 147 | $ 87 |
| Property Damage Liability: | $ 5,000 each accident | $ 209 | $ 209 |
| First Party Benefits: | $ 5,000 each person – medical benefits only | $ 109 | $ 65 |
| **YOUR TOTAL ANNUAL COST FOR MINIMUM REQUIRED COVERAGES:** | | **$ 465** | **$ 361** |

### "LIMITED TORT" OPTION

This form of insurance limits your right and the rights of members of your household to seek financial compensation for injuries caused by other drivers. Under this form of insurance, you and other household members covered under this policy may seek recovery for all medical and other out-of-pocket expenses, but not for pain and suffering or other nonmonetary damages unless the injuries suffered fall within the definition of "serious injury," as set forth in the policy, or unless one of several other exceptions noted in the policy applies.

The annual premium for basic coverage as required by law under this Limited Tort Option is shown above.

### "FULL TORT" OPTION

This form of insurance allows you to maintain an unrestricted right for yourself and other members of your household to seek financial compensation for injuries caused by other drivers. Under this form of insurance, you and other household members covered under this policy may seek recovery for all medical and other out-of-pocket expenses and may also seek financial compensation for pain and suffering or other nonmonetary damages as a result of injuries caused by other drivers.

The annual premium for basic coverage as required by law under this Full Tort Option is shown above.

**AD 1076 (03-14) PA**

One Park Circle • PO Box 5001 • Westfield Center OH  44251-5001 • 1.800.243.0210 • fax 330.887.0840 • www.westfieldinsurance.com

Copying Prohibited

# WESTFIELD®

**W E S P A K   P O L I C Y**
*DECLARATIONS PAGE*

1 Park Circle, P.O. Box 5001
Westfield Center, OH 44251-5001
www.westfieldinsurance.com

AMENDED DECLARATION
SUPERSEDES ANY PREVIOUS DECLARATION BEARING
THE SAME POLICY NUMBER FOR THIS POLICY PERIOD
REASON FOR AMENDMENT - MULTIPLE CHANGES

RENEWAL OF POLICY WNP 3780329
EFFECTIVE 06/15/21

*June 20, 2021* (handwritten)

| POLICY NUMBER | POLICY PERIOD FROM | TO | COMPANY PROVIDING COVERAGE | AGENCY | P |
|---|---|---|---|---|---|
| WNP 3780329 | 04/02/21 | 04/02/22 | AMERICAN SELECT INSURANCE COMPANY | 3704411 | JDW |

| NAMED INSURED AND ADDRESS | AGENCY |
|---|---|
| FRED & AVIVA GORSTEIN<br>3307 PARKVIEW DR<br>HAVERFORD PA 19041-2010 | THE WRIGHT AGENCY<br>TELEPHONE 610-269-6115<br>1142 HORSESHOE PIKE<br>DOWNINGTOWN PA 19335-1366 |

THIS IS NOT A BILL
DO NOT PAY AMOUNT SHOWN
YOUR QUARTERLY WIC BILL(S) WILL BE ADJUSTED
THE ADDITIONAL PREMIUM FOR THE REMAINDER OF THE POLICY TERM IS    $1,105.00

WIC ACCOUNT NO. 3770182664

-------------------------------------------------------------------------------
THE POLICY PERIOD BEGINS AND ENDS AT 12:01 AM STANDARD TIME AT THE PREMISES OF
THE INSURED LOCATED AT THE ADDRESS STATED HEREIN.
-------------------------------------------------------------------------------
HOMEOWNERS RATING INFORMATION - FRAME, TERRITORY 23, DELAWARE COUNTY,
  LOCATION FACTOR BASED ON CENSUS TRACT 408400, 1-4 FAMILIES,
  PROTECTION STATUS IS PROTECTED, DISTANCE TO FIRE STATION IS 5 MILES OR LESS,
  SUPPORTING AUTO DISCOUNT APPLIES, LOYALTY DISCOUNT,
  ALARM/PROTECTIVE DEVICES CREDIT,
  SCHEDULED INLAND MARINE PROTECTIVE DEVICE DISCOUNT.

CONDOMINIUM UNIT-OWNERS COVERAGES
  DEDUCTIBLE--IN CASE OF LOSS UNDER SECTION II, WE COVER ONLY THAT PART OF THE
      LOSS OVER  $1000

COVERAGE AT THE ABOVE DESCRIBED LOCATION IS PROVIDED ONLY WHERE A LIMIT OF
LIABILITY IS SHOWN OR A PREMIUM IS STATED.

| | LIMIT OF LIABILITY | PREMIUMS |
|---|---|---|
| **SECTION II** | | |
| A. DWELLING | $150,000 | 375 |
| B. OTHER STRUCTURES | NOT INCL | |
| C. PERSONAL PROPERTY | $250,000 | 388 |
| D. LOSS OF USE | $100,000 | |
| **SECTION III** | | |
| E. PERSONAL LIABILITY | $500,000 EACH OCCURRENCE | |
| F. MEDICAL PAY. TO OTHERS | $5,000 EACH PERSON | |
| | ADJUSTED BASIC PREMIUM | $763.00 |

| ADDITIONAL PREMIUMS OR CREDITS | |
|---|---|
| BACK-UP OF SEWER OR DRAIN SELECTED LIMIT | 48 |
| BACK-UP OF SEWER OR DRAIN LOSS ADJUSTMENT | 4 |
| IDENTITY THEFT COVERAGE - $20,000 LIMIT | 35 |
| AGREED VALUE JEWELRY - INLAND MARINE COVERAGE | 60 |
| BROAD PAIR & SET - INLAND MARINE COVERAGE | 127 |
| COLLECTIBLES - INLAND MARINE COVERAGE | 709 |
| FINE ARTS - INLAND MARINE COVERAGE | 63 |
| JEWELRY - INLAND MARINE COVERAGE | 807 |
| LOSS EXPERIENCE ADJUSTMENT | 67 |
| **TOTAL ANNUAL PREMIUM** | **$2,683.00** |

Copying Prohibited

CONTINUED ON NEXT PAGE

*0000C0WNP378032937441185 6*

Copying Prohibited

⬡ **WESTFIELD®**

**W E S P A K   P O L I C Y**
*DECLARATIONS PAGE*

1 Park Circle, P.O. Box 5001
Westfield Center, OH 44251-5001
www.westfieldinsurance.com

AMENDED DECLARATION    EFFECTIVE 06/15/21
SUPERSEDES ANY PREVIOUS DECLARATION BEARING
THE SAME POLICY NUMBER FOR THIS POLICY PERIOD
REASON FOR AMENDMENT - MULTIPLE CHANGES

RENEWAL OF POLICY WNP 3780329

| POLICY NUMBER | POLICY PERIOD FROM | TO | COMPANY PROVIDING COVERAGE | AGENCY | P |
|---|---|---|---|---|---|
| WNP 3780329 | 04/02/21 | 04/02/22 | AMERICAN SELECT INSURANCE COMPANY | 3704411 | JDW |

| NAMED INSURED AND ADDRESS | AGENCY |
|---|---|
| FRED & AVIVA GORSTEIN<br>3307 PARKVIEW DR<br>HAVERFORD PA 19041-2010 | THE WRIGHT AGENCY<br>TELEPHONE 610-269-6115<br>1142 HORSESHOE PIKE<br>DOWNINGTOWN PA 19335-1366 |

THIS POLICY PROVIDES FULL TORT COVERAGE FOR LIABILITY

--------------------------------------------------------------

PERSONAL AUTO

--------------------------------------------------------------

SECTION VI - DAMAGE TO YOUR AUTO PROVIDES COLLISION DAMAGE TO RENTAL VEHICLES
UNDER THE DEFINITION OF A "NON-OWNED AUTO". COVERAGE IS LIMITED BY THE
PROVISIONS AND EXCLUSIONS THAT APPLY TO SECTION VI. NO COVERAGE IS PROVIDED:
(1) IF WE DO NOT PROVIDE COLLISION COVERAGE FOR ANY "YOUR COVERED AUTO" SHOWN IN
THE DECLARATIONS; (2) FOR LOSS OF USE OF THE RENTED VEHICLE; OR (3) FOR VEHICLES
RENTED ON A REGULAR BASIS OR FOR MORE THAN 30 DAYS. DEPENDING ON THE TERMS OF
THE RENTAL CONTRACT, ADDITIONAL LIMITATIONS ON COVERAGE MAY APPLY.

--------------------------------------------------------------

CREDITS/DISCOUNTS

GOLD LOYALTY DISCOUNT:
 8% DISCOUNT APPLIES ON UNIT 03

30% PASSIVE RESTRAINT DISC APPLIES TO UNIT 03

15% ANTI-THEFT DEVICE DISC APPLIES TO UNIT 03

 5% ANTI-LOCK BRAKING SYSTEM DISCOUNT APPLIES TO UNIT 03

--------------------------------------------------------------

UNIT:003 LOCATION FACTOR BASED ON CENSUS TRACT 408400

VEHICLES COVERED

| UNIT | ST | TER | YR | MAKE-DESCRIPTION | VEHICLE ID NUMBER | COST | NEW CMP SYM | COL SYM | CLASS |
|---|---|---|---|---|---|---|---|---|---|
| 003 | PA | 041 | 21 | AUDI A4 2.0T PREM | WAUEAAF42MA075282 | 46 | 52 | | 8KW100 |

DRIVERS

| DRIVER 01 | BIRTHDATE | DRIVER 02 | BIRTHDATE |
|---|---|---|---|
| FRED GORSTEIN | 07/16/30 | AVIVA GORSTEIN | 11/19/32 |

PERSONAL AUTO INSURANCE IS PROVIDED ONLY WHERE A PREMIUM OR "INCL" IS SHOWN
FOR THE COVERAGE

| COVERAGE | LIMITS OF LIABILITY | UNIT | PREMIUMS 3 |
|---|---|---|---|
| SECTION-IV | | | |
| G. LIABILITY | | | |
| BODILY INJURY- | $250,000 EA PERSON    $500,000 EA ACC | | 428 |
| PROPERTY DAMAGE- | $250,000 EACH ACCIDENT | | 363 |
| SECTION-V | | | |
| UNINSURED MOTORISTS- STACKED | | | |
| BODILY INJURY- | $250,000 EA PERSON    $500,000 EA ACC | | 43 |
| UNDERINSURED MOTORISTS- STACKED | | | |
| BODILY INJURY- | $250,000 EA PERSON    $500,000 EA ACC | | 197 |

CONTINUED ON NEXT PAGE

# WESTFIELD

## W E S P A K  P O L I C Y
### DECLARATIONS PAGE

1 Park Circle, P.O. Box 5001
Westfield Center, OH 44251-5001
www.westfieldinsurance.com

AMENDED DECLARATION    EFFECTIVE 06/15/21    RENEWAL OF POLICY WNP 3780329
SUPERSEDES ANY PREVIOUS DECLARATION BEARING
THE SAME POLICY NUMBER FOR THIS POLICY PERIOD
REASON FOR AMENDMENT - MULTIPLE CHANGES

| POLICY NUMBER | POLICY PERIOD FROM | TO | COMPANY PROVIDING COVERAGE | AGENCY | P |
|---|---|---|---|---|---|
| WNP 3780329 | 04/02/21 | 04/02/22 | AMERICAN SELECT INSURANCE COMPANY | 3704411 | JDW |

| NAMED INSURED AND ADDRESS | AGENCY |
|---|---|
| FRED & AVIVA GORSTEIN<br>3307 PARKVIEW DR<br>HAVERFORD PA 19041-2010 | THE WRIGHT AGENCY<br>TELEPHONE 610-269-6115<br>1142 HORSESHOE PIKE<br>DOWNINGTOWN PA 19335-1366 |

PERSONAL AUTO INSURANCE IS PROVIDED ONLY WHERE A PREMIUM OR "INCL" IS SHOWN
FOR THE COVERAGE

| COVERAGE | LIMITS OF LIABILITY | UNIT 3 PREMIUMS |
|---|---|---|
| FIRST PARTY BENEFITS: | | |
| ADDED MEDICAL EXPENSE BENEFIT- | $100,000 | 173 |
| EXTRAORDINARY MEDICAL EXPENSE BENEFITS- | $1,000,000 | 26 |

SECTION-VI
K. DAMAGE TO YOUR AUTO
   OTHER THAN COLLISION- ACV LESS    $500 DED                    183
   COLLISION- ACV LESS $1,000 DEDUCTIBLE                         1106

TRANSPORTATION EXPENSES-    $50 PER DAY/$1,500 MAXIMUM          7

$100 ROADSIDE ASSISTANCE                                        9

WESPAK AUTO PACKAGE COVERAGES:                              INCL
  $5,000/$2,000 DEATH BENEFIT
  $500 PERSONAL CONTENTS COVERAGE
  $150 PER DAY/$600 MAX. TRIP INTERRUPTION COVERAGE
  LOAN/LEASE COVERAGE
  $1,000 LIMITED CUSTOMIZING EQUIPMENT COVERAGE
  $2,500 AIRBAG REPLACEMENT COVERAGE
  $150 LOCKSMITH SERVICE
  1-YEAR REPLACEMENT COST ON NEW AUTOS

TOTAL PREMIUM BY UNIT 2535

SECTION IV, V, VI TOTAL PREMIUM  $2,535.00

------------------------------------------------------------

Copy is Prohibited

CONTINUED ON NEXT PAGE

# WESTFIELD®

## WESPAK POLICY
### DECLARATIONS PAGE

1 Park Circle, P.O. Box 5001
Westfield Center, OH 44251-5001
www.westfieldinsurance.com

AMENDED DECLARATION        RENEWAL OF POLICY WNP 3780329
EFFECTIVE 06/15/21
SUPERSEDES ANY PREVIOUS DECLARATION BEARING
THE SAME POLICY NUMBER FOR THIS POLICY PERIOD
REASON FOR AMENDMENT - MULTIPLE CHANGES

| POLICY NUMBER | POLICY PERIOD FROM | TO | COMPANY PROVIDING COVERAGE | AGENCY | P |
|---|---|---|---|---|---|
| WNP 3780329 | 04/02/21 | 04/02/22 | AMERICAN SELECT INSURANCE COMPANY | 3704411 | JDW |

| NAMED INSURED AND ADDRESS | AGENCY |
|---|---|
| FRED & AVIVA GORSTEIN<br>3307 PARKVIEW DR<br>HAVERFORD PA 19041-2010 | THE WRIGHT AGENCY<br>TELEPHONE 610-269-6115<br>1142 HORSESHOE PIKE<br>DOWNINGTOWN PA 19335-1366 |

APPLICABLE FORMS
WN5037   07/20   IL0910   07/02   H00496   08/05   H00495   07/19   H00455   08/15
H00461   12/08   PMW7601  12/97   H02861   08/05   IJF1011  12/94

FORM #--DATE--UNITS            FORM #--DATE--UNITS
WN5037 07/20   003             IL0910 07/02   003
FORM #--DATE--UNITS            FORM #--DATE--UNITS
PA2340 07/17   003             PA0423 05/18   003
FORM #--DATE--UNITS            FORM #--DATE--UNITS
PA0419 05/18   003             PA0551 05/18   003
FORM #--DATE--UNITS            FORM #--DATE--UNITS
PA0553 12/08   003
----------------------------------------------------------------

ADDITIONAL INTERESTS

MORTGAGEE                          MORTGAGEE
 CENTRAL LOAN ADMINISTRATION &      BRYN MAWR TRUST
 ISAOA/ATIMA                        ISAOA
 PO BOX 202028                      PO BOX 3579
 FLORENCE SC 29502                  CARMEL IN 46082-3579
 LN#0147556419

LOSS PAYEE FOR UNIT #003
 VW CREDIT
 PO BOX 277
 MINNEAPOLIS MN 55440-0277
----------------------------------------------------------------

00110500P10000000000P00000000000P000

| | THE WRIGHT AGENCY | 06/20/21 |
|---|---|---|
| | AUTHORIZED REPRESENTATIVE | DATE |

IN WITNESS WHEREOF, THIS COMPANY HAS CAUSED THIS POLICY TO BE SIGNED BY ITS
PRESIDENT AND SECRETARY AND COUNTERSIGNED BY A DULY AUTHORIZED REPRESENTATIVE OF
THE COMPANY IF REQUIRED BY LAW.

*Frank A. Carrino* Secretary                *Edward J. Largento III* President

Copying Prohibited

Your WESPAK® Policy is a **legal contract** between you and this company. **READ YOUR POLICY CAREFULLY.** This Quick Reference provides only a brief outline of some of the important features of your policy. This is not the insurance contract and only the actual policy provisions will control. The policy itself sets forth, in detail, the rights and obligations of both you and your insurance company. **IT IS THEREFORE IMPORTANT THAT YOU READ YOUR POLICY CAREFULLY.**

## YOUR WESPAK POLICY
## QUICK REFERENCE

**DECLARATIONS PAGE**
Your Name
Location of Your Residence
Policy Period
Coverages
Amounts of Insurance
Deductible

|  |  | Beginning On Page |
|---|---|---|
| SECTION I GENERAL PROVISIONS FOR ALL SECTIONS | AGREEMENT | 2 |
| | DEFINITIONS | 2 |
| | EXCLUSIONS | 3 |
| | CONDITIONS | 3 |
| | DUTIES AFTER LOSS | 8 |
| SECTION II PROPERTY (OTHER THAN AUTO) | COVERAGES | 10 |
| | ADDITIONAL COVERAGES | 13 |
| | PERILS INSURED AGAINST | 19 |
| | EXCLUSIONS | 21 |
| | CONDITIONS | 23 |
| SECTION III PERSONAL LIABILITY (OTHER THAN AUTO) | COVERAGES | 26 |
| | ADDITIONAL COVERAGES | 28 |
| | EXCLUSIONS | 31 |
| | CONDITIONS | 35 |
| SECTION IV AUTO LIABILITY | COVERAGES | 36 |
| | ADDITIONAL COVERAGES | 37 |
| | EXCLUSIONS | 37 |
| | CONDITIONS | 39 |
| SECTION V UNINSURED AND UNDERINSURED MOTORISTS | | **See State Endorsement** |
| SECTION VI DAMAGE TO YOUR AUTO | COVERAGES | 40 |
| | ADDITIONAL COVERAGES | 42 |
| | EXCLUSIONS | 45 |
| | CONDITIONS | 46 |

Copying Prohibited

Includes Copyrighted Material of Insurance Services Office with its permission,
Copyright, Insurance Services Office, 2018

WN 50 37 (Ed. 07-20)
**Page 1 of 48**

# PENNSYLVANIA WESPAK COMBINED POLICY
# SECTION I GENERAL PROVISIONS
## (APPLICABLE TO ALL SECTIONS OF THIS POLICY)

## AGREEMENT

We will provide insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

## DEFINITIONS

**A.** In this policy, *"you"* and *"your"* refer to:

**1.** The *"named insured"* shown in the Declarations; and

**2.** The spouse if a resident of the same household.

If a spouse ceases to be a resident of the same household during the policy period or prior to the inception of this policy, the spouse will be considered *"you"* and *"your"* under this policy, but only until the earlier of:

**1.** The end of 90 days following the spouse's change of residency; or

**2.** The effective date of another policy listing the spouse as a **named insured**; or

**3.** The end of the policy period.

*"We"*, *"us"* and *"our"* refer to the Company providing this insurance.

**B.** Other words and phrases are defined. They are bold italics when used.

**C.** Definitions applicable to all sections of the policy:

**1.** *"Bodily injury"* means bodily harm, sickness or disease, including required care, loss of services and death that results.

**2.** *"Business"* means:

**a.** A trade, profession or occupation engaged in on a full-time or a part-time or occasional basis; or

**b.** Any other activity engaged in for money or other compensation, except the following:

**(1)** One or more activities, not described in **(2)** through **(4)** below, for which no **insured** receives no more than $2,000 in total compensation for the 12 months before the inception date of the policy;

**(2)** Volunteer activities for which no money is received other than

payment for expenses incurred to perform that activity;

**(3)** Providing home day care services for which no compensation is received other than mutual exchange of such services; or

**(4)** The rendering of home day care services to your relative.

**3.** *"Family member"* means a person related to you by blood, marriage or adoption who is a resident of your household. This includes a ward, foster child or any person under the age of 21 who is in your care or the care of any *family member*.

**4.** *"Occupying"* means:

**a.** In;

**b.** Upon; or

**c.** Getting in, on, out or off.

**5.** *"Property damage"* means physical injury to, or destruction of, or loss of use of tangible property.

**6.** *"Residence employee"* means:

**a.** An employee of an **insured** or an employee leased to an **insured** by a labor leasing firm, under an agreement between an **insured** and the labor leasing firm, whose duties are related to the maintenance or use of the **residence premises**, including household or domestic services; or

**b.** One who performs similar duties elsewhere not related to the **business** of an **insured**.

A **residence employee** does not include a temporary employee who is furnished to an **insured** to substitute for a permanent **residence employee** on leave or to meet seasonal or short-term workload conditions.

Copying Prohibited

*000C0WNP37803283744*1660*

7. **"Residence premises"** means:

   a. The one family dwelling;

   b. The two, three or four family dwelling where you reside in at least one of the family units;

   c. That part of any other building where you reside; or

   d. A condominium unit;

on or within 60 days of the effective date of the policy period shown in the Declarations and which is shown as the **residence premises** in the Declarations;

on or within 60 days of the inception date of coverage on your newly acquired dwelling which is shown as the **residence premises** in the Declarations; or

on or within 60 days of completion of a newly constructed dwelling which is shown as the **residence premises** in the Declarations.

Should you cease to reside at the dwelling or building, and your policy renews, the dwelling or building will not be considered your **residence premises** in the renewal policy period.

**Residence premises** also includes other structures and grounds at that location.

## EXCLUSIONS

We do not provide coverage for:

A. Loss, **bodily injury** or **property damage** caused directly or indirectly by war, including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose and including any consequence of any of these.

Discharge of a nuclear weapon shall be deemed a warlike act even if accidental.

B. Loss due to or as a consequence of **Nuclear Hazard**.

   1. **"Nuclear hazard"** means any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused.

   2. Loss caused by the **nuclear hazard** shall not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against in Section II.

   3. This policy does not apply under Section II to loss caused directly or indirectly by **nuclear hazard**, except that direct loss by fire resulting from the **nuclear hazard** is covered.

C. **Bodily injury** or **property damage** for which an **insured** as defined in Section III - Coverage E and Section IV - Coverage G.

   1. Is an **insured** under a nuclear energy liability policy; or

   2. Would be an **insured** under a nuclear energy liability policy but for its termination upon exhaustion of its limit of liability.

   A nuclear energy liability policy is a policy issued by any of the following or their successors:

   1. Nuclear Energy Liability Insurance Association;

   2. Mutual Atomic Energy Liability Underwriters; or

   3. Nuclear Insurance Association of Canada.

D. Medical Payments for any **insured** as defined in Coverage F and Coverage H for **bodily injury** from or as a consequence of the following, whether controlled or uncontrolled or however caused:

   1. Nuclear reaction;

   2. Nuclear radiation; or

   3. Radioactive contamination.

## CONDITIONS

A. **Appraisal**

If under Section II or VI, you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the **residence premises** is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

Copying Prohibited

Each party will:

**1.** Pay its own appraiser; and

**2.** Bear the other expenses of the appraisal and umpire equally.

We do not waive any of our rights under this policy by agreeing to an appraisal.

**B.  Assignment Or Transfer Of Your Interest In This Policy**

**1.** Assignment of this policy will not be valid unless we give our consent.

**2.** Your rights and duties under this policy may not be assigned without our written consent.

**C.  Bankruptcy**

Bankruptcy or insolvency of an *insured* will not relieve us of our obligations under this policy.

**D.  Change And Waiver**

**1.** This policy contains all the agreements between you and us. Its terms may not be changed or waived except by endorsement issued by us.

**2.** The premium for your property and each of *your covered autos* is based on information we received from you or from other sources. You agree to cooperate with us in determining if this information is correct and complete, and you agree to notify us if any of this information changes during the policy period.

To properly insure your property, other than auto, you must promptly notify us when:

**a.** You make improvements to your *residence premises* estimated to be in excess of $5,000; or

**b.** You alter the use of your *residence premises* to include a *business* that was not present or revealed at the inception date of the policy.

To properly insure *your covered auto,* you must promptly notify us when:

**a.** You acquire an additional or replacement auto; or

**b.** Any drivers are added to or leave your household.

**c.** You change the location where *your covered auto* is principally garaged.

**3.** Changes during the policy period that may result in premium adjustment during the policy period are included in our rules and rates. These include, but are not limited to:

**a.** Changes to the value of your *residence premises* as the result of improvements and betterments;

**b.** Changes in the number, type, use or garaging of *your covered autos*;

**c.** Changes in operators using *your covered autos*, their ages or marital status;

**d.** A *family member* obtaining a driver's license;

**e.** Changes in coverage, deductibles or limits of liability.

**4.** If a change resulting from **2.**, **3.** or **4.** requires a premium adjustment, we will make the premium adjustment in accordance with our manual rules.

**5.** If we make a change which broadens coverage under this edition of your policy without additional premium charge, that change will automatically apply to your policy as of the date we implement the change in your state. This paragraph **(D.5.)** does not apply to changes implemented with a general program revision that includes both broadenings and restrictions in coverage, whether that general program revision is implemented through introduction of:

**a.** A subsequent edition of your policy; or

**b.** An Amendatory Endorsement.

**E.  Conformity To Law**

The premiums for, and the coverages of this policy have been established in reliance upon the provisions of the Pennsylvania Law. In the event a court, from which there is no appeal, declares or enters a judgment the effect of which is to render the provisions of such statute invalid or unenforceable in whole or in part, we will have the right to re-compute the premium payable for the policy and void or amend the provisions of the policy, subject to the approval of the Insurance Commissioner.

**F.  Death**

If you die, coverage will be provided for:

**1.** The surviving spouse if a resident of the same household at the time of death;

**2.** Any *family member* at the time of death;

**3.** Your legal representative, but only with respect to:

Copying prohibited

*0000C0WNP9780329374411661*

a.  Your premises and property covered under this policy at the time of your death;

b.  Legal responsibility to maintain or use *your covered auto*; and

c.  With respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

Insurance under this policy will continue as provided in **a.** or **b.** below, whichever is later:

a.  For 180 days after your death regardless of the policy period shown in the Declarations, unless your premises and property, covered under the policy at the time of your death, are sold prior to that date; or

b.  Until the end of the policy period shown in the Declarations, unless your premises and property, covered under the policy at the time of your death, are sold prior to that date.

Coverage during the period of time after your death is subject to all the provisions of this policy including payment of any premium due for the policy period shown in the Declarations and any extension of that period.

### G.  Deductible

Unless otherwise indicated in this policy, the deductible shown in the Declarations Page shall be deducted from the amount of the loss. If an accident or *occurrence* results in a loss under more than one section of this policy or to more than one *your covered auto* under Section VI, only one deductible shall apply. This shall be the highest deductible amount under any one coverage applicable to the accident or *occurrence*.

### H.  Fraud

This insurance was issued in reliance on the information provided in your insurance application or otherwise requested from you.

1.  We may void coverage under this policy if you or an *insured* have knowingly concealed or misrepresented any material fact or circumstances, or engaged in fraudulent conduct at the time insurance was made for insurance or at any other time during the policy period.

2.  We may void this policy or deny coverage for an *occurrence* or loss if you or an *insured* have knowingly concealed or misrepresented any material fact or circumstances, or engaged in fraudulent conduct, in connection with the presentation or settlement of a claim.

3.  We may void this policy for fraud or material misrepresentation even after an *occurrence* or loss. This means we will not be liable for any claims or damages, which would otherwise be covered.

4.  We will not void Sections IV, V and VI of this policy if this policy has been in effect for 60 days or more or if this is a renewal or continuation policy.

5.  We will not void this policy due to misrepresentation or concealment in the application if:

    a.  This policy has been in effect for more than one year; or

    b.  Such misrepresentation or concealment is not prejudicial to us.

6.  No person who engages in fraudulent conduct shall be entitled to receive payment for a claim under this policy.

7.  If we void this policy, it shall be void from its inception as if the policy never took place.

### I.  Loss Payee Clause

Loss or damage under this policy shall be paid, as interest may appear, to you and the loss payee or additional insured shown in the Declarations. This insurance, with respect to the interest of the loss payee or additional insured shall not become invalid because of your fraudulent acts or omissions unless the loss results from your conversion, secretion or embezzlement of *your covered auto*. However, we reserve the right to cancel or nonrenew the policy as permitted by policy terms and any cancellation or nonrenewal shall terminate this agreement as the loss payee's or additional insured's interest.

We will give the same notice of cancellation or nonrenewal to the loss payee or additional insured shown in the Declarations as we give to you.

When we pay the loss payee or additional insured, we shall to the extent of payment, be subrogated to the loss payee's or additional insured's rights of recovery.

### J.  No Benefit To Bailee

We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision, of this policy.

### K.  Owned Auto

For purposes of this policy, a private passenger type auto, pickup or van shall be deemed to be owned by a person:

1.  If leased:

    a. Under a written agreement to that person; and

    b. For a continuous period of at least 6 months.

2. If owned by a trust where that person is the grantor or trustee of that trust.

**L. Policy Period**

This policy applies only to accidents and losses which occur:

1. During the policy period as shown in the Declarations; and

2. Within the policy territory.

**M. Policy Territory**

The policy territory for Section **II** and Section **III** is worldwide unless stated otherwise in this policy.

The policy territory for Section **IV**, Section **V** and Section **VI** is:

1. The United States of America, its territories or possessions;

2. Puerto Rico; or

3. Canada.

This policy also applies to loss to, or accidents involving, *your covered auto* while being transported between their ports.

**N. Subrogation**

If we make a payment under this policy and:

1. The person to or for whom payment was made has a right to recover damages from another, we shall be subrogated to that right.

That person shall do:

    a. Whatever is necessary to enable us to exercise our rights; and

    b. Nothing after loss to prejudice them.

However, our rights in this paragraph do not apply to Section **VI** Coverage **K**, against any person using *your covered auto* with the express or implied permission of you or any *family member* while within the scope of such permission granted.

2. The person to or for whom payment is made recovers damages from another, that person shall:

    a. Hold in trust for us the proceeds of the recovery; and

    b. Reimburse us to the extent of our payment less reasonable attorneys'

fees, costs and expenses incurred by that person in collecting our share of the recovery.

3. If recovery is made by an *insured* under this policy from a liable party without our written consent, the *insured's* right to payment under any affected coverage will no longer apply.

4. An *insured* may waive in writing before a loss all right of recovery against any party for loss to the property covered in Section **II**. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, an *insured* must sign and deliver all related papers and cooperate with us.

**O. Suit Against Us**

No legal action shall be brought against us unless there has been compliance with all the provisions of the policy. In addition, no legal action shall be brought against us:

1. Under Coverage **E** and Coverage **G**, until the obligation of such *insured* has been determined by final judgment or agreement signed by us; or

2. Under Section **II**, unless the action is started within one year after the date of loss or damage.

No person or organization shall have any right under this policy to join us as a party to any action to determine the liability of an *insured*.

**P. Termination**

1. **Cancellation**

    a. This entire policy may be cancelled during the policy period as follows:

      (1) A named insured may cancel at any time by letting us know in writing on or before the date cancellation is to take effect.

      (2) When this policy has been in effect less than 60 days and is not a renewal or continuation policy, we may cancel for any reason by notifying you in writing at the mailing address shown in the policy at least 30 days before the cancellation takes effect. However, our right to cancel this policy is subject to the limitations contained in the applicable Pennsylvania statutes.

*0000COWNP37803293744411662*

(3) When this policy has been in effect for 60 days or more, or at any time if it is a renewal or continuation policy with us, we may cancel by notifying you in writing at the mailing address shown in the policy:

    (a) At least 30 days prior to the proposed cancellation effective date for only one or more of the following reasons:

        (i) There is a substantial increase in hazard insured against by reason of willful or negligent acts or omissions by the *insured.* This includes suspension or revocation of your driver's license after the effective date of the policy.

        (ii) You have failed to pay the policy premium by the due date, whether payable to us or to our agent under any finance or credit plan.

        (iii) For any other reason approved by the Pennsylvania Insurance Commissioner.

    (b) At least 60 days prior to the proposed cancellation date if the policy was obtained through material misrepresentation.

  b. The Provisions in (a.) above shall not apply if you have demonstrated by some overt action to us or to our agent that you wish the policy to be cancelled.

  c. If this policy is cancelled, you may be entitled to a premium refund. If so, the premium will be refunded pro rata in a reasonable time after the cancellation takes effect. However, making or offering to make the refund is not a condition of cancellation.

  d. The effective date of cancellation stated in the notice shall become the end of the policy period.

**2. Nonrenewal**

  a. If the laws of Pennsylvania prohibit us from nonrenewing any portion of this policy, we shall issue you a policy providing identical coverage to the coverage included in this policy. However, the premium charged for any such policy may not be the same as charged for in that portion of this policy.

  b. If we decide not to renew or continue certain sections of this policy, we will mail to you at the mailing address shown in the policy written notice:

    (1) At least 30 days prior to the expiration date for nonrenewal of Sections II and III of this policy. However, we will not fail to renew Sections II and III except for one or more of the following reasons:

        (a) This policy was obtained through material misrepresentation, fraudulent statements, omissions or concealment of fact material to the acceptance of the risk or to the hazard assumed by us.

        (b) There has been a substantial change or increase in hazard in the risk assumed by us subsequent to the date the policy was issued.

        (c) There is a substantial increase in hazard insured against by reason of willful or negligent acts or omissions of the *insured.*

        (d) You failed to pay the premium by the due date, whether payable to us or to our agent or under any finance or credit plan.

        (e) For any other reason approved by the Pennsylvania Insurance Commissioner.

    (2) At least 60 days prior to the expiration date for nonrenewal of Sections IV, V and VI of this policy.

    (3) Our rights to nonrenew are subject to the limitations contained in the applicable Pennsylvania statutes.

  c. The Provisions in (b) above shall not apply if:

Copying Prohibited

**(1)** You have demonstrated by some overt action to us or to our agent that you do wish the policy to be renewed; or

**(2)** We have indicated our willingness to renew and you have failed to pay the premium by the renewal date.

**3.** We may deliver any notice to you instead of mailing it. Proof of mailing of any notice shall be sufficient proof of notice.

**Q. Two Or More Auto Policies**

If this policy and any other auto insurance policy issued to you by us, or by any of our affiliated companies, apply to the same accident, the maximum limit of our liability under all the policies shall not exceed the highest applicable limit of liability under any one policy.

**R. Underwriting Information**

You shall provide us upon request all information necessary to properly underwrite and rate this policy.

# DUTIES AFTER LOSS

**A. Duties Applicable To Section II**

In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an *insured* seeking coverage or a representative of either:

**1.** Give prompt notice to us or our agent;

**2.** Notify the police in case of loss by theft;

**3.** Notify the credit card or electronic fund transfer card or access device company in case of loss as provided for in Additional Coverage **F** Credit Card Or Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money coverage;

**4.** Protect the property from further damage. If repairs to the property are required, you must:

**a.** Make reasonable and necessary repairs to protect the property; and

**b.** Keep an accurate record of repair expenses;

**5.** Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

**6.** As often as we reasonably require:

**a.** Show the damaged property;

**b.** Provide us with records and documents we request and permit us to make copies; and

**c.** Submit to examination under oath, while not in the presence of another *insured,* and sign the same;

**7.** Send to us, within 60 days after our request, your signed sworn proof of loss which sets forth, to the best of your knowledge and belief:

**a.** The time and cause of loss;

**b.** The interest of the *insured* and all others in the property involved and all liens on the property;

**c.** Other insurance which may cover the loss;

**d.** Changes in title or occupancy of the property during the term of the policy;

**e.** Specifications of damaged buildings and detailed repair estimates;

**f.** The inventory of damaged personal property described in **A.5.** above;

**g.** Receipts for additional living expenses incurred and records that support the fair rental value loss; and

**h.** Evidence or affidavit that supports a claim under Additional Coverage **F.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money coverage, stating the amount and cause of loss.

**8.** Cooperate with us in the investigation of the claim.

**B. Duties Applicable To Section III, Section IV, Section V And Section VI**

In case of an accident, loss or *occurrence*, you or another *insured* will perform the following duties that apply. We have no duty to provide coverage under this policy if your failure to comply with the following duties is prejudicial to us. You will help us by seeing that these duties are performed:

Copying Prohibited

1. General duties:

   a. Promptly give notice to us or to our agent, and in the event of theft to the police. Notice shall include:

      (1) The identity of the policy and the *insured*;

      (2) Reasonably available information on the time, place and circumstances of the accident, loss or *occurrence*; and

      (3) The names and addresses of injured persons, claimants and witnesses.

   b. A person seeking coverage must:

      (1) At our request, assist in:

         (a) The investigation, settlement or defense of any claim or suit;

         (b) Obtaining the cooperation of witnesses; and

         (c) The enforcement of any right of contribution or indemnity against any person or organization who may be liable to an *insured.*

      (2) Promptly send us copies of notices or other legal papers received in connection with the accident, loss or *occurrence*.

      (3) Submit a proof of loss, as we may require.

   c. An injured person or someone acting on behalf of an injured person shall:

      (1) Execute authorization to allow us to obtain copies of medical reports and records; and

      (2) Submit, as often as we reasonably require:

         (a) To physical exams by physicians we select. We will pay for these exams.

         (b) To examination under oath and subscribe the same.

         (c) To recorded statements.

2. Additional duties for Section III:

   a. A person seeking coverage for Damage to Property of Others must also:

      (1) Submit to us within 60 days after the loss, a sworn statement of loss; and

      (2) Exhibit the damaged property, if in an *insured's* control.

   b. Payment under this coverage is not an admission of liability by an *insured* or us.

3. Additional duties for Section V:

   a. A person seeking Uninsured or Underinsured Motorists Coverage must also:

      (1) Promptly notify the police if a hit-and-run driver is involved; and

      (2) Promptly send us copies of the legal papers if suit is brought.

4. Additional duties for Section VI:

   a. A person seeking Damage to Your Auto Coverage must also:

      (1) Take reasonable steps after loss to protect the vehicle and its equipment from further loss. We will pay reasonable expenses incurred to do this; and

      (2) Permit us to inspect and appraise the damaged property before its repair or disposal.

5. An *insured* shall not, except at the *insured's* own cost, assume any obligation, incur any expense or make any payment for any accident, loss or *occurrence* other than for:

   a. First aid to an injured person at the time of the *bodily injury*; or

   b. Reasonable expenses incurred after a loss to protect damaged property from further loss.

*0000C0WNP3780289374411663*

Copying Prohibited

# SECTION II PROPERTY (OTHER THAN AUTO)

## SECTION II - PROPERTY COVERAGES

**A. COVERAGE A - Dwelling**

  **1.** We cover:

    **a.** The dwelling on the **residence premises** shown in the Declarations, including structures attached to the dwelling; and

    **b.** Materials and supplies located on or next to the **residence premises** used to construct, alter or repair the dwelling or other structures on the **residence premises.**

    **c.** Or, for condominium ownership:

      **(1)** The alterations, appliances, fixtures and improvements which are part of the building contained with the **residence premises;**

      **(2)** Items of real property which pertain exclusively to the **residence premises;**

      **(3)** Property which is your insurance responsibility under a corporation or association of property owner's agreement.

  **2.** We do not cover land, including land on which the dwelling is located.

**B. COVERAGE B - Other Structures**

  **1.** We cover other structures on the **residence premises** set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

  **2.** We do not cover:

    **a.** Land, including land on which other structures are located;

    **b.** Other structures rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage;

    **c.** Other structures from which any **business** is conducted; or

    **d.** Other structures used to store **business** property. However, we do cover a structure that contains **business** property solely owned by an **insured** or a tenant of the dwelling, provided that **business** property does not include gaseous or liquid fuel, other than fuel in a permanently installed fuel tank of a vehicle or craft parked or stored in the structure.

  **3.** The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage **A.** Use of this coverage does not reduce the Coverage **A** limit of liability.

**C. COVERAGE C - Personal Property**

  **1. Covered Property**

    We cover personal property owned or used by an **insured** while it is anywhere in the world. After a loss and at your request, we will cover personal property owned by:

    **a.** Others while the property is on the part of the **residence premises** occupied by an **insured**; or

    **b.** A guest or a **residence employee**, while the property is in any residence occupied by an **insured,**

  **2. Limits For Property At Other Residences**

    Our limit of liability for personal property usually located at an **insured's** residence, other than the **residence premises,** is 10% of the limit of liability for Coverage **C,** or $1,000, whichever is greater. However, this limitation does not apply to personal property:

    **a.** Moved from the **residence premises** because it is being repaired, renovated or rebuilt and is not fit to live in or store property in; or

    **b.** In a newly acquired principal residence for 30 days from the time you begin to move the property there.

  **3. Special Limits Of Liability**

    The special limit for each category shown below is the total limit for each loss for all property in that category. These special limits do not increase the Coverage **C** limit of liability.

Copying Prohibited

*0000C0WNP37800329374411884*

a. $1,000 on money, cryptocurrency, bank notes, bullion, gold other than goldware, silver other than silverware, platinum other than platinumware, coins, medals, scrip, stored value cards and smart cards.

b. $5,000 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, personal records, passports, tickets and stamps. This dollar limit applies to these categories regardless of the medium (such as paper or computer software) on which the material exists.

This limit includes the cost to research, replace or restore the information from the lost or damaged material.

c. $2,500 on watercraft of all types, including their *trailers,* furnishings, equipment and outboard engines or motors.

d. $2,000 on *trailers* or semitrailers not used with watercraft of all types.

e. $10,000 for loss by theft, misplacing or losing of jewelry, watches, furs, precious and semi-precious stones.

f. $10,000 for loss by theft, misplacing or losing of firearms and related equipment.

g. $10,000 for loss by theft, misplacing or losing of silverware, silverplated ware, goldware, goldplated ware, platinum ware, platinumplated ware and pewterware. This includes flatware, hollowware, tea sets, trays and trophies made of or including silver, gold or pewter.

h. $10,000 on property, on the *residence premises,* used primarily for *business* purposes.

i. $1,000 on property, away from the *residence premises,* used primarily for *business* purposes. However, this limit does not apply to antennas, tapes, wires, records, disks or other media that are:

(1) Used with electronic equipment that reproduces, receives or transmits audio, visual or data signals; and

(2) In or upon a *motor vehicle.*

j. $1,500 on portable electronic equipment that:

(1) Reproduces, receives or transmits audio, visual or data signals;

(2) Is designed to be operated by more than one power source, one of which is a *motor vehicle's* electrical system; and

(3) Is in or upon a *motor vehicle.*

k. $250 on antennas, tapes, wires, records, disks or other media that are:

(1) Used with electronic equipment that reproduces, receives or transmits audio, visual or data signals; and

(2) In or upon a *motor vehicle.*

l. $500 for animals, birds, or fish when the loss is caused by fire, lightning, windstorm, hail, smoke, explosion, riot or falling aircrafts.

4. **Property Not Covered**

We do not cover:

a. Articles separately described and specifically insured, regardless of the limit for which they are insured, in this or other insurance;

b. Animals, birds or fish except as provided under Coverage **C** - Personal Property, Special Limit of Liability, Paragraph **l.**

c. *Motor vehicles.*

This includes a *motor vehicle's* equipment and parts. However, this Paragraph **4.c.** does not apply to:

(1) Portable electronic equipment that:

(a) Reproduces, receives or transmits audio, visual or data signals; and

(b) Is designed so that it may be operated from a power source other than a *motor vehicle's* electrical system.

(2) *Motor vehicles* not required to be registered for use on public roads or property which are:

(a) Used to service a residence. However, we do not cover *recreational motor vehicles* unless used solely to service the *residence premises;* or

(b) Designed to assist the handicapped;

A *recreational motor vehicle* as used in this provision is one of the following:

Copying Prohibited

Copying Prohibited

(a)  All-terrain vehicle (ATV);

(b)  Dune buggy;

(c)  Golf cart;

(d)  Snowmobile; or

(e)  Any other motorized land vehicle designed for recreational use off public road.

d.  Aircraft, meaning any contrivance used or designed for flight, including any parts whether or not attached to the aircraft.

We do cover model or hobby aircraft not used or designed to carry people or cargo;

e.  Hovercraft and parts. Hovercraft means a self-propelled motorized ground effect vehicle and includes, but is not limited to, flarecraft and air cushion vehicles;

f.  Property of roomers, boarders and other tenants, except property of roomers and boarders related to an *insured;*

g.  Property in an apartment regularly rented or held for rental to others by an *insured,* except as provided in Section II Additional Coverages **J** - Landlord's Furnishings;

h.  Property rented or held for rental to others off the *residence premises;*

i.  *Business* data, including such data stored in:

(1)  Books of account, drawings or other paper records; or

(2)  Computers and related equipment.

We do cover the cost of blank recording or storage media, and of pre-recorded computer programs available on the retail market;

j.  Credit cards, electronic fund transfer cards or access devices used solely for deposit, withdrawal or transfer of funds except as provided in Section II Additional Coverages **F.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money; or

k.  Water or Steam.

## D. COVERAGE D - Loss Of Use

The limit of liability for Coverage **D** is the total limit for the coverage in **1.** Additional Living Expense, **2.** Fair Rental Value and **3.** Civil Authority Prohibits Use below.

### 1. Additional Living Expense

If a loss covered under Section II makes that part of the *residence premises* where you reside not fit to live in, we cover any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living.

Payment will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

### 2. Fair Rental Value

If a loss covered under Section II makes that part of the *residence premises* rented to others or held for rental by you not fit to live in, we cover the fair rental value of such premises less any expenses that do not continue while it is not fit to live in.

Payment will be for the shortest time required to repair or replace such premises.

### 3. Civil Authority Prohibits Use

If a civil authority prohibits you from use of the *residence premises* as a result of direct damage to neighboring premises by a Peril Insured Against, we cover the loss as provided in the **1.** Additional Living Expense and **2.** Fair Rental Value above for no more than four weeks.

### 4. Loss Or Expense Not Covered

We do not cover loss or expense due to cancellation of a lease or agreement.

The periods of time under **1.** Additional Living Expense, **2.** Fair Rental Value and **3.** Civil Authority Prohibits Use above are not limited by expiration of this policy.

## E. Definitions Applicable To Section II - Property (Other Than Auto)

### 1. Description Of Actual Cash Value

Throughout this policy, the following is added to any provision which uses the term actual cash value.

Actual cash value is calculated as the amount it would cost to repair or replace covered property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence. Actual cash value applies to valuation of covered property regardless of whether that property has sustained partial or total loss or damage.

The actual cash value of the lost or damaged property may be significantly less than its replacement cost.

*0000C0WNP3780829374411665*

2. *"Insured"* means:

   a. You and any *family member*, unless otherwise defined;

   b. A student enrolled in school full time, as defined by the school, who was a resident of your household before moving out to attend school, provided the student is under the age of:

      (1) 24 and a *family member*; or

      (2) 21 and in your care or the care of a *family member*.

   Under Section **II**, when the word an immediately precedes the word *insured*, the words an *insured* together mean one or more *insureds*.

3. *"Insured location"* means:

   a. The *residence premises*;

   b. The part of any other premises, other structures and grounds used by you as a residence; and

      (1) Which is shown in the Declarations; or

      (2) Which is acquired by you during the policy period for your use as a residence;

   c. Any premises used by you in connection with a premises described in **3.a.** or **3.b.** above;

   d. Any part of a premises:

      (1) Not owned by an *insured*; and

      (2) Where an *insured* is temporarily residing;

   e. Vacant land, other than farm land, owned by or rented to an *insured*;

   f. Land owned by or rented to an *insured* on which a one, two, three or four family dwelling is being built as a residence for an *insured*;

   g. Individual or family cemetery plots or burial vaults of an *insured*; or

   h. Any part of a premises occasionally rented to an *insured* for other than *business* use.

4. *"Motor Vehicle"* means:

   a. A self-propelled land or amphibious vehicle; or

   b. Any *trailer* or semi-trailer which is being carried on, towed by or hitched for towing by a vehicle described in **a.** above.

## SECTION II - ADDITIONAL COVERAGES

**A. Debris Removal**

1. We will pay your reasonable expense for the removal of:

   a. Debris of covered property if a Peril Insured Against that applies to the damaged property causes the loss; or

   b. Ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

   This expense is included in the limit of liability that applies to the damaged property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit is available for such expense.

2. **Fallen Trees**

   We will pay your reasonable expense, up to $1,000, for the removal from the *residence premises* of:

   a. Your trees felled by the peril of Windstorm Or Hail or Weight Of Ice, Snow Or Sleet; or

   b. A neighbor's trees felled by a Peril Insured Against under Coverage **C**.

   The $1,000 limit is the most we will pay in any one loss, regardless of the number of fallen trees. No more than $500 of this limit will be paid for the removal of any one tree.

   This coverage is additional insurance.

**B. Reasonable Repairs**

1. We will pay the reasonable cost incurred by you for necessary measures taken solely to protect covered property that is damaged by a Peril Insured Against from further damage.

2. If the measures taken involve repair to other damaged property, we will only pay if that property is covered under this policy and the damage to that property is caused by a Peril Insured Against. This coverage does not:

Copying Prohibited

**a.** Increase the limit of liability that applies to the covered property; or

**b.** Relieve you of your duties, in case of a loss to covered property, described in **A.4.** under Duties After Loss.

**C. Trees, Shrubs And Other Plants**

We cover trees, shrubs, plants or lawns, on the *residence premises,* for loss caused by the following Perils Insured Against:

**1.** Fire or Lightning;

**2.** Explosion;

**3.** Riot or Civil Commotion;

**4.** Aircraft;

**5.** Vehicles not owned or operated by a resident of the *residence premises;*

**6.** Vandalism or Malicious Mischief; or

**7.** Theft.

We will pay up to 5% of the limit of liability that applies to the dwelling, for all trees, shrubs, plants or lawns.  No more than $500 of this limit will be paid for any one tree, shrub or plant.  We do not cover property grown for *business* purposes.

This coverage is additional insurance.

**D. Fire Department Service Charge**

We will pay up to $1,000 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

This coverage is additional insurance.  No deductible applies to this coverage.

**E. Property Removed**

We insure covered property against direct loss from any cause while being removed from a premises endangered by a Peril Insured Against and for no more than 30 days while removed.

This coverage does not change the limit of liability that applies to the property being removed.

**F. Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money**

**1.** We will pay up to $10,000 for:

**a.** The legal obligation of an *insured* to pay because of the theft or unauthorized use of credit cards issued to or registered in an *insured's* name;

**b.** Loss resulting from theft or unauthorized use of an electronic fund transfer card or access device used for deposit, withdrawal or transfer of funds, issued to or registered in an *insured's* name;

**c.** Loss to an *insured* caused by forgery or alteration of any check or negotiable instrument; and

**d.** Loss to an *insured* through acceptance in good faith of counterfeit United States or Canadian paper currency.

All loss resulting from a series of acts committed by any one person or in which any one person is concerned or implicated is considered to be one loss.

This coverage is additional insurance. No deductible applies to this coverage.

**2.** We do not cover:

**a.** Use of a credit card, electronic fund transfer card or access device:

**(1)** By a resident of your household;

**(2)** By a person who has been entrusted with either type of card or access device; or

**(3)** If an *insured* has not complied with all terms and conditions under which the cards are issued or the devices accessed.

**b.** Loss arising out of *business* use or dishonesty of an *insured*.

**3.** If the coverage in **1.** above applies, the following defense provisions also apply:

**a.** We may investigate and settle any claim or suit that we decide is appropriate.  Our duty to defend a claim or suit ends when the amount we pay for the loss equals our limit of liability.

**b.** If a suit is brought against an *insured* for liability under **1.a.** or **b.** above, we will provide a defense at our expense by counsel of our choice.

**c.** We have the option to defend at our expense an *insured* or an *insured's* bank against any suit for the enforcement of payment under **1.c.** above.

Copying Prohibited

*0000C0WNP37803293974411686*

### G. Loss Assessment

1. We will pay up to $10,000 for your share of loss assessment charged during the policy period against you, as owner or tenant of the *residence premises*, by a corporation or association of property owners. The assessment must be made as a result of direct loss to the property, owned by all members collectively, of the type that would be covered by this policy if owned by you, caused by a Peril Insured Against, under Coverage A. other than earthquake or land shock waves or tremors before, during or after a volcanic eruption.

   The limit of $10,000 is the most we will pay with respect to any one loss, regardless of the number of assessments. We will only apply one deductible per unit, to the total amount of any one loss to the property described above, regardless of the number of assessments.

2. We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

3. Section I - Condition L. Policy Period, does not apply to this coverage.

This Coverage is additional insurance.

### H. Collapse

This Additional Coverage applies to property covered under Coverages A and B.

1. The coverage provided under this Additional Coverage - Collapse applies only to an abrupt collapse.

2. For the purpose of this Additional Coverage - Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or any part of the building cannot be occupied for its intended purpose.

3. This Additional Coverage - Collapse does not apply to:

   a. A building or any part of a building that is in danger of falling down or caving in;

   b. A part of a building that is standing, even if it has been separated from another part of the building; or

   c. A building or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

4. We insure for direct physical loss to covered property involving abrupt collapse of a building or any part of a building if such collapse was caused by one or more of the following:

   a. The Perils Insured Against under Coverages A and B;

   b. Decay, of a building or any part of a building, that is hidden from view, unless the presence of such decay is known to an *Insured* prior to collapse;

   c. Insect or vermin damage, to a building or any part of a building, that is hidden from view, unless the presence of such damage is known to an *Insured* prior to collapse;

   d. Weight of contents, equipment, animals or people;

   e. Weight of rain which collects on a roof;

   f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of construction, remodeling or renovation; or

   g. Water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundations, swimming pool or other structure.

      Section II - Exclusion A.3. Water, Paragraph c. does not apply to this coverage.

5. Loss to an awning, fence, patio, deck, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under 4.b. through g. above unless the loss is a direct result of the collapse of a building or any part of a building.

6. This coverage does not increase the limit of liability applying to the damaged covered property.

### I. Glass or Safety Glazing Material

1. We cover:

   a. For all but Tenants and Unit Owners, the breakage of glass or safety glazing material which is part of a covered building, storm door or storm window, and for:

      (1) Under Tenants, the breakage of glass or safety glazing material which is part of a building, storm door or storm window, and covered as Building Additions and Alterations;

Copying Prohibited

**(2)** Under Unit Owners, the breakage of glass or safety glazing material which is part of a building, storm door or storm window, and covered under Coverage **A**; and

**b.** For all forms other than Tenants and Unit Owners, the breakage, caused directly by earth movement, of glass or safety glazing material which is part of a covered building, storm door or storm window, and for:

**(1)** Under Tenants, the breakage, caused directly by earth movement, of glass or safety glazing material which is part of a building, storm door or storm window, and covered as Building Additions and Alterations; and

**(2)** Under Unit Owners, the breakage, caused directly by earth movement, of glass or safety glazing material which is part of a building, storm door or storm window, and covered under Coverage **A**; and

**c.** The direct physical loss to covered property caused solely by the pieces, fragments or splinters of broken glass or safety glazing material which is part of a building, storm door or storm window.

**2.** This coverage does not include loss:

**a.** To covered property which results because the glass or safety glazing material has been broken, except as provided in **1.c.** above; or

**b.** On the *residence premises* if the dwelling has been vacant for more than 60 consecutive days immediately before the loss, except when the breakage results directly from earth movements as provided in **1.b.** above. A dwelling being constructed is not considered vacant.

**3.** This coverage does not increase the limit of liability that applies to the damaged property.

**J.** **Landlord's Furnishings**

We will pay up to $2,500 for your appliances, carpeting and other household furnishings, in each apartment on the *residence premises* regularly rented or held for rental to others by an *insured,* for loss caused only by the following Perils Insured Against:

**1.** **Fire Or Lightning**

**2.** **Windstorm Or Hail**

This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

This peril includes loss to watercraft of all types and their *trailers,* furnishings, equipment, and outboard engines or motors, only while inside a fully enclosed building.

**3.** **Explosion**

**4.** **Riot Or Civil Commotion**

**5.** **Aircraft**

This peril includes self-propelled missiles and spacecrafts.

**6.** **Vehicles**

**7.** **Smoke**

This peril means sudden and accidental damage from smoke, including the emission or puffback of smoke, soot, fumes or vapors from a boiler, furnace or related equipment.

This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

**8.** **Vandalism Or Malicious Mischief**

**9.** **Falling Objects**

This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

**10.** **Weight Of Ice, Snow Or Sleet**

This peril means weight of ice, snow or sleet which causes damage to property contained in a building.

**11.** **Accidental Discharge Or Overflow Of Water Or Steam**

**a.** This peril means accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

**b.** This peril does not include loss:

**(1)** To the system or appliance from which the water or steam escaped;

**(2)** Caused by or resulting from freezing except as provided in **13.** Freezing below;

Copying Prohibited

Copying Prohibited

**(3)** On the *residence premises* caused by accidental discharge or overflow which occurs off the *residence premises*; or

**(4)** Caused by mold, fungus or wet rot unless hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

**c.** In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixture or equipment.

**12. Sudden And Accidental Tearing Apart, Cracking, Burning Or Bulging**

This peril means sudden and accidental tearing apart, cracking, burning or bulging of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover loss caused by or resulting from freezing under this peril.

**13. Freezing**

**a.** This peril means freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance but only if you have used reasonable care to:

**(1)** Maintain heat in the building; or

**(2)** Shut off the water supply and drain all systems and appliances of water.

However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

**b.** In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

**14. Sudden and Accidental Damage From Artificially Generated Electrical Current**

This peril does not include loss to tubes, transistors, electronic components or circuitry that is a part of appliances, fixtures, computers, home entertainment units or other types of electronic apparatus.

**15. Volcanic Eruption**

This peril does not include loss caused by earthquake, land shock waves or tremors.

This limit is the most we will pay in any one loss regardless of the number of appliances, carpeting or other household furnishings involved in the loss (or for tenants coverage, you may use up to 10% of the Limit of Liability that applies to Building Additions and Alterations).

This coverage does not increase the limit of liability applying to the damaged property.

**K. Ordinance Or Law**

**1.** You may use up to 10% of the limit of liability that applies to Coverage **A** for the increased costs you incur due to the enforcement of any ordinance or law which requires or regulates:

**a.** The construction, demolition, remodeling, renovation or repair of that part of a covered building or other structure damaged by a Peril Insured Against;

**b.** The demolition and reconstruction of the undamaged part of a covered building or other structure, when that building or other structure must be totally demolished because of damage by a Peril Insured Against to another part of that covered building or other structure; or

**c.** The remodeling, removal or replacement of the portion of the undamaged part of a covered building or other structure necessary to complete the remodeling, repair or replacement of that part of the covered building or other structure damaged by a Peril Insured Against.

**2.** You may use all or part of this ordinance or law coverage to pay for the increased costs you incur to remove debris resulting from the construction, demolition, remodeling, renovation, repair or replacement of property as stated in **1.** above.

**3.** We do not cover:

**a.** The loss in value to any covered building or other structure due to the requirements of any ordinance or law; or

**b.** The costs to comply with any ordinance or law which requires any *insured* or others to test for, monitor, cleanup, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants in or on any covered building or other structure.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

This coverage is additional insurance.

**L.   Grave Markers**

We will pay up to $5,000 for grave markers, including mausoleums, on or away from the **residence premises** for loss caused by a Peril Insured Against.

This coverage does not increase the limits of liability that apply to the damaged covered property.

**M.   Arson Reward**

We will pay $1,000 for information which leads to an arson conviction in connection with a fire loss to property covered by this policy. This coverage may increase the limit otherwise applicable. However, the $1,000 limit shall not be increased regardless of the number of persons providing information.

This coverage is additional insurance. No deductible applies to this coverage.

**N.   Mold, Fungus, Wet Rot, Bacteria Or Other Biological Contaminants**

1.  We will pay up to $10,000 for direct physical loss to property covered under Section **II** caused by mold, fungus, wet rot, bacteria or other biological contaminants including mycotoxins and reproductive gases. This additional coverage applies only if the loss caused by mold, fungus, wet rot, bacteria or other biological contaminants is the direct result of one or more of the following perils that occurs during the policy period:

    a.  **Fire Or Lightning**;

    b.  **Windstorm Or Hail**;

        This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

    c.  **Thawing Of Snow, Sleet Or Ice** on the building or structure;

    d.  **Accidental Discharge Or Overflow Of Water Or Steam** from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system, or a household appliance on the **residence premises**; or

We do not cover loss caused by water which backs up through sewers or drains or loss to the system or appliance from which the water or steam escaped.

For the purpose of this Additional Coverage, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment;

    e.  **Vandalism Or Malicious Mischief**;

    f.  **Freezing** of plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance; or

        This peril does not include loss on the **residence premises** while the dwelling is unoccupied, unless you have taken reasonable care to maintain heat in the building or shut off the water supply and drain the system and appliances of water.

    g.  **Release** of any biological contaminant as a result of the death of a person on the **residence premises.**

2.  $10,000 is the most we will pay in any one loss; this includes, but is not limited to:

    a.  Testing and investigation expenses;

    b.  Containment, cleanup, remediation, abatement and mitigation expenses;

    c.  Debris removal expenses; and

    d.  Coverage found under Coverage **D** - Loss Of Use.

This coverage is additional insurance.

**O.   Deep Freeze Or Refrigerated Units Contents**

We will pay up to $10,000 for damage to the contents of deep freeze or refrigerated units, on the **residence premises**, when the damage is caused by power failure or mechanical breakdown.

If power failure or mechanical breakdown is known by you, you must use all reasonable means to protect the property covered from further damage or this coverage is void.

Section **II** - Exclusion **A.4.** does not apply to this coverage.

No deductible applies to this coverage.

**P.   Rented Golf Carts**

We cover rented golf carts while being used for golfing purposes to an amount not exceeding $10,000 for direct physical loss except:

*0000C0WNP378032987441668*

1. Loss or damage caused by wear and tear, gradual deterioration, mechanical breakdown, or any damage while being worked upon; or

2. Infidelity of persons to whom the property is entrusted.

No deductible applies to this coverage.

### Q. Building Additions, Alterations

We cover under Coverage C for direct loss caused by the Perils Insured Against: the building additions, alterations, fixtures, improvements or installations, made or acquired at your expense, to that part of the *residence premises* described in the Declarations not owned by you but used exclusively by you. The limit of liability for this coverage shall not exceed 10% of the limit of liability that applies to Coverage C.

This coverage is additional insurance.

### R. Lock Replacement

If the keys to your house are lost or stolen, we will pay up to $1,000 for replacing the locks of the dwelling listed as the described *residence premises.* For this coverage to apply, you must immediately notify the police upon discovery of the loss or theft; and notify us within 72 hours of discovering the loss.

This coverage is additional insurance. No deductible applies to this coverage.

### S. Water Damage

We will pay up to $1,000 for damage caused by:

1. Flood, surface water, waves, including tidal wave and tsunami, tides, tidal water, overflow of a body of water, or spray from any of these, all whether or not driven by wind including storm surge; and

2. Water which backs up through sewers or drains or which overflows from a sump.

### T. Land

We will pay up to $10,000 for the cost required to replace, rebuild, stabilize or restore land that is necessary to support the insured dwelling that is damaged by a covered loss. This coverage increases the limit applying to the property.

### U. Personal Computer (Coverage C - Personal Property Limits)

If you have a covered loss and your Coverage C - Personal Property Limits are not enough to cover the loss, we will pay up to $10,000 more to cover your personal computer. For purposes of this coverage, a personal computer is defined as:

1. Electronic data processing hardware and related peripheral equipment, including CRT screens, disc drives, printers and modems; and

2. Discs, tapes, wires, records or other software media used with the equipment in 1. above.

### V. Extension Of Coverage C - Personal Property

Coverage C - Personal Property, is covered for the following perils while the property is away from your *residence premises* and in transit: flood (meaning rising water), earthquake, landslide, collision or overturn of the conveyance in which the property is carried. We will pay up to $5,000 for any loss incurred under these circumstances.

Section II - Exclusions A.2. and A.3. do not apply to this coverage.

### W. Theft Reward

We will pay $1,000 for information which leads to a theft conviction in connection with a theft loss to property covered by this policy. This coverage may increase the limit otherwise applicable. However, the $1,000 limit shall not be increased regardless of the number of persons providing information.

This coverage is additional insurance. No deductible applies to this coverage.

## SECTION II - PERILS INSURED AGAINST

We insure against direct loss to property described in Coverages A, B and C.

We do not insure, however, for loss:

A. Under Coverages A, B and C:

1. Excluded under Section II - Exclusions;

2. Caused by:

a. Freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This provision does not apply if you have used reasonable care to:

(1) Maintain heat in the building; or

(2) Shut off the water supply and drain the system and appliances of water.

However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

Copying Prohibited

For purposes of this provision a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment;

b.  Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

(1)  Fence, pavement, patio or swimming pool;

(2)  Footing, foundation, bulkhead, wall, or any other structure or device that supports all or part of a building or other structure;

(3)  Retaining wall or bulkhead that does not support all or part of a building or other structure; or

(4)  Pier, wharf or dock;

c.  Theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

d.  Mold, fungus or wet rot. However, we do insure for loss caused by mold, fungus or wet rot that is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure if such loss results from the accidental discharge or overflow of water or steam from within:

(1)  A plumbing, heating, air conditioning or automatic fire protective sprinkler system or a household appliance on the **residence premises**; or

(2)  A storm drain or water, steam or sewer pipes off the **residence premises**.

For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

e.  Any of the following:

(1)  Wear and tear, marring, deterioration;

(2)  Mechanical breakdown, latent defect, inherent vice or any quality in property that causes it to damage or destroy itself;

(3)  Smog, rust or other corrosion, or dry rot;

(4)  Smoke from agricultural smudging or industrial operations;

(5)  Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against in **1.** through **15.** as listed in **J.**  Landlord's Furnishings under Section II - Additional Coverages.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed;

(6)  Settling, shrinking, bulging, or expansion including resultant cracking of bulkheads, pavements, patios, footings, foundations, walls, floors, roofs or ceilings;

(7)  Birds, rodents, or insects;

(8)  Nesting or infestation, or discharge or release of waste products or secretions, by any animals; or

(9)  Animals owned or kept by an **insured.**

**Exception to 2.e.**

Unless the loss is otherwise excluded, we cover loss to property covered under Coverage **A, B** or **C** resulting from an accidental discharge or overflow of water or steam from within a:

(i)  Storm drain, or water, steam or sewer pipe, off the **residence premises**; or

(ii)  Plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance on the **residence premises.** This includes the cost to tear out and replace any part of a building, or other structure, on the **residence premises,** but only when necessary to repair the system or appliance.  However, such tear out and replacement coverage only applies to other structures if the water or steam causes actual damage to a building on the **residence premises.**

Copying Prohibited

*0000C0WNP37803293744116639*

We do not cover loss to the system or appliance from which this water or steam escaped.

For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

Section II - Exclusion **A.3.** Water, Paragraphs **a.** and **c.** that apply to surface water and water below the surface of the ground do not apply to loss by water covered under **2.d.** and **2.e.** above.

Under **2.a.** through **e.** above, any ensuing loss to property described in Coverages **A**, **B** and **C** not precluded by any other provision in this policy is covered.

**B.** Under Coverages **A** and **B**:

**1.** Caused by vandalism and malicious mischief and any ensuing loss, including but not limited to fire, theft and water, caused by any intentional and wrongful act committed in the course of the vandalism or malicious mischief, if the dwelling has been vacant for more than 60 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant. A dwelling is not considered vacant for the first 60 days from the inception date of coverage if the dwelling is a newly acquired dwelling.

**2.** Involving collapse, including any of the following conditions of property or any part of the property:

**a.** An abrupt falling down or caving in;

**b.** Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

**c.** Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to **a.** or **b.** above

other than as provided in **H.** Collapse under Section II - Additional Coverages. However, any ensuing loss to property described in Coverages **A** and **B** not precluded by any other provision in this policy is covered.

**C.** Under Coverage **C** caused by:

**1.** Breakage of eyeglasses, glassware, statuary, marble, bric-a-brac, porcelains and similar fragile articles other than jewelry, watches, bronzes, cameras and photographic lenses.

However, there is coverage for breakage of the property by or resulting from:

**a.** Fire, lightning, windstorm, hail;

**b.** Smoke, other than smoke from agricultural smudging or industrial operations;

**c.** Explosion, riot, civil commotion;

**d.** Aircraft, vehicles, vandalism and malicious mischief;

**e.** Collapse of a building or any part of a building;

**f.** Water not otherwise excluded;

**g.** Theft or attempted theft; or

**h.** Sudden and accidental tearing apart, cracking, burning or bulging of:

**(1)** A steam or hot water heating system;

**(2)** An air conditioning or automatic fire protective sprinkler system; or

**(3)** An appliance for heating water;

**2.** Dampness of atmosphere or extremes of temperature unless the direct cause of loss is rain, snow, sleet or hail;

**3.** Refinishing, renovation or repairing property other than watches, jewelry and furs;

**4.** Collision, other than collision with a land vehicle, sinking, swamping or stranding of watercraft, including their *trailers*, furnishings, equipment and outboard engines or motors; or

**5.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body. However, any ensuing loss to property described in Coverage **C** not precluded by any other provision in this policy is covered.

Copying Prohibited

# SECTION II - EXCLUSIONS

**A.** We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any se-

quence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

1. **Ordinance Or Law**

   Ordinance or Law means any ordinance or law:

   a. Requiring or regulating the construction, demolition, remodeling, renovation, or repair of property, including removal of any resulting debris. This Exclusion **1.a.** does not apply to the amount of coverage that may be provided for in **K. Ordinance Or Law under Section II - Additional Coverages**;

   b. The requirements of which results in a loss in value to property; or

   c. Requiring any *insured* or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants.

   Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

   This Exclusion **A.1.** applies whether or not the property has been physically damaged.

2. **Earth Movement**

   Earth Movement means:

   a. Earthquake, including land shock waves or tremors before, during or after a volcanic eruption;

   b. Landslide, mudslide or mudflow;

   c. Subsidence or sinkhole; or

   d. Any other earth movement including earth sinking, rising or shifting;

   This Exclusion **A.2.** applies regardless of whether any of the above, in **A.2.a.** through **A.2.d.**, is caused by an act of nature or is otherwise caused.

   However, direct loss by fire, explosion or theft resulting from any of the above, in **A.2.a.** through **A.2.d.**, is covered.

3. **Water**

   This means:

   a. Flood, surface water, waves, including tidal wave and tsunami, tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind, including storm surge;

   b. Water which:

   (1) Backs up through sewers or drains; or

   (2) Overflows or is otherwise discharged from a sump, sump pump or related equipment;

   c. Water below the surface of the ground, including water which exerts pressure on, or seeps, leaks or flows through a building, sidewalk, driveway, patio, foundation, swimming pool or other structure; or

   d. Waterborne material carried or otherwise moved by any of the water referred to in **A.3.a.** through **A.3.c.** of this exclusion.

   This Exclusion **A.3.** applies regardless of whether any of the above, in **A.3.a.** through **A.3.d.**, is caused by an act of nature or is otherwise caused.

   This Exclusion **A.3.** applies to, but is not limited to, escape, overflow or discharge, for any reason, of water or waterborne material from a dam, levee, seawall or any other boundary or containment system.

   However, direct loss by fire, explosion or theft resulting from any of the above, in **A.3.a.** through **A.3.d.**, is covered.

   This exclusion does not apply to property described in Coverage **C** that is away from a premises or location owned, rented, occupied or controlled by an *insured.*

   This exclusion applies to property described in Coverage **C** that is on a premises or location owned, rented, occupied or controlled by an *insured* even if weather conditions contribute in any way to produce the loss.

4. **Power Failure**

   Power Failure meaning the failure of power or other utility service if the failure takes place off the *residence premises.* But, if the failure results in a loss from a Peril Insured Against on the *residence premises,* we will pay for the loss caused by that peril.

5. **Neglect**

   Neglect meaning neglect of an *insured* to use all reasonable means to save and preserve property at and after the time of a loss.

6. **Intentional Loss**

   a. Intentional loss means any loss arising out of any act an *insured* commits or conspires to commit with the intent to cause a loss.

Copying Prohibited

*0000C0WNP378032937441670*

Copying Prohibited

In the event of such loss, no **insured** is entitled to coverage, even **insureds** who did not commit to conspire to commit the act causing the loss.

b. However, this exclusion will not apply to deny payment to the **insured** who did not cooperate in or contribute to the creation of the loss if the loss:

(1) Is otherwise covered property under Coverage **A**, **B** or **C** of the policy; and

(2) Arises out of abuse to that innocent **insured** by another **insured**.

With respect to this provision, abuse means:

(a) Abuse as defined in the Pennsylvania Protection From Abuse Act; or

(b) Attempting to cause or intentionally, knowingly or recklessly causing damage to covered property so as to intimidate or attempt to control the behavior of another person.

If we pay a claim under this Provision **6.b.**, our payment to the **insured** is limited to that **insured** insurable interest in the property. In no event will we pay more than the Limit of Liability.

**7. Governmental Action**

Governmental Action means the destruction, confiscation or seizure of property described in Coverage **A**, **B**, or **C** by order of any governmental or public authority.

This exclusion does not apply to such acts ordered by any governmental or public authority that are taken at the time of a fire to prevent its spread, if the loss caused by fire would be covered under this policy.

**8. Mold, Fungus, Wet Rot, Bacteria And Other Biological Contaminants**

Mold, fungus, wet rot, bacteria and other biological contaminants including mycotoxins and reproductive gases, whether hidden or not, except as provided under Section **II** - Additional Coverage **N.** Mold, Fungus, Wet Rot, Bacteria Or Other Biological Contaminants.

**B.** We do not insure for loss to property described in Coverages **A** and **B** caused by any of the following. However, any ensuing loss to property described in Coverages **A** and **B** not precluded by any other provision in this policy is covered.

**1.** Weather conditions. However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in **A.** above to produce the loss.

**2.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**3.** Faulty, inadequate or defective:

a. Planning, zoning, development, surveying, siting;

b. Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

c. Materials used in repair, construction, renovation or remodeling; or

d. Maintenance;

of part or all of any property whether on or off the **residence premises**.

# SECTION II - CONDITIONS

**A. Insurable Interest And Limit Of Liability**

Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

**1.** To an **insured** for more than the amount of such **insured's** interest at the time of loss; or

**2.** For more than the applicable limit of liability.

**B. Loss Settlement**

In this Condition **B.**, the terms "cost to repair or replace" and "replacement cost", do not include the increased costs incurred to comply with the enforcement of any ordinance or law, except to the extent that coverage for these increased costs is provided in **K.** Ordinance or Law under Section **II** - Additional Coverages. Covered property losses are settled as follows:

**1.** Building under Coverage **A**:

**a.** We agree to settle covered losses to the dwelling insured under Coverage **A** at replacement costs, without deduction for depreciation up to 125 percent of the specific limit of liability shown in the Declarations of the policy, if you agree to:

**(1)** Maintain coverage on the dwelling to 100% of its full replacement cost by allowing us to annually adjust the Coverage **A** limit of liability reflecting any changes in the cost of construction for the area in which the *residence premises* is located;

**(2)** Notify us, within 90 days, of completion of any improvements to the dwelling exceeding $5,000 of the limit of liability shown in the Declarations; and

**(3)** Repair or replace the building with new material of like kind and quality within a reasonable time.

**b.** If you do not comply with **a.(1)**, **(2)** and **(3)** above, our limit of liability shall not exceed the limit shown in the Declarations of this policy.

**2.** Buildings under Coverage **B**:

**a.** At replacement cost without deduction for depreciation, however, we will pay no more than the smallest of the following amounts for equivalent construction and use:

**(1)** The amount actually and necessarily spent to repair or replace the building or part of it;

**(2)** The replacement cost of the building or any parts of it;

**(3)** The applicable limit of liability shown in the Declarations of the policy.

Under **1.** and **2.** above, we will pay no more than the actual cash value of the damage until actual repair or replacement is completed.

**3.** Personal property under Coverage **C**, including awnings, carpeting, household appliances, outdoor antennas, and outdoor equipment whether or not attached to buildings, excluding personal property in **4.** below, at replacement cost subject to the following:

**a.** We will not pay more than the smallest of the following amounts:

**(1)** The replacement cost of the property or any of its parts without deduction for depreciation;

**(2)** The amount you actually and necessarily spent to repair or replace the property or any of its parts:

**(a)** With an identical new article; or

**(b)** When the identical article is no longer manufactured or available, with a new article similar to that damaged or destroyed and which is of comparable quality and usefulness;

**(3)** The limit of liability applying to Coverage **C**; or

**(4)** Any special limits of liability stated in the policy.

**b.** When the replacement cost for the entire loss to personal property under this item exceeds $1,000, we will pay no more than the actual cash value for the loss or damage until and unless you have completed repairs or have replaced the damaged or destroyed property.

**4.** Structures that are not buildings and the following personal property:

**a.** Antiques, fine arts, paintings, statuary and similar articles of rarity or antiquity which by their inherent nature, cannot be replaced with new articles;

**b.** Memorabilia, souvenirs, collector's items and similar articles whose age or history contribute to its value;

**c.** Articles not maintained in good or workable condition; and

**d.** Articles that are outdated and are stored or not being used;

**e.** Grave markers, including mausoleums;

at actual cash value at the time of loss but not exceeding the amount necessary to repair or replace.

**5.** Unit-Owners building items:

**a.** If damage is repaired or replaced within a reasonable time, at the actual cost to repair or replace;

Copyright Protected

b. If the damage is not repaired or replaced within a reasonable time, at actual cash value but not exceeding the amount necessary to repair or replace.

6. You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage on an actual cash value basis and then make claim within 180 days after loss for any additional liability on a replacement cost basis.

**C. Loss To A Pair Or Set**

In case of loss to a pair or set, you may elect to receive the full value of the set, if you agree to surrender the remaining article or articles of the set to us.

**D. Glass Replacement**

Loss for damage to glass caused by a Peril Insured Against shall be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

**E. Other Insurance And Service Agreement**

1. For all but Unit Owners, if a loss covered by this policy is also covered by:

a. Other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss; or

b. A service agreement, this insurance is excess over any amounts payable under any such agreement. Service agreement means a service plan, property restoration plan, home warranty or other similar service warranty agreement, even if it is not characterized as insurance.

2. For Unit Owners, if a loss covered by this policy is also covered by:

a. Other insurance, except insurance in the name of a corporation or association of property owners, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss; or

b. A service agreement, except a service agreement in the name of a corporation or association of property owners, this insurance is excess over any amounts payable under any such agreement.

3. Subject to Paragraph **E.2.** if, at the time of loss, there is other insurance or a

service agreement in the name of a corporation or association of property owners covering the same property covered by this policy, this insurance is:

a. Excess over the amount due under such other insurance or service agreement, whether the corporation or association of property owners has collected that amount or not; and

b. Primary with respect to any amount of the loss covered by this policy and not due under such other insurance or service agreement because of the application of a deductible.

4. As used in this Paragraph **E.**, a service agreement means a service plan, property restoration plan, home warranty or other similar service warranty agreement, even if it is characterized as insurance.

**F. Our Option**

We may repair or replace any part of the damaged property with material or property of like kind and quality if we give you written notice of our intention to do so within 15 working days after we receive your signed sworn proof of loss.

**G. Loss Payment**

We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:

1. Reach agreement with you;

2. There is an entry of a final judgment; or

3. There is a filing of an appraisal award with us.

**H. Abandonment Of Property**

We need not accept any property abandoned by an *insured*.

**I. Mortgage Clause**

1. If a mortgagee is named in this policy, any loss payable under Coverage **A** or **B** will be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment shall be the same as the order of precedence of the mortgages.

2. If we deny your claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

*0000C0WNP378032937441187*

Copyright Prohibited

a. Notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

b. Pays any premium due under this policy on demand if you have neglected to pay the premium; and

c. Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so.   Policy Conditions relating to Appraisal, Suit Against Us and Loss Payment also apply to the mortgagee.

3. If we decide to cancel or not to renew this policy, the mortgagee will be notified in accordance with the termination provisions of this policy.

4. If we pay the mortgagee for any loss and deny payment to you:

a. We are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

b. At our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest.  In this event, we will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

5. Subrogation will not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

**J.   Recovered Property**

If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery.  At our option, the property will be returned to or retained by you or it will become our property.   If the recovered property is returned to or retained by you, the loss payment will be adjusted based on the amount you receive for the recovered property.

**K.   Value Guard Clause**

The limits of liability shown in the Declarations for Coverages **A, B, C** and **D** will be adjusted at the beginning of each renewal period based upon the construction costs indicated in the residential price indicator for the area where the *residence premises* is located.

**L.   Volcanic Eruption Period**

One or more volcanic eruptions that occur within a 72-hour period will be considered as one volcanic eruption.

**M.   Reporting Period**

When damage is caused by a Peril Insured Against, notice to us or our agent must be given within 12 months after the date of the event causing the loss.

# SECTION III PERSONAL LIABILITY (OTHER THAN AUTO)

## SECTION III - LIABILITY COVERAGES

**A.   COVERAGE E - Personal Liability**

If a claim is made or a suit is brought against an *insured* for damages because of *bodily injury, property damage* or *personal injury* caused by an *occurrence* to which this coverage applies, we will:

1. Pay up to our limit of liability for the damages for which an *insured* is legally liable; and

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent.  We may investigate and settle any claim or suit that we decide is appropriate.  Our duty to settle or defend ends when our limit of liability for the *occurrence* has been exhausted by payment of a judgment or settlement.

**B.   COVERAGE F - Medical Payments To Others**

We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing *bodily injury*.  Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing and prosthetic devices.  Medical expenses do not include expenses for funeral expenses.  This coverage does not apply to you or regular residents of your household except *residence employees.*  As to others, this coverage applies only:

1. To a person on the *insured location* with the permission of an *insured;* or

2. To a person off the *insured location,* if the *bodily injury:*

Copying Prohibited

*000DCOWNP9780329374411672*

**a.** Arises out of a condition on the *insured location* or the ways immediately adjoining;

**b.** Is caused by the activities of an *insured;*

**c.** Is caused by a *residence employee* in the course of the *residence employee's* employment by an *insured;* or

**d.** Is caused by an animal owned by or in the care of an *insured.*

**C.** Definitions Applicable To Section III - Personal Liability (Other Than Auto)

**1.** *"Aircraft Liability", "Hovercraft Liability", "Motor Vehicle Liability"* and *"Watercraft Liability"*, subject to the provisions in **b.** below mean the following:

**a.** Liability for *bodily injury* or *property damage* arising out of the:

**(1)** Ownership of such vehicle or craft by an *insured;*

**(2)** Maintenance, occupancy, operation, use, loading or unloading of such vehicle or craft by any person;

**(3)** Entrustment of such vehicle or craft by an *insured* to any person;

**(4)** Failure to supervise or negligent supervision of any person involving such vehicle or craft by an *insured;* or

**(5)** Vicarious liability, whether or not imposed by law, for the actions of a child or minor involving such vehicle or craft.

**b.** For the purpose of this definition:

**(1)** Aircraft means any contrivance used or designed for flight except model or hobby aircraft not used or designed to carry people or cargo;

**(2)** Hovercraft means a self-propelled motorized ground effect vehicle and includes, but is not limited to, flarecraft and air-cushion vehicles;

**(3)** Watercraft means a craft principally designed to be propelled on or in water by wind, engine power or electric motor; and

**(4)** Motor vehicle means a *motor vehicle* as defined in **7.** below.

**2.** *"Bullying"* means a form of violence which includes attack or intimidation causing:

**a.** Fear, distress, or harm that is either physical, verbal, or psychological/relational; and

**b.** Which can result in physical injury, social and emotional distress, and even death; whether or not expected or intended by an *insured.*

**3.** *"Electronic Aggression."* Aggression, included but not limited to, harassment or *bullying* committed:

**a.** By means of electronic forum, including but not limited to, a blog, an electronic bulletin board, an electronic chat room, a gripe site, a social networking site, a web site, or a weblog; or

**b.** By other electronic means, including but not limited to, email, instant messaging, or texting messaging.

**4.** *"Employee"* means an employee of an *insured*, or an employee leased to an *insured* by a labor leasing firm under an agreement between an *insured* and the labor leasing firm, whose duties are other than those performed by a *residence employee.*

**5.** *"Insured"* means:

**a.** You and any *family member*, unless otherwise defined;

**b.** A student enrolled in school full time, as defined by the school, who was a resident of your household before moving out to attend school, provided the student is under the age of:

**(1)** 24 and a *family member;* or

**(2)** 21 and in your care or the care of a *family member.*

**c.** Under Section III

*"Insured"* also means:

**(1)** With respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any *family members.* A person or organization using or having custody of these animals or watercraft in the course of any *business,* or without consent of the owner is not an *insured;* or

**(2)** With respect to any *motor vehicle* to which this policy applies:

Copying Prohibited

(a) Persons while engaged in your employ or the employment of any *family member*; or

(b) Other persons using the vehicle on an *insured location* with your consent.

Under Section **III**, when the word an immediately precedes the word *insured*, the words an *insured* together mean one or more *insured*.

6. *"Insured location"* means:

a. The *residence premises;*

b. The part of any other premises, other structures and grounds used by you as a residence; and

(1) Which is shown in the Declarations; or

(2) Which is acquired by you during the policy period for your use as a residence;

c. Any premises used by you in connection with the premises described in **6.a.** or **6.b.** above;

d. Any part of a premises:

(1) Not owned by an *insured;* and

(2) Where an *insured* is temporarily residing;

e. Vacant land, other than farm land, owned by or rented to an *insured*;

f. Land owned by or rented to an *insured* on which a one, two, three or four family dwelling is being built as a residence for an *insured*;

g. Individual or family cemetery plots or burial vaults of an *insured*; or

h. Any part of a premises occasionally rented to an *insured* for other than *business* use.

7. *"Motor Vehicle"* means:

a. A self-propelled land or amphibious vehicle; or

b. Any *trailer* or semi-trailer which is being carried on, towed by or hitched for towing by a vehicle described in **a.** above.

8. *"Occurrence"* means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

a. *Bodily injury;* or

b. *Property damage.*

9. *"Personal injury"* means injury arising out of one or more of the following offenses but only if the offense was committed during the policy period:

a. False arrest, detention or imprisonment, or malicious prosecution;

b. Libel, slander or defamation of character;

c. Invasion of privacy, wrongful eviction or wrongful entry.

# SECTION III - ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

A. **Claim Expenses**

We pay:

1. Expenses we incur and costs taxed against an *insured* in any suit we defend;

2. Premiums on bonds required in a suit we defend, but not for bond amounts more than the Coverage **E** Limit Of Liability. We need not apply for or furnish any bond;

3. Reasonable expenses incurred by an *insured* at our request, including actual loss of earnings (but not loss of other income) up to $250 per day, for assisting us in the investigation or defense of a claim or suit;

4. Interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies; and

5. Prejudgment interest awarded against an *insured* on that part of the judgment we pay. Any prejudgment interest awarded against an *insured* is subject to the applicable Pennsylvania Rules of Civil Procedure.

B. **First Aid Expenses**

We will pay expenses for first aid to others incurred by an *insured* for *bodily injury* covered under this policy. We will not pay for first aid to an *insured*.

*0000COWNP37803293744118173*

C. **Damage To Property Of Others**

1. We will pay, at replacement cost, up to $2,000 per *occurrence* for *property damage* to property of others caused by an *insured*.

2. We will not pay for *property damage*;

   a. To the extent of any amount recoverable under Section **II**;

   b. Caused intentionally by an *insured* who is 13 years of age or older;

   c. To property owned by an *insured*;

   d. To property owned by or rented to a tenant of an *insured* or a resident in your household; or

   e. Arising out of:

      (1) A *business* engaged in by an *insured*;

      (2) Any act or omission in connection with a premises owned, rented or controlled by an *insured*, other than the *insured location*; or

      (3) The ownership, maintenance, occupancy, operation, use, loading or unloading of aircraft, hovercraft, watercraft or *motor vehicles*.

      This Exclusion **e.(3)** does not apply to a *motor vehicle* that:

         (a) Is designed for recreational use off public roads;

         (b) Is not owned by an *insured*; and

         (c) At the time of the *occurrence*, is not required by law, or regulation issued by a government agency, to have been registered for it to be used on public roads or property.

D. **Loss Assessment**

1. We will pay up to $10,000 for your share of loss assessment charged against you, as owner or tenant of the *residence premises*, during the policy period by a corporation or association of property owners, when the assessment is made as a result of:

   a. *Bodily injury* or *property damage* not excluded from coverage under Section III - Exclusions; or

b. Liability for an act of a director, officer or trustee in the capacity as a director, officer or trustee, provided such person:

   (1) Is elected by the members of a corporation or association of property owners; and

   (2) Serves without deriving any income from the exercise of duties which are solely on behalf of a corporation or association of property owners.

2. Regardless of the number of assessments, the limit of $10,000 is the most we will pay for loss arising out of:

   a. One accident, including continuous or repeated exposure to substantially the same general harmful condition; or

   b. A covered act of a director, officer or trustee. An act involving more than one director, officer or trustee is considered to be a single act.

3. Policy Period under Condition **L.** does not apply to this Loss Assessment Coverage.

4. We do not cover assessments charged against you or a corporation or association of property owners by any governmental body.

E. **Mold, Fungus, Wet Rot, Bacteria Or Other Biological Contaminants**

We will pay up to $50,000 for *bodily injury* or *property damage* arising out of mold, fungus, wet rot, bacteria or other biological contaminants subject to the following:

1. With respect to *bodily injury* or *property damage* described in Paragraph **2.**, the coverages provided by Section III - Liability Coverages, Coverage **E** - Personal Liability and Coverage **F** - Medical Payments To Others in this policy form, and the Limits Of Liability stated on the Declarations page do not apply.

2. This coverage applies if a claim is made or a suit is brought against an *insured* for damages because of:

   a. *Bodily injury* caused by an *occurrence* during the policy period involving the absorption, ingestion or inhalation of mycotoxins, reproductive gases, bacteria or other biological contaminants; or

Copying Prohibited

**b.** *Property damage* arising out of mold, fungus, wet rot, bacteria or other biological contamination, but only if, immediately prior to the *occurrence*, the mold, fungus, wet rot, bacteria or other biological contaminants was located at an *insured location*.

No other mold, fungus, wet rot, bacteria or other biological contaminants liability coverage applies under this policy except as provided in **E.2.**

**3.** If coverage applies as stated in **E.2.**, we will:

  **a.** Pay up to $50,000 for damages for which an *insured* is legally liable; and

  **b.** Provide a defense at our expense by counsel of our choice even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from *bodily injury* or *property damage* described in **E.2.** exhausts the $50,000 Aggregate limit.

**4.** This additional coverage does not apply to *bodily injury* or *property damage* arising from a premises not occupied by an *insured* and rented   by an *insured* to others as a residence.

**5.** With respect to coverage described in Coverage **E** - Personal Liability under Section **III** - Liability Coverages, Section **I** - Duties After Loss - Paragraph **B.1.c.** Duties Of An Injured Person - Coverage **F** - Medical Payments To Others and Section **III** - Condition **C.** - Payment Of Claim - Coverage **F** - Medical Payments To Others in this policy form are deleted with respect to the liability coverage provided under this Additional Coverage.

**F. Accidental Death Benefit Coverage**

  **1. Insuring Agreement**

  We will pay the amount shown below for Accidental Death to the named insured or spouse subject to the following conditions:

  **a.** The death must be caused by an accident;

  **b.** The death must result directly from the accident and be independent of all other causes of death; and

  **c.** The cause of death is not excluded.

**2. Amount Of Coverage**

  The amount of coverage provided for any accidental death of the person described below is:

  Named Insured ............................ $10,000
  Spouse .......................................... $10,000

**3. Exclusions**

  This coverage does not apply to death to the named insured or spouse resulting directly or indirectly from:

  **a.** Suicide, while sane or insane;

  **b.** War or any act incident to war, declared or undeclared;

  **c.** Operating, riding in, descending or falling from or with any kind of aircraft, except as a passenger without duties of any kind on a civilian aircraft operated by a licensed pilot;

  **d.** Any bodily injuries caused or contributed to by, or as a consequence of any of the following excluded risks, even though the proximate or precipitating cause of death is bodily injuries caused by accident:   (a) bodily or mental infirmity, illness or disease (unless the injury is a bacterial infection which occurs through an external wound); or (b) medical or surgical treatment of such infirmity, illness or disease;

  **e.** Military, naval, or air force service with any country, countries, or international organization engaged in war, declared or undeclared;

  **f.** Voluntarily inhaling any gas (except while performing occupational duties) or voluntarily taking any poison (except food poisoning caused by the normal ingestion of food); voluntarily taking any drug unless taken or used as prescribed by a physician;

  **g.** From injuries incurred while committing or attempting to commit an assault or felony.

**4. Conditions**

  **a.** Autopsy.  We reserve the right to require an autopsy, at our expense, where it is not forbidden by law.

  **b.** Payment of Benefit Amount.  We will pay any benefit amount to:

  **(1)** the surviving spouse; or

Coding Prohibited

*0000C0WNP378032937441 16874*

Copying prohibited

**(2)** at our option, to any person or organization authorized by law to receive such payment.

**c.** General Provision. This coverage is made a part of the policy to which it is attached. All terms of the policy apply to this coverage except as changed by the terms of this coverage.

**G. Acts Of Electronic Aggression By Minors**

**1.** We will pay up to $25,000 for *personal injury* arising out of acts of *electronic aggression* by minors, subject to the following:

**a.** If coverage applies as stated we will:

**(1)** Pay for the damages for which an *insured* is legally liable, subject to the Aggregate Limit of Liability. Damages include prejudgment interest awarded against an *insured.*

**(2)** Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the Aggregate Limit of Liability has been exhausted by payment of a judgment or settlement.

**b.** With respect to coverage described in Section III - Conditions:

Paragraph A. Limit Of Liability is replaced by:

**A. Aggregate Limit Of Liability**

Our total limit of liability in an annual policy period under Acts Of Electronic Aggression By Minors Coverage for all damage resulting from the total of all offenses during the policy period will not be more than $50,000. This is the most we will pay regardless of the number of:

**1.** *Insureds;*

**2.** Offenses;

**3.** Claims made; or

**4.** Suits brought.

**c.** With respect to coverage described in Section III - Liability Coverage, Exclusion H:

Exclusions **H.1.** and **H.2.** are replaced by:

**1.** Injury caused by or at the direction of an *insured* who is not a minor with the knowledge that the act would violate the rights of another and would inflict *personal injury;*

**2.** Injury arising out of *electronic aggression* at or by the direction of an *insured* who is not a minor with knowledge of its falsity;

**d.** With respect to coverage described in Section III - Liability Coverage, Exclusion H:

Exclusions **H.10.** and **H.11.** are added:

**10.** Injury caused to the victim with the knowledge of the *insured* who is not a minor; or

**11.** *Electronic aggression* by the *insured* that took place prior to the start of the policy period.

# SECTION III - EXCLUSIONS

**A.** *Motor Vehicle* Liability

**1.** Coverage E and Coverage F do not apply to any *motor vehicle liability* if, at the time and place of an *occurrence,* the involved *motor vehicle:*

**a.** Is registered for use on public roads or property;

**b.** Is not registered for use on public roads or property, but such registration is required by a law, or regulation issued by a government agency, for it to be used at the place of the *occurrence*; or

**c.** Is being:

**(1)** Operated in, or practicing for, any prearranged or organized race, speed contest or other competition;

**(2)** Rented to others;

**(3)** Used to carry persons or cargo for a charge; or

**(4)** Used for any *business* purpose except for a motorized golf cart while on a golfing facility.

**2.** If Exclusion **A.1.** does not apply, there is still no coverage for *motor vehicle liability* unless the *motor vehicle* is:

**a.** In dead storage on an *insured location*;

**b.** Used to service a residence as long as the *motor vehicle* is not a *recreational motor vehicle*.

**c.** Designed to assist the handicapped and, at the time of an *occurrence*, it is:

**(1)** Being used to assist a handicapped person; or

**(2)** Parked on an *insured location*;

**d.** A *recreational motor vehicle* and:

**(1)** Not owned by an *insured*; or

**(2)** Owned by an *insured* provided the *occurrence* takes place:

**(a)** On an *insured location* as defined in Section **III - Definitions C.6.a., b., d., e.,** or **h.**; or

**(b)** Off an *insured location* and the *motor vehicle* is:

**(i)** Designed as a toy vehicle for use by children under seven years of age;

**(ii)** Powered by one or more batteries; and

**(iii)** Not built or modified after manufacture to exceed a speed of five miles per hour on level ground;

**e.** A motorized golf cart that is owned by an *insured*, designed to carry up to four persons, not built or modified after manufacture to exceed a speed of 25 miles per hour on level ground and, at the time of an *occurrence*, is within the legal boundaries of:

**(1)** A golfing facility and is parked or stored there, or being used by an *insured* to:

**(a)** Play the game of golf or for other recreational or leisure activity allowed by the facility;

**(b)** Travel to or from an area where *motor vehicles* or golf carts are parked or stored; or

**(c)** Cross public roads at designated points to access other parts of the golfing facility; or

**(2)** A private residential community, including its public roads upon which a motorized golf cart can legally travel, which is subject to the authority of a property owners association and contains an *insured's* residence.

A *recreational motor vehicle* as used in this provision is one of the following:

**a.** All-terrain vehicle (ATV);

**b.** Dune buggy;

**c.** Golf cart;

**d.** Snowmobile; or

**e.** Any other motorized land vehicle designed for recreational use off public roads.

**B. Watercraft Liability**

**1.** Coverages **E** and **F** do not apply to any *watercraft liability* if, at the time of an *occurrence*, the involved watercraft is being:

**a.** Operated in, or practicing for, any prearranged or organized race, speed contest or other competition. This exclusion does not apply to a sailing vessel or a predicted log cruise;

**b.** Rented to others;

**c.** Used to carry persons or cargo for a charge; or

**d.** Used for any *business* purpose.

**2.** If Exclusion **B.1.** does not apply, there is still not coverage for *watercraft liability* unless, at the time of the *occurrence*, the watercraft:

**a.** Is stored;

**b.** Is a sailing vessel, with or without auxiliary power that is:

**(1)** Less than 26 feet in overall length; or

**(2)** 26 feet or more in overall length and not owned by, rented to, furnished or available for regular use by an *insured*; or

**c.** Is not a sailing vessel and is powered by:

Copying Prohibited

*0000C0WNP3780329374411675*

**(1)** Engines or motors of 400 cubic centimeters or less on personal watercraft, such as jet skis, water bikes, water scooters or similar watercraft;

**(2)** Engines or motors of more than 400 cubic centimeters on personal watercraft, such as jet skis, water bikes, water scooters, or similar watercraft and not owned by or furnished or available for regular use by an *insured*;

**(3)** Engines or motors of 150 horsepower or less on watercraft which are not personal watercraft; or

**(4)** Engines or motors of more than 150 horsepower on watercraft which are not personal watercraft and not owned by or furnished or available for regular use by an *insured*.

Horsepower means the maximum power rating assigned to the engine or motor by the manufacturer.

**C.  Aircraft Liability**

This policy does not cover *aircraft liability*.

**D.  Hovercraft Liability**

This policy does not cover *hovercraft liability*.

**E.  Coverage E – Personal Liability And Coverage F – Medical Payments To Others**

Coverage **E** and **F** do not apply to the following:

**1.  Expected Or Intended Injury**

*Bodily Injury* or *property damage* which is expected or intended by an *insured*, even if the resulting *bodily injury* or *property damage*:

**a.** Is of a different kind, quality or degree than initially expected or intended; or

**b.** Is sustained by a different person, entity or property than initially expected or intended.

However, this Exclusion **E.1.** does not apply to *bodily injury* or *property damage* resulting from the use of reasonable force by an *insured* to protect persons or property;

**2.  Business**

**a.** *Bodily Injury* or *property damage* arising out of or in connection with

a *business* conducted from an *insured location* or engaged in by an *insured*, whether or not the *business* is owned or operated by an *insured* or employs an *insured*.

This Exclusion **E.2.** applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the *business*.

**b.** This Exclusion **E.2.** does not apply to:

**(1)** The rental or holding for rental of an *insured location*:

**(a)** On an occasional basis if used only as a residence;

**(b)** In part for use only as a residence, unless a single family unit is intended for use by the *occupying* family to lodge more than two roomers or boarders; or

**(c)** In part, as an office, school, studio or private garage; and

**(2)** An *insured* under the age of 21 years involved in a part-time or occasional, self-employed *business* with no employees;

**3.  Professional Services**

*Bodily injury* or *property damage* arising out of the rendering of or failure to render professional services;

**4.  Insured's Premises Not An *Insured Location***

*Bodily injury* or *property damage* arising out of a premises:

**a.** Owned by an *insured*;

**b.** Rented to an *insured*; or

**c.** Rented to others by an *insured*;

that is not an *insured location*;

**5.  Communicable Disease**

*Bodily injury* or *property damage* which arises out of the transmission of a communicable disease by an *insured*;

**6.  Sexual Molestation, Corporal Punishment Or Physical Or Mental Abuse**

*Bodily injury* or *property damage* arising out of sexual molestation, corporal punishment or physical or mental abuse;

7. **Controlled Substance**

*Bodily injury* or *property damage* arising out of the use, sale, manufacture, delivery, transfer or possession by any person of a Controlled Substance(s) as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. Controlled Substances include but are not limited to cocaine, LSD, marijuana and all narcotic drugs. However, this exclusion does not apply to the legitimate use of prescription drugs by a person following the lawful orders of a licensed health care professional; or

8. **Mold, Fungus, Wet Rot, Bacteria And Other Biological Contaminants**

*Bodily injury* or *property damage* arising out of existence of, exposure to, inhalation, absorption, or ingestion of mold, spores, mycotoxins, reproductive gases, bacteria or other biological contaminants, except as granted under Section II - Additional Coverage **E** of this policy.

9. **Act Of Bullying And Electronic Aggression**

*Bodily injury* or *property damage* arising out of the acts of *bullying* or *electronic aggression* by an *insured.*

Exclusions **A.** *Motor Vehicle Liability*, **B.** *Watercraft Liability*, **C.** *Aircraft Liability*, **D.** *Hovercraft Liability* and **E.4,** *Insured's* **Premises Not an** *Insured Location* do not apply to *bodily injury* to a *residence employee* arising out of and in the course of the *residence employee's* employment by an *insured.*

**F.   Coverage E - Personal Liability**

Coverage **E** does not apply to:

1.   Liability:

a.   For any loss assessment charged against you as a member of an association, corporation or community of property owners except as provided in **D.** Loss Assessment under Section III - Additional Coverages;

b.   Under any contract or agreement entered into by an *insured*. However, this exclusion does not apply to written contracts:

(1)   That directly relate to the ownership, maintenance or use of an *insured location*; or

(2)   Where the liability of others is assumed by you prior to an *occurrence*;

Unless excluded in **F.1.a.** above or elsewhere in this policy;

2.   *Property damage* to property owned by the *insured*. This includes costs or expenses incurred by an *insured* or others to repair, replace, enhance, restore or maintain such property to prevent injury to a person or damage to property of others, whether on or away from an *insured location.*

3.   *Property damage* to property rented to, occupied or used by or in the care of an *insured*. This exclusion does not apply to *property damage* caused by fire, smoke or explosion;

4.   *Bodily injury* to any person eligible to receive any benefits voluntarily provided or required to be provided by an *insured* under any:

a.   Workers' compensation law;

b.   Non-occupational disability law; or

c.   Occupational disease law;

5.   *Bodily injury* or *property damage* for which an *insured* under this policy:

a.   Is also an *insured* under a nuclear energy liability policy issued by the:

(1)   Nuclear Energy Liability Insurance Association;

(2)   Mutual Atomic Energy Liability Underwriters;

(3)   Nuclear Insurance Association of Canada;

or any of their successors; or

b.   Would be an *insured* under such a policy but for the exhaustion of its limit of liability; or

6.   *Bodily injury* to you or an *insured* as defined under Section III - Coverages - Definition **C.5.** *Insured.*

This exclusion also applies to any claim made to or suit brought against you or an *insured* to:

a.   Repay; or

b.   Share damages with;

another person who may be obligated to pay damages because of *bodily injury* to an *insured.*

**G.   Coverage F - Medical Payments To Others**

Coverage **F** does not apply to *bodily injury:*

Copyright Prohibited

Copying Prohibited

1. To a **residence employee** if the **bodily injury**:

    a. Occurs off the **insured location**; and

    b. Does not arise out of or in the course of the **residence employee's** employment by an **insured**;

2. To any person eligible to receive benefits voluntarily provided or required to be provided under any:

    a. Worker's compensation law;

    b. Non-occupational disability law; or

    c. Occupational disease law;

3. From any:

    a. Nuclear reaction;

    b. Nuclear radiation; or

    c. Radioactive contamination;

    all whether controlled or uncontrolled or however caused; or

    d. Any consequence of any of these; or

4. To any person other than a **residence employee** of an **insured**, regularly residing on any part of the **insured location**.

**H. Personal Injury**

Section III - Exclusions **A. - G.** do not apply to **personal injury**.

**Personal Injury** insurance does not apply to:

1. Injury caused by or at the direction of an **insured** with the knowledge that the act would violate the rights of another or would inflict **personal injury**;

2. Injury arising out of oral or written publication of material, if done by or at the direction of an **insured** with knowledge of its falsity;

3. Injury arising out of acts of **bullying** or **electronic aggression** by an **insured** except as provided in Section III - Additional Coverage **G.**

4. Injury to you or an **insured** as defined under Definition **5. Insured**;

5. Liability assumed by the **insured** under any contract or agreement except any indemnity obligation assumed by an **insured** under a written contract directly relating to the ownership, maintenance or use of the premises;

6. Injury caused by a violation of a penal law or ordinance committed by or with the knowledge or consent of an **insured**;

7. Injury sustained by any person as a result of an offense directly or indirectly related to the employment of this person by an **insured**;

8. Injury arising out of a **business** engaged in by an insured; or

9. Civic or public activities performed for pay by an **insured**.

# SECTION III - CONDITIONS

**A. Limit Of Liability**

Our total liability under Coverage **E** for all damages resulting from any one **occurrence** will not be more than the Coverage **E** Limit Of Liability as shown in the Declarations. This limit is the same regardless of the number of **insureds**, claims made or persons injured. All **bodily injury** and **property damage** resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one **occurrence**.

Our total liability under Coverage **F** for all medical expenses payable for **bodily injury** to one person as the result of one accident will not be more than the Coverage **F** Limit Of Liability as shown in the Declarations.

**B. Severability Of Insurance**

This insurance applies separately to each **insured**. This condition will not increase our limit of liability for any one **occurrence**.

**C. Payment Of Claim - Coverage F - Medical Payments To Others**

Payment under this coverage is not an admission of liability by an **insured** or us.

**D. Other Insurance - Coverage E - Personal Liability**

This insurance is excess over any other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

*0000C0WNP37803293744116T6*

# SECTION IV AUTO LIABILITY

# SECTION IV - COVERAGES

**A.  COVERAGE G - AUTO LIABILITY**

We will pay damages for *bodily injury* or *property damage* for which any *insured* becomes legally responsible because of an auto accident.  We will settle or defend, as we consider appropriate, any claim or suit asking for these damages.  In addition to our limit of liability, we will pay all defense costs we incur.  Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted by payment of judgments or settlements. We have no duty to defend any suit or settle any claim for *bodily injury* or *property damage*  not covered under this policy.

**B.  Definitions Applicable To Section IV - Auto Liability:**

1.  *"Insured"* means:

   a.  You or any *family member* for the ownership, maintenance or use of any auto or *trailer*.

   b.  Any person using *your covered auto* with the express or implied permission of you or any *family member* while within the scope of such permission.

   c.  For *your covered auto*, any person or organization but only with respect to legal responsibility for acts or omissions of a person for whom coverage is afforded under this section.

   d.  For any auto or *trailer*, other than *your covered auto*, any other person or organization but only with respect to legal responsibility for acts or omissions of you or any *family member* for whom coverage is afforded under this section. This Provision **d.** applies only if the person or organization does not own or hire the auto or *trailer*.

   The following are not *insured*s under Coverage **G**:

   a.  The United States of America or any of its agencies.

   b.  Any person with respect to *bodily injury* or *property damage* resulting from the operation of a *motor vehicle* by that person as an employee of the United States government. The Provision **b.** applies only if the

provisions of Section 2679 of Title 28 of the United States Code, as amended require the Attorney General of the United States to defend that person in any civil action which may be brought for the *bodily injury* or *property damage*.

2.  *"Newly acquired auto"*:

   a.  *Newly acquired auto* means any of the following types of vehicles you become the owner of during the policy period:

      (1)  A private passenger auto; or

      (2)  A pickup or van, for which no other insurance policy provides coverage, that:

         (a)  Has a gross vehicle weight rating of 13,500 lbs. or less; and

         (b)  Is not used for the delivery or transportation of goods and materials unless such use is incidental to your *business* of installing, maintaining or repairing furnishings or equipment.

   b.  Coverage for a *newly acquired auto* is provided as described below.  If you ask us to insure a *newly acquired auto* after a specified time period described below has elapsed, any coverage we provide for a *newly acquired auto* will begin at the time you request the coverage.

   c.  For any coverage provided in Section **IV**, a *newly acquired auto* will have the broadest coverage now provided for any vehicle shown in the Declarations.  Coverage begins on the date you become the owner. However, for this coverage to apply to a *newly acquired auto* which is in addition to any vehicle shown in the Declarations, you must ask us to insure it within 14 days after you become the owner.  If a *newly acquired auto* replaces a vehicle shown in the Declarations, coverage is provided for this vehicle without your having to ask us to insure it.

3.  *"Noneconomic loss"* means pain and suffering and other nonmonetary detriment.

Copying Prohibited

*0000C0WNP3780329374411677*

4. **"Serious injury"** means an injury resulting in death, serious impairment of bodily function or permanent serious disfigurement.

5. **"Trailer"** means a vehicle designed to be pulled by a:

   a. Private passenger auto; or

   b. Pickup or van.

   However, a **trailer** does not include:

   a. A mobile home; or

   b. Any vehicle used as an office, store, display, residence or passenger conveyance.

6. **"Your covered auto"** means:

   a. Any vehicle shown in the Declarations as subject to this policy form.

   b. A **newly acquired auto**.

   c. Any **trailer** you own.

   d. Any **temporary substitute auto**.

7. **"Transportation network platform"** means an online-enabled application or digital network used to connect passengers with drivers using vehicles for the purpose of providing prearranged transportation services for compensation.

# SECTION IV - ADDITIONAL COVERAGES

## COVERAGE G - SUPPLEMENTARY PAYMENTS

In addition to our limit of liability for Coverage **G**, we will pay on behalf of an **insured**:

A. Up to $250 for the cost of bail bonds required because of an accident, including related traffic law violations. The accident must result in **bodily injury** or **property damage** covered under this policy.

B. Premiums on appeal bonds and bonds to release attachments in any suit we defend.

C. Interest accruing after a judgment is entered in any suit we defend. Our duty to pay interest ends when we offer to pay the part of the judgment which does not exceed our limit of liability for this coverage.

D. At the **insured's** request, up to $250 a day for loss of earnings, but not other income, because of attendance at hearings or trials at our request.

E. Other reasonable expenses incurred at our request.

F. Prejudgment interest awarded against the **insured** on the part of the judgment we pay. Any prejudgment interest awarded against the **insured** is subject to the applicable Pennsylvania Rules of Civil Procedure.

These payments will not reduce the limit of liability.

## DEATH BENEFITS

In addition to our limit of liability, we will pay:

A. A $5,000 death benefit for:

   1. You; and

   2. Your spouse, if a resident of your household; and

B. A $2,000 death benefit for each **family member**;

If you or they die within 24 months from **bodily injury** sustained as a direct result of an accident while **occupying**, or as a pedestrian when struck by, a **motor vehicle** designed for use mainly on public roads or by a **trailer** of any type.

Death must be caused solely through external, violent and accidental means.

Payment will be made to the surviving spouse, the next of kin or to any person or organization authorized by law to receive such payment, as we may elect.

This coverage is in addition to any Accidental Death or Funeral Expense Benefits provided.

# SECTION IV - EXCLUSIONS

A. We do not provide Auto Liability Coverage for any **insured**:

   1. For **bodily injury** or **property damage** which is:

      a. Expected or intended by an **insured**; or

      b. At the direction of an **insured**;

   even if the resulting **bodily injury** or **property damage**:

      a. Is of a different kind, quality or degree than initially expected or intended; or

      b. Is sustained by a different person, entity or property than initially expected or intended.

2. For *property damage* to property owned or being transported by that *insured.*

3. For *property damage* to property:

   a. Rented to;

   b. Used by; or

   c. In the care of;

   that *insured.* This Exclusion **A.3.** does not apply to *property damage* to a residence or private garage.

4. For *bodily injury* to an employee of that *insured* during the course of employment.

   This Exclusion **A.4.** does not apply to *bodily injury* to a *residence employee* unless workers' compensation benefits are required or available for that *residence employee.*

5. For that *insured's* liability arising out of the ownership or operation of a vehicle while being used as a public or livery conveyance. However this Exclusion **A.5.** shall not include a share-the-expense car pool.

6. While employed or otherwise engaged in the *business* of:

   | | | |
   |---|---|---|
   | a. Selling; | d. | Storing; |
   | b. Repairing; | e. | Parking; or |
   | c. Servicing; | f. | Leasing; |

   vehicles designed for use mainly on public highways. This includes road testing and delivery. This Exclusion **A.6.** does not apply to the ownership, maintenance or use of *your covered auto* by:

   a. You;

   b. Any *family member*; or

   c. Any partner, agent or employee of you or any *family member.*

7. Maintaining or using any vehicle while that *insured* is employed or otherwise engaged in any *business* not described in Exclusion **A.6.** above.

   This Exclusion **A.7.** does not apply to the maintenance or use of a:

   a. Private passenger auto;

   b. Pickup or van; or

   c. *Trailer* used with a vehicle described in **a.** or **b.** above.

8. Using a vehicle without the express or implied permission of the owner of that vehicle or while exceeding the scope of such permission. This Exclusion **A.8.** does not apply to a *family member* using *your covered auto* which is owned by you.

9. For any obligation for which the United States Government is liable under the Federal Tort Claims Act.

10. Sustained while *occupying* a vehicle owned by an *insured* while rented or leased to any person or organization other than you.

11. For punitive or exemplary damages.

B. We do not provide Auto Liability Coverage for the ownership, maintenance or use of:

   1. Any vehicle which:

      a. Has fewer than four wheels; or

      b. Is designed mainly for use off public roads.

      This Exclusion **B.1.** does not apply:

      a. While such vehicle is being used by an *insured* in a medical emergency;

      b. To any *trailer*; or

      c. To any non-owned golf cart.

   2. Any vehicle other than *your covered auto*, which is:

      a. Owned by you; or

      b. Furnished or available for your regular use.

   3. Any vehicle, other than *your covered auto*, which is:

      a. Owned by any *family member*; or

      b. Furnished or available for the regular use of any *family member.*

      However, this Exclusion **B.3.** does not apply to you while you are maintaining or *occupying* a vehicle which is owned by or furnished or available for the regular use of a *family member.*

   4. Any vehicle, located inside a facility designed for racing, for the purpose of:

      a. Competing in; or

      b. Practicing or preparing for;

      any prearranged or organized racing or speed contest.

Copying Prohibited

*0000COWNP3780329374411678*

# SECTION IV - CONDITIONS

## A. COVERAGE G - AUTO LIABILITY

1. If the Declarations indicates a single limit of liability for each accident:

   a. The limit of liability shown in the Declarations for Coverage G is our maximum limit of liability for all damages resulting from any one auto accident. This is the most we will pay regardless of the number of:

      (1) *Insureds*;

      (2) Claims made;

      (3) Vehicles or premiums shown in the Declarations; or

      (4) Vehicles involved in the accident.

   b. We will apply the limit of liability to provide any separate limits required by law for bodily injury liability and property damage liability. However, this Provision, **1.b.** will not change our total limit of liability.

2. If the Declarations indicates a split limit of liability for Bodily Injury Liability and Property Damage Liability:

   a. The limit shown in the Declarations for "each person" for Bodily Injury Liability is our maximum limit of liability for all damages, including damages for care, loss of services or death, arising out of *bodily injury* sustained by any one person in any one auto accident.

   b. Subject to this limit for "each person", the limit shown in the Declarations for "each accident" for Bodily Injury Liability is our maximum limit of liability for all damages for *bodily injury* resulting from any one auto accident.

   c. The limit shown in the Declarations for "each accident" for Property Damage Liability is our maximum limit of liability for all damages for *property damage* resulting from any one auto accident.

   d. This is the most we will pay regardless of the number of:

      (1) *Insureds*;

      (2) Claims made;

      (3) Vehicles or premiums shown in the Declarations; or

      (4) Vehicles involved in the accident.

3. No one will be entitled to receive duplicate payments for the same elements of loss under this coverage and any:

   a. First Party Benefits Coverage;

   b. Uninsured Motorists Coverage; or

   c. Underinsured Motorists Coverage;

   provided by this policy.

## B. OTHER INSURANCE

If there is other applicable liability insurance we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits. However, any insurance we provide for a vehicle:

1. You do not own, including any vehicle while used as a temporary substitute for *your covered auto*; or

2. Which is operated or used by any person other than you or any *family member*;

shall be excess over any other collectible insurance, self-insurance or bond. However, any insurance we provide for a vehicle you do not own, including any vehicle while used as a temporary substitute for *your covered auto* that is provided by a motor vehicle dealer as defined in the Pennsylvania Board of Vehicles Act, shall be primary.

## C. OUT-OF-STATE COVERAGE

If an auto accident to which this policy applies occurs in any state or province other than the one in which *your covered auto* is principally garaged, we will interpret your policy for that accident as follows:

If the state or province has:

1. A financial responsibility or similar law specifying limits of liability for *bodily injury* or *property damage* higher than the limit shown in the Declarations, your policy will provide the higher specified limit.

2. A compulsory insurance or similar law requiring a non-resident to maintain insurance whenever the non-resident uses a vehicle in that state or province, your policy will provide at least the required minimum amounts and types of coverage.

No one will be entitled to duplicate payments for the same elements of loss.

**D. FINANCIAL RESPONSIBILITY REQUIRED**

When this policy is certified as future proof of financial responsibility, this policy shall comply with the law to the extent required.

# SECTION V - FIRST PARTY BENEFITS COVERAGE
# UNINSURED MOTORISTS COVERAGE
# UNDERINSURED MOTORISTS COVERAGE
## *(SEE APPLICABLE STATE ENDORSEMENTS)*

# SECTION VI - DAMAGE TO YOUR AUTO

# SECTION VI - COVERAGES

**COVERAGE K - DAMAGE TO YOUR AUTO**

**A.** We will pay direct and accidental loss to *your covered auto* or any *non-owned auto*, including its equipment, minus any applicable deductible shown in the Declarations. If loss to more than one *your covered auto* or *non-owned auto* results from the same *collision,* only the highest applicable deductible will apply. We will pay for loss to *your covered auto* caused by:

**1.** Other than *collision* only if the Declarations indicate that Other Than Collision Coverage is provided for that auto.

**2.** *Collision* only if the Declarations indicate that Collision Coverage is provided for that auto.

**B.** If there is a loss to a *non-owned auto,* we will provide the broadest coverage applicable to any *your covered auto* shown in the Declarations.

**C.** If breakage of glass is caused by a *collision,* you may elect to have it considered a loss caused by *collision.*

**D. Definitions Applicable To Section VI - Damage To Your Auto**

**1.** *"Collision"* means the upset of *your covered auto* or a *non-owned auto* or its impact with another vehicle or object. However, loss caused by the following is considered other than *collision,*

**a.** Missiles or falling objects;

**b.** Contact with bird or animal; or

**c.** Breakage of glass. If breakage of glass is caused by a *collision,* you

may elect to have it considered a loss caused by *collision.*

Other than *collision* also includes, but is not limited to, loss caused by:

**a.** Fire;

**b.** Theft or larceny;

**c.** Malicious mischief or vandalism;

**d.** Explosion;

**e.** Earthquake;

**f.** Windstorm;

**g.** Hail;

**h.** Water or flood; and

**i.** Riot or civil commotion.

**2.** *"Diminution in value"* means the actual or perceived loss in market value or resale value, which results from a direct and accidental loss.

**3.** *"New auto"* means *your covered auto:*

**a.** That is owned by you;

**b.** Acquired by you within the past 12 months; and

**c.** That has never been previously titled;

**4.** *"Newly acquired auto":*

**a.** *Newly acquired auto* means any of the following types of vehicles you become the owner of during the policy period:

**(1)** A private passenger auto; or

Copying Prohibited

*00000C0WNP37803293744116Z9*

**(2)** A pickup or van, for which no other insurance policy provides coverage, that:

**(a)** Has a gross vehicle weight rating of 13,500 lbs. or less; and

**(b)** Is not used for the delivery or transportation of goods and materials unless such use is incidental to your *business* of installing, maintaining or repairing furnishings or equipment.

**b.** Coverage for a *newly acquired auto* is provided as described below. If you ask us to insure a *newly acquired auto* after a specified time period described below has elapsed, any coverage we provide for a *newly acquired auto* will begin at the time you request the coverage.

**c.** *Collision* Coverage for a *newly acquired auto* begins on the date you become the owner. However, for this coverage to apply, you must ask us to insure it within:

**(1)** 14 days after you become the owner if the Declarations indicate that *Collision* Coverage applies to at least one auto. In this case, the *newly acquired auto* will have the broadest coverage we now provide for any auto shown in the Declarations.

**(2)** Four days after you become the owner if the Declarations do not indicate that *Collision* Coverage applies to at least one auto. If you comply with the 4-day requirement and a loss occurred before you asked us to insure the *newly acquired auto*, a *Collision* deductible of $500 will apply.

**d.** Other Than *Collision* Coverage for a *newly acquired auto* begins on the date you become the owner. However, for this coverage to apply, you must ask us to insure it within:

**(1)** 14 days after you become the owner if the Declarations indicate that Other Than *Collision* Coverage applies to at least one auto. In this case, the *newly*

*acquired auto* will have the broadest coverage we now provide for any auto shown in the Declarations.

**(2)** Four days after you become the owner if the Declarations do not indicate that Other Than *Collision* Coverage applies to at least one auto. If you comply with the 4-day requirement and a loss occurred before you asked us to insure the *newly acquired auto*, an Other Than *Collision* deductible of $500 will apply.

**5.** *"Non-owned auto"* means:

**a.** Any private passenger auto, pickup, van or *trailer* not owned by or furnished or available for the regular use of you or any *family member* while in the custody of or being operated by you or any *family member;* or

**b.** Any auto or *trailer* used as a *temporary substitute auto.*

**6.** *"Trailer"* means a vehicle designed to be pulled by a:

**a.** Private passenger auto; or

**b.** Pickup or van.

**7.** *"Temporary substitute auto"* means any auto or *trailer* you do not own while used as a substitute for *your covered auto* which is out of normal use because of its:

**a.** Breakdown;

**b.** Repair;

**c.** Servicing;

**d.** Loss;

**e.** Destruction; or

**f.** Being inspected or transported by a motor vehicle dealer as defined in the Pennsylvania Board of Vehicles Act.

**8.** *"Your covered auto"* means:

**a.** Any vehicle shown in the Declarations as subject to this policy form.

**b.** A *newly acquired auto.*

**c.** Any *trailer* you own.

# SECTION VI - ADDITIONAL COVERAGES

In addition, we will provide the following additional coverages.

## A. SUPPLEMENTARY PAYMENTS

1. We will pay, without application of a deductible, up to the maximum limit of liability shown either in the Declarations or in **2.**, **4.** or **6.** below for the following additional coverages in the event of a loss to *your covered auto* or a *non-owned auto*. We will pay if the loss is caused by:

   a. Other than *collision* only if the Declarations indicate that Other Than *Collision* Coverage is provided for that auto.

   b. *Collision* only if the Declarations indicate that *Collision* Coverage is provided for that auto.

   c. If there is a loss to a *non-owned auto*, we will provide the broadest coverage applicable to any *your covered auto* shown in the Declarations.

2. **Personal Contents Coverage**

   Up to $500 for loss or damage to personal property owned by you or any *family member* which is in or upon *your covered auto* or a *non-owned auto* at the time of the accident. However, we will not pay for:

   a. Property excluded under Section **VI** - Exclusions of this policy;

   b. Loss of use of any personal property; or

   c. Money.

   This coverage shall be excess over any other collectible insurance.

3. **Transportation Expenses Coverage**

   a. Up to the maximum limit shown in the Declarations for:

      (1) Temporary transportation expenses incurred by you in the event of a loss to *your covered auto.*

      (2) Loss of use expenses for which you become legally responsible in the event of loss to a *non-owned auto.*

   b. If the loss is caused by a total theft of *your covered auto* or a *non-owned*

*auto,* we will pay only expenses incurred during the period:

   (1) Beginning 48 hours after the theft is reported to us; and

   (2) Ending the earlier of when *your covered auto* or the *non-owned auto*:

      (a) Is recovered and returned to you or to its owner;

      (b) Is recovered and repaired;

      (c) Is replaced.

   c. If the loss is caused by other than theft of a *your covered auto* or a *non-owned auto*, we will pay only expenses you incur during the period:

      (1) Beginning:

         (a) When *your covered auto* or the *non-owned auto* cannot be driven because of the loss; or

         (b) On the date *your covered auto* or the *non-owned auto* is delivered to a repair shop to be repaired due to the loss if it can be safely driven.

      (2) Ending the earlier of when *your covered auto* or the *non-owned auto*:

         (a) Is returned to you or to its owner;

         (b) Is repaired;

         (c) Is replaced.

   d. Our payment will be limited to that period of time reasonably required to repair or replace *your covered auto* or the *non-owned auto.*

   e. At our request, you must provide us with written proof of your transportation expenses and loss of use costs.

   f. The most we will pay for temporary transportation expenses or loss of use expenses for any loss is the lesser of:

      (1) Cost of a comparable rental auto to the *your covered auto* or the *non-owned auto* involved in the loss; or

Copying prohibited

*000C0WNP3780329374411680*

Copying Prohibited

**(2)** The limit per day shown in the Declarations.

**4. Trip Interruption Coverage**

Up to $150 per day to a maximum of $600 for reasonable:

**a.** Transportation expenses incurred by you or any *family member* in the event of a mechanical or electrical breakdown of *your covered auto*.

**b.** Expenses incurred by you or any *family member* for lodging and meals in the event of:

**(1)** Direct and accidental loss to *your covered auto* caused by *collision* or other than *collision*; and

**(2)** Mechanical or electrical breakdown of *your covered auto*.

This coverage applies only if:

**a.** The loss to, or mechanical or electrical breakdown or, *your covered auto* occurs more than 100 miles from home; and

**b.** The *your covered auto* is withdrawn from use for at least 24 hours; and

**c.** You or a *family member* are *occupying your covered auto* at the time of loss or mechanical or electrical breakdown.

Our payment for the Trip Interruption Coverage will be limited to that period of time reasonably required to:

**a.** Resume travel under a prearranged itinerary; or

**b.** Return home.

No one will be entitled to receive duplicate payments for the same elements of loss under this coverage and any other coverage provided under this policy.

Any insurance we provide with respect to Trip Interruption Coverage shall be excess over any other collectible source of recovery including but not limited to:

**a.** Any coverage provided by:

**(1)** Vehicle warranties;

**(2)** Automobile clubs; or

**(3)** Mechanical breakdown or similar plans; or

**b.** Any other source of recovery applicable to the loss.

**5. Loan/Lease Coverage**

In the event of a total loss to *your covered auto* shown in the Declarations, we will pay any unpaid amount due on the lease or loan of that *your covered auto* less:

**a.** The amount paid under Collision Coverage or Other Than Collision Coverage; and

**b.** Any:

**(1)** Overdue loan/lease payments at the time of the loss.

**(2)** Financial penalties imposed under a lease for excessive use, abnormal wear and tear or high mileage;

**(3)** Security deposits not refunded by a lessor;

**(4)** Costs for extended warranties, credit life insurance, accident or disability insurance purchased with the loan or lease; and

**(5)** Carry-over balances from previous loans or leases.

**6. Limited Customizing Equipment Coverage**

Section **VI** Exclusion **G.** does not apply to the coverage afforded by this coverage.

With respect to *your covered auto* that is a pickup or van, we will pay up to $1,000 for loss to:

**a.** Special carpets, furniture or bars, height-extending roofs, custom murals, paintings or graphics and similar equipment.

**b.** Equipment designed to assist the handicapped in *your covered auto* that is a pickup or van including, but not limited to:

**(1)** Lifts;

**(2)** Ramps;

**(3)** Power seats;

**(4)** Power pans;

and similar equipment.

**c.** Permanently installed equipment designed for other than the normal operation of *your covered auto* including, but not limited to:

**(1)** Winches;

**(2)** Light bars; and tool boxes.

Limited Customizing Equipment Coverage does not include furnishings and equipment that are excluded from coverage under Section **VI** Exclusions **C., D., E.** or **H.**

**B. ROADSIDE ASSISTANCE**

If Roadside Assistance Coverage is shown in the Declarations, we will pay for our authorized service representative to provide:

1. Towing of a *covered disabled auto* to a qualified repair facility within thirty (30) miles; and

2. Labor on a *covered disabled auto* at the place of disablement;

Which is necessary due to a *covered emergency*.

When used in this coverage:

1. *"Covered disabled auto"* means any *your covered auto* to which this coverage applies as shown in the Declarations.

2. *"Covered emergency"* means a disablement that is a result of:

    a. Mechanical or electrical breakdown;

    b. Battery failure;

    c. Insufficient supply of fuel (delivery of up to 2 gallons of fuel included at no cost), oil, water, or other fluid;

    d. Flat tire;

    e. Lock-out; or

    f. Entrapment in snow, mud, water or sand, within 100 feet of a road or highway.

This coverage does not apply to:

1. Parts, replacement keys, fluid, lubricants, or fuel;

2. Installation of products or material not related to the disablement;

3. Labor not related to the disablement;

4. Labor on a *covered disabled auto* for any time period in excess of sixty (60) minutes per disablement;

5. Towing or storage related to impoundment, abandonment, illegal parking, or other violations of law;

6. Assistance with jacks, levelers, airbags, or awnings;

7. Towing from a service station, garage, or repair shop;

8. Labor or repair work performed at a service station, garage, or repair shop;

9. Vehicle storage charges;

10. A second tow for a single disablement;

11. Disablement that occurs on roads not regularly maintained, including sand beaches, open fields, and areas designated as not passable due to construction;

12. Mounting or removing of snow tires or chains;

13. Tire repair;

14. Repeated service calls for a *covered disabled auto* in need of routine maintenance or repair;

15. Disablement that results from a willful act or action by the operator of a *covered disabled auto*;

16. Disablement that is not the result of a *covered emergency*;

17. Disablement that results from the use of intoxicants or narcotics; or

18. A *trailer*.

When service is rendered by a provider other than our authorized service representative, we will only pay reasonable charges, as determined by us, for:

1. Towing of a *covered disabled auto* to a qualified repair facility; and

2. Labor on a *covered disabled auto* at the place of disablement;

Which is necessary due to a *covered emergency*.

**C. LOCKSMITH SERVICE**

1. If you or any *family member* are accidently locked out of *your covered auto* or a *non-owned auto,* we will pay up to $150 maximum per disablement for the services of a Locksmith. We will only pay for labor and services performed at the place where entry to the auto is made.

2. Any insurance we provide with respect to Locksmith Service shall be excess over any other collectible source of recovery including, but not limited to:

    a. Any coverage provided by:

        (1) Vehicle warranties;

        (2) Automobile clubs; or

        (3) Mechanical breakdown or similar plans; or

Copying Prohibited

*0000COWNP37803293744116B1*

    **b.** Any other source of recovery applicable to the loss.

### D. AIRBAG REPLACEMENT COVERAGE

**1.** We will reimburse you up to $2,500 for the cost of reinstalling a factory installed airbag in **your covered auto** if it deploys due to a failure that is not the result of an accident caused by **collision** or other than **collision**.

**2.** Any insurance we provide with respect to Airbag Replacement Coverage shall be excess over any other collectible source of recovery including, but not limited to:

    **a.** Any coverage provided by:

      **(1)** Vehicle warranties;

      **(2)** Automobile clubs; or

      **(3)** Mechanical breakdown or similar plans; or

    **b.** Any other source of recovery applicable to the loss.

# SECTION VI - EXCLUSIONS

We will not pay for:

**A.** Loss to **your covered auto** or any **non-owned auto** which occurs while it is being used as a public or livery conveyance. However, this Exclusion **A.** shall not include a share-the-expense car pool.

**B.** Damage due and confined to:

    **1.** Wear and tear;

    **2.** Freezing;

    **3.** Mechanical or electrical breakdown or failure; or

    **4.** Road damage to tires.

This Exclusion **B.** does not apply if the damage results from the total theft of **your covered auto** or any **non-owned auto.**

**C.** Loss to any electronic equipment that reproduces, receives or transmits audio, visual or data signals. This includes, but is not limited to:

    **1.** Radios and stereos;

    **2.** Tape decks;

    **3.** Compact disc systems;

    **4.** Navigation systems;

    **5.** Internet access systems;

    **6.** Personal computers;

    **7.** Video entertainment systems;

    **8.** Telephones;

    **9.** Televisions;

    **10.** Two-way mobile radios;

    **11.** Scanners; and

    **12.** Citizen band radios.

This Exclusion **C.** does not apply to electronic equipment that is permanently installed in **your covered auto** or any **non-owned auto.**

**D.** Loss to tapes, records, discs or other media used with equipment described in Exclusion **C.** above, whether or not that equipment is provided coverage under this policy.

**E.** Loss to:

    **1.** A **trailer** or camper body or motor home which is not shown in the Declarations as subject to this policy form; or

    **2.** Facilities or equipment used with such **trailer** or camper body. Facilities or equipment include, but are not limited to:

      **a.** cooking, dining, plumbing or refrigeration facilities;

      **b.** awnings or cabanas; or

      **c.** any other facilities or equipment used with a **trailer** or camper body.

This Exclusion **E.** does not apply to a:

    **a.** **trailer**, and its facilities or equipment, which you do not own;

    **b.** **trailer**, camper body, or the facilities or equipment in or attached to the **trailer** or camper body, which you:

      **(1)** acquire during the policy period; and

      **(2)** ask us to insure within 14 days after you become the owner.

**F.** Loss to any **non-owned auto** when used by you or a **family member** without the express or implied consent of the owner of that auto, or while exceeding the scope of the permission granted.

**G.** Loss to any custom furnishings or equipment in or upon any pickup or van. Custom furnishings or equipment include but are not limited to:

Copying Prohibited

1. Special carpets, furniture or bars, height-extending roofs, custom murals, paintings, decals or graphics and similar equipment.

2. Equipment designed to assist the handicapped in *your covered auto* that is a pickup or van including, but not limited to:

   a. Lifts;

   b. Ramps;

   c. Power seats;

   d. Power pans;

   and similar equipment.

   This Exclusion **G.** does not apply to:

   1. A cap or bed liner in or upon any *your covered auto* which is a pickup; or

   2. Any coverage provided under Section VI - Additional Coverages.

**H.** Loss to equipment designed or used for the detection or location of radar, laser or other speed measuring equipment or its transmissions.

**I.** Loss to any *non-owned auto* being maintained or used by any person while employed or otherwise engaged in the *business* of:

   1. Selling;          4. Storing;

   2. Repairing;        5. Parking; or

   3. Servicing;        6. Leasing;

   vehicles designed for use on public highways. This includes road testing and delivery.

**J.** A total loss to *your covered auto* or any *non-owned auto* due to destruction or confiscation by governmental or civil authorities.

**K.** Loss to *your covered auto* or any *non-owned auto,* located inside a facility designed for racing, for the purpose of:

   1. Competing in; or

2. Practicing or preparing for;

   any prearranged or organized racing or speed contest.

**L.** Loss to, or loss of use of, a *non-owned auto* rented by:

   1. You; or

   2. Any *family member;*

   if a rental vehicle company is precluded from recovering such loss or loss of use, from you or that *family member,* pursuant to the provisions of any applicable rental agreement or state law; or

**M.** Loss to *your covered auto* or a *non-owned auto,* which is expected or intended by an *insured,* or at the direction of an *insured,* even if the resulting damage is of a different kind, quality or degree than initially expected or intended. However, with respect to *property damage,* this Exclusion **M.** does not apply to the interest of an innocent *insured* who did not cooperate in or contribute to the creation of the loss if the loss arose out of abuse of that innocent *insured* by another *insured.*

With respect to this provision, abuse means:

   1. Abuse as defined in the Pennsylvania Protection From Abuse Act; or

   2. Attempting to cause or intentionally, knowingly or recklessly causing damage to covered property so as to intimidate or attempt to control the behavior of another person.

If we pay a claim under this provision, our payment to the *insured* is limited to that *insured's* insurable interest in the property. In no event will we pay more than the Limit of Liability.

**N.** Loss to *your covered auto* while rented or leased to any person or organization other than you.

**O.** Loss to *your covered auto* or a *non-owned auto* due to *diminution in value* after repairs have been made.

---

# SECTION VI - CONDITIONS

**For the Collision and Other Than Collision Coverages, if a specific dollar amount is shown as the limit of liability in the Declarations, that amount is not necessarily the amount you will receive at the time of loss for damage to the described vehicle. Please refer to the Limit of Liability provision for clarification.**

---

**A. LIMIT OF LIABILITY**

1. For loss caused by fire, theft or larceny to *your covered auto* or to any loss to a *non-owned auto,* our limit of liability will be the lesser of the:

   a. Amount shown in the Declarations;

   b. Actual cash value of the stolen or damaged property; or

   c. Amount necessary to repair or replace the stolen or damaged property with other property of like kind and quality;

*0000C0WNP378032937441168Z*

less the applicable deductible shown in the Declarations and less its salvage value if you retain the salvage.

2. For loss caused by **collision** or by other than **collision** not caused by fire, theft or larceny to **your covered auto**, our limit of liability will be:

   a. In the event of a total loss to a **new auto**, the cost of a new vehicle of the same make, model and with the same original manufacturer's equipment, or if unavailable, a similar new vehicle and equipment.

   b. For other than a total loss to a **new auto**, the lesser of the:

     (1) Amount shown in the Declarations;

     (2) Actual cash value of the stolen or damaged property; or

     (3) Amount necessary to repair or replace the stolen or damaged property with other property of like kind and quality;

less the applicable deductible shown in the Declarations and less its salvage value if you retain the salvage.

However, Provision **A.2.a.** shall:

   a. Only apply to **your covered auto** for twelve months from the date you become the owner; and

   b. Not apply to a **newly acquired auto** unless:

     (1) That **newly acquired auto** has never been previously titled; and

     (2) You notify us within 14 days after you become the owner.

3. The most we will pay for loss to:

   a. Any **non-owned auto** which is a **trailer** is $2,000.

   b. Electronic equipment that reproduces, receives or transmits audio, visual or data signals, which is permanently installed in the auto in locations not used by the auto manufacturer for installation of such equipment, is $1,000.

**B. REDUCTION OF COLLISION DEDUCTIBLE**

We will reduce the deductible shown in the Declarations for **collision** of **your covered auto** with:

1. A **motor vehicle** whose operator:

   a. Has been positively identified; and

   b. Who is more than 50% legally responsible for all damages resulting from the accident;

provided no liability bond or policy applies at the time of the accident, or a liability bond or policy does apply at the time of the accident but its limit is less than the amount of damages you are legally entitled to recover. This reduction **B.1.** shall not apply if:

   a. The amount of damages you are legally entitled to recover is less than the deductible applicable to **your covered auto** involved in the accident; or

   b. The vehicle involved in the accident, other than **your covered auto**, is owned by or furnished or available for the regular use of you or of any **family member**.

2. Another vehicle insured by us or by any of our affiliated companies. This reduction **B.2.** shall not apply if we or any of our affiliated companies have reduced a deductible on any other vehicle involved in the **collision** that is owned by or furnished or available for the regular use of you or any **family member**.

State law requires that the resulting **collision** deductible amount will never decrease to an amount below $100.

**C. PAYMENT OF LOSS**

1. An adjustment for depreciation and physical condition will be made in determining actual cash value at the time of loss.

2. If a repair or replacement necessitates the use of replacement parts that are in better condition than what the damaged property was prior to the loss, we will not pay for the amount of that betterment.

3. Our liability for the amount necessary to repair the damaged property shall be determined by:

   a. The prevailing competitive labor rates in the area where the property is to be repaired as reasonably determined by us; and

   b. The cost of replacement parts reasonably specified by us in accordance with applicable laws and government regulations. The replacement parts may be new, refurbished, restored or used and may be made by original equipment manufacturers or by non-original equipment manufacturers.

If we use a new part made by a non-original equipment manufacturer, it shall have a manufacturer's warranty that is equal to or greater than the warranty offered by the original equipment manufacturer of the same type part.

This determination of our liability shall not be affected by the amount actually expended to repair the damaged property.

4. At our option, we may pay for loss in money or repair or replace the stolen or damaged property. We may, at our expense, return any stolen property to you or to your address shown in the Declarations. If we return stolen property, we will pay for any damages resulting from the theft. We may keep all or part of the property at an agreed or appraised value.

5. If we pay for loss in money, our payment will include applicable sales tax for the damaged or stolen property.

**D. BAILMENT**

Any charges we pay for storage because of a loss covered under Section **VI** of this policy shall end the earlier of when *your covered auto* or the *non-owned auto*:

1. Is returned to you or to its owner;

2. Is repaired;

3. Is replaced; or

4. Within 5 working days after we make an offer to pay, if deemed by us to be a total loss or unrecoverable.

**E. OTHER SOURCES OF RECOVERY**

If other sources of recovery also cover the loss, we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits. However, any insurance we provide with respect to a *non-owned auto* shall be excess over any other collectible source of recovery including, but not limited to:

1. Any coverage provided by the owner of the *non-owned auto;*

2. Any other applicable physical damage insurance; or

3. Any other source of recovery applicable to the loss.

However, any insurance we provide for a *non-owned auto* while used as a temporary substitute for *your covered auto* that is provided by a motor vehicle dealer as defined in the Pennsylvania Board of Vehicles Act, shall be primary.

Copying Prohibited

# PENNSYLVANIA NOTICE

An Insurance Company, its agents, employees, or service contractors acting on its behalf, may provide services to reduce the likelihood of injury, death or loss. These services may include any of the following or related services incident to the application for, issuance, renewal or continuation of, a policy of insurance:

1. surveys;

2. consultation or advice; or

3. inspections.

The "Insurance Consultation Services Exemption Act" of Pennsylvania provides that the Insurance Company, its agents, employees or service contractors acting on its behalf, is not liable for damages from injury, death or loss occurring as a result of any act or omission by any person in the furnishing of or the failure to furnish these services.

The Act does not apply:

1. if the injury, death or loss occurred during the actual performance of the services and was caused by the negligence of the Insurance Company, its agents, employees or service contractors;

2. to consultation services required to be performed under a written service contract not related to a policy of insurance; or

3. if any acts or omissions of the Insurance Company, its agents, employees or service contractors are judicially determined to constitute a crime, actual malice, or gross negligence.

© ISO Properties, Inc., 2001

IL 09 10 (Ed. 07 02)

Copying Prohibited



# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PUBLIC OR LIVERY CONVEYANCE EXCLUSION ENDORSEMENT

The provisions of the Policy apply unless modified by the endorsement.

## I. Definitions

The following definition is added:

*Transportation network platform* means an online-enabled application or digital network used to connect passengers with drivers using vehicles for the purpose of providing pre-arranged transportation services for compensation.

## II. Part A Personal Auto Policy – Liability Coverage

**Section IV Wespak and Wespak Estate Policy – Liability Coverage**

Exclusion A.5. is replaced by the following:

We do not provide Liability Coverage for any *insured*:

5. For that *insured's* liability arising out of the ownership or operation of a vehicle while it is being used as a public or livery conveyance. This includes but is not limited to any period of time a vehicle is being used by any *insured* who is logged into a *transportation network platform* as a driver, whether or not a passenger is *occupying* the vehicle.

   This exclusion (A.5.) does not apply to a share-the-expense car pool.

## III. Part B – Medical Payments Coverage

Exclusion 2. is replaced by the following:

We do not provide Medical Payments Coverage for any *insured* for *bodily injury*:

2. Sustained while *occupying your covered auto* when it is being used as a public or livery conveyance. This includes but is not limited to any period of time *your covered auto* is being used by any *insured* who is logged into a *transportation network platform* as a driver, whether or not a passenger is *occupying* the vehicle.

   This exclusion (2.) does not apply to a share-the-expense car pool.

## IV. Part D Personal Auto Policy – Coverage For Damage To Your Auto

**Section VI Wespak and Wespak Estate Policy – Coverage For Damage To Your Auto**

Exclusion 1. is replaced by the following:

We will not pay for:

1. Loss to *your covered auto* or any *non-owned auto* which occurs while it is being used as a public or livery conveyance. This includes but is not limited to any period of time *your covered auto* or any *non-owned auto* is being used by any person who is logged into a *transportation network platform* as a driver, whether or not a passenger is *occupying* the vehicle.

   This exclusion (1.) does not apply to a share-the-expense car pool.

Includes Copyrighted Material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 2015

PA 23 40  (Ed. 07-17)

*0000C0WNP97803293974411684*

Copying Prohibited

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# UNINSURED MOTORISTS COVERAGE - PENNSYLVANIA (STACKED)

## I. UNINSURED MOTORISTS COVERAGE

### INSURING AGREEMENT

**A.** We will pay compensatory damages which an *insured* is legally entitled to recover from the owner or operator of an *uninsured motor vehicle* because of *bodily injury:*

   **1.** Sustained by an *insured;* and

   **2.** Caused by an accident.

The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the *uninsured motor vehicle.*

No judgment for damages arising out of a suit brought against the owner or operator of an *uninsured motor vehicle* is binding on us unless we:

   **1.** Received reasonable notice of the pendency of the suit resulting in the judgment; and

   **2.** Had a reasonable opportunity to protect our interests in the suit.

**B.** *"Insured"* as used in this endorsement means:

   **1.** You or any *family member.*

   **2.** Any other person *occupying your covered auto.*

   **3.** Any person for damages that person is entitled to recover because of *bodily injury* to which this coverage applies sustained by a person described in **1.** or **2.** above.

**C.** *"Uninsured motor vehicle"* means a land motor vehicle or trailer of any type:

   **1.** To which no bodily injury liability bond or policy applies at the time of the accident.

   **2.** Which is a hit-and-run vehicle whose operator or owner cannot be identified and which hits or which causes an accident resulting in *bodily injury* without hitting:

     **a.** you or any *family member;*

     **b.** a vehicle which you or any *family member* are *occupying;* or

     **c.** *your covered auto.*

    If there is no physical contact with the hit-and-run vehicle the facts of the accident must be proved.

   **3.** To which a bodily injury liability bond or policy applies at the time of the accident but the bonding or insuring company:

     **a.** denies coverage; or

     **b.** is or becomes:

       **(1)** insolvent; or

       **(2)** involved in insolvency proceedings.

However, *"uninsured motor vehicle"* does not include any vehicle or equipment:

   **1.** Owned by or furnished for the regular use of you or any *family member.*

   **2.** Operated on rails or crawler treads.

   **3.** Designed mainly for use off public roads while not on public roads.

   **4.** While located for use as a residence or premises.

   **5.** Owned or operated by a self-insurer under any applicable motor vehicle law, except a self insurer which is or becomes insolvent.

### EXCLUSIONS

**A.** We do not provide Uninsured Motorists Coverage for *bodily injury* sustained:

   **1.** By you while *occupying*, or when struck by, any motor vehicle you own which is not insured for this coverage. This includes a trailer of any type used with that vehicle.

   **2.** By a *family member* who owns an auto, while *occupying*, or when struck by, any motor vehicle owned by you or any *family member* which is not insured for this coverage. This includes a trailer of any type used with that vehicle.

Includes copyrighted Material of Insurance Services Office with its permission - Copyright, Insurance Services Office, Inc. 2016

**B.** We do not provide Uninsured Motorists Coverage for *bodily injury* sustained by any *insured*:

    **1.** If that *insured* or the legal representative settles the *bodily injury* claim without our consent. However, this exclusion (**B.1**) does not apply if such settlement does not adversely affect our rights.

    **2.** While *occupying your covered auto* when it is being used as a public or livery conveyance. This includes but is not limited to any period of time *your covered auto* is being used by any *insured* who is logged into a *transportation network platform* as a driver, whether or not a passenger is *occupying* the vehicle. This exclusion (**B.2.**) does not apply to a share-the-expense car pool.

    **3.** Using a vehicle without a reasonable belief that that *insured* is entitled to do so.

**C.** We do not provide Uninsured Motorists Coverage for *noneconomic loss* sustained by any *insured* to whom the limited tort alternative applies, resulting from *bodily injury* caused by an accident involving an *uninsured motor vehicle,* unless the *bodily injury* sustained is a *serious injury.*

This exclusion (**C.**) does not apply if that *insured* is injured while *occupying* a motor vehicle insured under a commercial motor vehicle insurance policy.

**D.** This coverage shall not apply directly or indirectly to benefit any insurer or self-insurer under any disability benefits or similar law, except a workers' compensation law.

**E.** We do not provide Uninsured Motorists Coverage for punitive or exemplary damages.

## LIMIT OF LIABILITY

**A.** If the Declarations indicates a single limit of liability for "each accident" for Uninsured Motorists Coverage:

    **1.** Except as provided in the following paragraph (**A.2.**), the limit of liability shown in the Declarations for this coverage is our maximum limit of liability for all damages resulting from any one accident. This is the most we will pay regardless of the number of:

        **a.** *Insureds;*

        **b.** Claims made;

        **c.** Vehicles or premiums shown in the Declarations; or

        **d.** Vehicles involved in the accident.

    **2.** If *bodily injury* is sustained in an accident by you or any *family member,* our maxi-

mum limit of liability for all damages in any such accident is the sum of the limits of liability for Uninsured Motorists Coverage shown in the Declarations applicable to each vehicle. Subject to this maximum limit of liability for all damages, the most we will pay for *bodily injury* sustained by an *insured* other than you or any *family member* is the limit shown in the Declarations applicable to the vehicle the *insured* was *occupying* at the time of the accident. This is the most we will pay regardless of the number of:

        **a.** *Insureds;*

        **b.** Claims made;

        **c.** Vehicles or premiums shown in the Declarations; or

        **d.** Vehicles involved in the accident.

**B.** If the Declarations indicates an "each person" and "each accident" limit of liability for Uninsured Motorists Coverage:

    **1.** If *bodily injury* is sustained in an accident by you or any *family member:*

        **a.** Our maximum limit of liability for all damages, including damages for care, loss of services or death, arising out of *bodily injury* sustained by any one person in any such accident is the sum of the limits of liability shown in the Declarations for "each person" for Uninsured Motorists Coverage.

        **b.** Subject to the maximum limit for "each person" described in **1.a.** above, our maximum limit of liability for all damages arising out of *bodily injury* resulting from any one accident is the sum of the limits of liability shown in the Declarations for "each accident" for Uninsured Motorists Coverage.

        **c.** Subject to the maximum limits of liability set forth in **1.a.** and **1.b.** above, the most we will pay for *bodily injury* sustained in such accident by an *insured* other than you or any *family member* is the "each person" or "each accident" limit of liability shown in the Declarations applicable to the vehicle that the *insured* was *occupying* at the time of the accident.

        **d.** The maximum limit of liability is the most we will pay regardless of the number of:

            **1.** *Insureds;*

            **2.** Claims made;

Copying Prohibited

3. Vehicles or premiums shown in the Declarations; or

4. Vehicles involved in the accident.

2. If **bodily injury** is sustained by any **insured** other than you or any **family member** in an accident in which neither you nor any **family member** sustains **bodily injury,** the limit of liability shown in the Declarations for "each person" for Uninsured Motorists Coverage is our maximum limit of liability for all damages, including damages for care, loss of services or death, arising out of **bodily injury** sustained by any one person in any one accident. Subject to this limit for "each person", the limit of liability shown in the Declarations for "each accident" for Uninsured Motorists Coverage is our maximum limit of liability for all damages for **bodily injury** resulting from any one accident. This is the most we will pay regardless of the number of:

1. **Insureds;**

2. Claims made;

3. Vehicles or premiums shown in the Declarations; or

4. Vehicles involved in the accident.

C. No one will be entitled to receive duplicate payments for the same elements of loss under Uninsured Motorists Coverage and:

1. The Auto Liability Coverage;

2. First Party Benefits Coverage; or

3. Any Underinsured Motorists Coverage provided by this policy.

D. We will not make a duplicate payment under this coverage for any element of loss for which payment has been made by or on behalf of persons or organizations who may be legally responsible. This includes all payments made to an **insured's** attorney either directly or as part of the payment made to the **insured.**

E. We will not pay for any element of loss if a person is entitled to receive payment for the same element of loss under any disability benefits or similar law, except a workers' compensation law.

**OTHER INSURANCE**

If there is other applicable similar insurance available under more than one policy or provision of coverage the following priorities of recovery apply:

First The Uninsured Motorists Coverage applicable to the vehicle the **insured** was **occupying** at the time of the accident.

Second The policy affording Uninsured Motorists Coverage to the **insured** as a named insured or **family member.**

If two or more policies have equal priority, the insurer against whom the claim is first made shall process and pay the claim as if wholly responsible for all insurers with equal priority. The insurer is thereafter entitled to recover contribution pro rata from any other insurer for the benefits paid and the costs of processing the claim.

**ARBITRATION**

A. If we and an **insured** do not agree:

1. Whether that **insured** is legally entitled to recover damages; or

2. As to the amount of damages which are recoverable by that **insured;**

from the **owner** or operator of an **uninsured motor vehicle** or an **underinsured motor vehicle** then the matter may be arbitrated. However, disputes concerning coverage under this policy may not be arbitrated.

Both parties must agree to arbitration. If so agreed, each party will select an arbitrator. The two arbitrators will select a third. If they cannot agree within 30 days, either may request that selection be made by a judge of a court having jurisdiction.

B. Each party will:

1. Pay the expenses it incurs; and

2. Bear the expenses of the third arbitrator equally.

C. Unless both parties agree otherwise, arbitration will take place in the county in which the **insured** lives. Local rules of law as to procedure and evidence shall apply.

A decision agreed to by at least two of the arbitrators shall be binding.

**II. GENERAL PROVISIONS**

The following is added to the Two Or More Auto Policies provision:

**TWO OR MORE AUTO POLICIES**

1. This provision does not apply to Uninsured Motorists Coverage.

2. No one will be entitled to receive duplicate payments for the same elements of loss under Uninsured Motorists Coverage.

The terms of this endorsement apply to your policy as stated in the Declarations.

*00000OWNP3780328374441686*

Copying Prohibited

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# UNDERINSURED MOTORISTS COVERAGE - PENNSYLVANIA (STACKED)

With respect to the coverage provided by this endorsement, the provisions of the policy apply unless modified by the endorsement.

## INSURING AGREEMENT

**A.** We will pay compensatory damages which an *insured* is legally entitled to recover from the owner or operator of an *underinsured motor vehicle*, because of *bodily injury*:

1. Sustained by an *insured*; and

2. Caused by an accident.

The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the *underinsured motor vehicle*. We will pay under this coverage only if **1.** or **2.** below applies:

1. The limits of liability under any applicable bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements; or

2. A tentative settlement has been made between an *insured* and the insurer of the *underinsured motor vehicle* and we:

   **a.** have been given prompt written notice of such tentative settlement; and

   **b.** advance payment to the *insured* in an amount equal to the tentative settlement within 30 days after receipt of notification.

No judgment for damages arising out of a suit brought against the owner or operator of an *underinsured motor vehicle* is binding on us unless we:

1. Received reasonable notice of the pendency of the suit resulting in the judgment; and

2. Had a reasonable opportunity to protect our interests in the suit.

**B.** "*Insured*" as used in this endorsement means:

1. You or any *family member*.

2. Any other person *occupying your covered auto*.

3. Any person for damages that person is entitled to recover because of *bodily injury* to which this coverage applies sustained by a person described in **1.** or **2.** above.

**C.** "*Underinsured motor vehicle*" means a land motor vehicle or trailer of any type to which a bodily injury liability bond or policy applies at the time of the accident but the amount paid for *bodily injury* under that bond or policy to an *insured* is not enough to pay the full amount the *insured* is legally entitled to recover as damages.

However, "*underinsured motor vehicle*" does not include any vehicle or equipment:

1. Owned by or furnished for the regular use of you or any *family member*.

2. Operated on rails or crawler treads.

3. Designed mainly for use off public roads while not on public roads.

4. While located for use as a residence or premises.

## EXCLUSIONS

**A.** We do not provide Underinsured Motorists Coverage for *bodily injury* sustained:

1. By you while *occupying*, or when struck by, any motor vehicle you own which is not insured for this coverage. This includes a trailer of any type used with that vehicle.

2. By a *family member* who owns an auto, while *occupying*, or when struck by, any motor vehicle owned by you or any *family member* which is not insured for this coverage. This includes a trailer of any type used with that vehicle.

**B.** We do not provide Underinsured Motorists Coverage for *bodily injury* sustained by any *insured*:

1. While *occupying your covered auto* when it is being used as a public or livery conveyance. This includes but is not limited to any period of time *your covered auto* is being used by any *insured* who is logged into a *transportation network platform* as a driver, whether or not a passenger is *occupying* the vehicle. This exclusion (**B.1.**) does not apply to a share-the-expense car pool.

2. Using a vehicle without a reasonable belief that that *insured* is entitled to do so.

**C.** We do not provide Underinsured Motorists Coverage for *noneconomic loss* sustained by any *insured* to whom the limited tort alternative applies, resulting from *bodily injury* caused by an accident involving an *underinsured motor vehicle*, unless the *bodily injury* sustained is a *serious injury*.

Includes copyrighted Material of Insurance Services Office with its permission - Copyright, Insurance Services Office, Inc. 2016

*0000COWNP37803293744118B7*

Copying Prohibited

This exclusion (C.) does not apply if that **insured** is injured while **occupying** a motor vehicle insured under a commercial motor vehicle insurance policy.

**D.** This coverage shall not apply directly or indirectly to benefit any insurer or self-insurer under any disability benefits or similar law, except a workers' compensation law.

**E.** We do not provide Underinsured Motorists Coverage for punitive or exemplary damages.

## LIMIT OF LIABILITY

**A.** If the Declarations indicates a single limit of liability for "each accident" for Underinsured Motorists Coverage:

    **1.** Except as provided in the following paragraph (**A.2.**), the limit of liability shown in the Declarations for this coverage is our maximum limit of liability for all damages resulting from any one accident. This is the most we will pay regardless of the number of:

        **a.** **Insureds;**

        **b.** Claims made;

        **c.** Vehicles or premiums shown in the Declarations; or

        **d.** Vehicles involved in the accident.

    **2.** If **bodily injury** is sustained in an accident by you or any **family member,** our maximum limit of liability for all damages in any such accident is the sum of the limits of liability for Underinsured Motorists Coverage shown in the Declarations applicable to each vehicle. Subject to this maximum limit of liability for all damages, the most we will pay for **bodily injury** sustained by an **insured** other than you or any **family member** is the limit shown in the Declarations applicable to the vehicle the **insured** was **occupying** at the time of the accident. This is the most we will pay regardless of the number of:

        **a.** **Insureds;**

        **b.** Claims made;

        **c.** Vehicles or premiums shown in the Schedule or in the Declarations; or

        **d.** Vehicles involved in the accident.

**B.** If the Declarations indicates an "each person" and "each accident" limit of liability for Underinsured Motorists Coverage:

    **1.** If **bodily injury** is sustained in an accident by you or any **family member:**

        **a.** Our maximum limit of liability for all damages, including damages for care, loss of services or death, arising out of **bodily injury** sustained by any one person in any such accident is the sum of the limits of liability shown in the Declarations for "each person" for Underinsured Motorists Coverage.

        **b.** Subject to the maximum limit for "each person" described in **1.a.** above, our maximum limit of liability for all damages arising out of **bodily injury** resulting from any one accident is the sum of the limits of liability shown in the Declarations for "each accident" for Underinsured Motorists Coverage.

        **c.** Subject to the maximum limits of liability set forth in **1.a.** and **1.b.** above, the most we will pay for **bodily injury** sustained in such accident by an **insured** other than you or any **family member** is the "each person" or "each accident" limit of liability shown in the Declarations applicable to the vehicle that the **insured** was **occupying** at the time of the accident.

        **d.** The maximum limit of liability is the most we will pay regardless of the number of:

            **1.** **Insureds;**

            **2.** Claims made;

            **3.** Vehicles or premiums shown in the Declarations; or

            **4.** Vehicles involved in the accident.

    **2.** If **bodily injury** is sustained by any **insured** other than you or any **family member** in an accident in which neither you nor any **family member** sustains **bodily injury,** the limit of liability shown in the Declarations for "each person" for Underinsured Motorists Coverage is our maximum limit of liability for all damages, including damages for care, loss of services or death, arising out of **bodily injury** sustained by any one person in any one accident. Subject to this limit for "each person", the limit of liability shown in the Declarations for "each accident" for Underinsured Motorists Coverage is our maximum limit of liability for all damages for **bodily injury** resulting from any one accident. This is the most we will pay regardless of the number of:

        **1.** **Insureds;**

        **2.** Claims made;

Copy Reproduction Prohibited

3. Vehicles or premiums shown in the Declarations; or

4. Vehicles involved in the accident.

C. No one will be entitled to receive duplicate payments for the same elements of loss under Underinsured Motorists Coverage and:

1. The Auto Liability Coverage;

2. First Party Benefits Coverage; or

3. Any Uninsured Motorists Coverage provided by this policy.

D. We will not make a duplicate payment under this coverage for any element of loss for which payment has been made by or on behalf of persons or organizations who may be legally responsible.

E. We will not pay for any element of loss if a person is entitled to receive payment for the same element of loss under any disability benefits or similar law, except a workers' compensation law.

**OTHER INSURANCE**

If there is other applicable similar insurance available under more than one policy or provision of coverage, the following priorities of recovery apply:

First    The Underinsured Motorists Coverage applicable to the vehicle the *insured* was *occupying* at the time of the accident.

Second  The policy affording Underinsured Motorists Coverage to the *insured* as a named insured or *family member.*

If two or more policies have equal priority, the insurer against whom the claim is first made shall process and pay the claim as if wholly responsible for all insurers with equal priority. The insurer is thereafter entitled to recover contribution pro rata from any other insurer for the benefits of processing the claim.

**ARBITRATION**

A. If we and an *insured* do not agree:

1. Whether that *insured* is legally entitled to recover damages; or

2. As to the amount of damages which are recoverable by that *insured*;

from the *owner* or operator of an *uninsured motor vehicle* or an *underinsured motor vehicle* then the matter may be arbitrated. However, disputes concerning coverage under this policy may not be arbitrated.

Both parties must agree to arbitration. If so agreed, each party will select an arbitrator. The two arbitrators will select a third. If they cannot agree within 30 days, either may request that selection be made by a judge of a court having jurisdiction.

B. Each party will:

1. Pay the expenses it incurs; and

2. Bear the expenses of the third arbitrator equally.

C. Unless both parties agree otherwise, arbitration will take place in the county in which the *insured* lives. Local rules of law as to procedure and evidence shall apply.

A decision agreed to by at least two of the arbitrators shall be binding.

**ADDITIONAL DUTIES**

A person seeking Underinsured Motorists Coverage must also promptly:

1. Send us copies of the legal papers if a suit is brought; and

2. Notify us in writing of a tentative settlement between the *insured* and the insurer of the *underinsured motor vehicle* and allow us 30 days to advance payment to that *insured* in an amount equal to the tentative settlement to preserve our rights against the insurer, owner or operator of such *underinsured motor vehicle.*

**GENERAL PROVISIONS**

A. The following is added to the Our Right To Recover Payment (Subrogation) provision:

**OUR RIGHT TO RECOVER PAYMENT (SUBROGATION)**

Our rights do not apply with respect to Underinsured Motorists Coverage if we:

1. Have been given prompt written notice of a tentative settlement between an *insured* and the insurer of an *underinsured motor vehicle;* and

2. Fail to advance payment to the *insured* in an amount equal to the tentative settlement within 30 days after receipt of notification.

If we advance payment to the *insured* in an amount equal to the tentative settlement within 30 days after receipt of notification:

1. That payment will be separate from any amount the *insured* is entitled to recover under the provisions of Underinsured Motorists Coverage; and

*0000C0WNP378032937441888*

Copying Prohibited

**2.** We also have a right to recover the advanced payment.

**B.** The following is added to the Two or More Auto Policies provision:

**TWO OR MORE AUTO POLICIES**

**1.** This provision does not apply to Underinsured Motorists Coverage.

**2.** No one will be entitled to receive duplicate payments for the same elements of loss under Underinsured Motorists Coverage.

The terms of this endorsement apply to your policy as stated in the Declarations.

Copying Prohibited

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
## FIRST PARTY BENEFITS COVERAGE - PENNSYLVANIA

With respect to coverage provided by this endorsement, the provision of the policy apply unless modified by the endorsement.

### SCHEDULE

**BASIC FIRST PARTY BENEFITS**

| Benefits | Limit of Liability |
|---|---|
| Medical Expense Benefit | Up to $ 5,000 |

**Note:** If ADDED FIRST PARTY BENEFITS or COMBINATION FIRST PARTY BENEFITS are not shown as applicable in the Declarations, only BASIC FIRST PARTY BENEFITS apply.

The following options shall apply instead of BASIC FIRST PARTY BENEFITS as indicated in the Declarations.

**1. ADDED FIRST PARTY BENEFITS**

| Benefits | Limit of Liability |
|---|---|
| Medical Expense Benefit | Up to the limit shown in the Declarations |
| Work Loss Benefit | Up to the limit shown in the Declarations, |
| subject to a maximum of: | |
| $1,000 per month on either a $5,000 limit or a $15,000 limit; or | |
| $1,500 per month on a $25,000 limit; or | |
| $2,500 per month on a $50,000 limit. | |
| Funeral Expense Benefit | Up to the limit shown in the Declarations. |
| Accidental Death Benefit | The limit shown in the Declarations. |

**2. COMBINATION FIRST PARTY BENEFITS**

| Benefits | Limit of Liability |
|---|---|
| Maximum Total Single Limit | Up to the limit shown in the Declarations |
| Subject to the following individual limits: | |
| Medical Expense Benefit | No specific dollar amount |
| Work Loss Benefit | No specific dollar amount |
| Funeral Expense Benefit | Up to $ 2,500 |
| Accidental Death Benefit | The limit shown in the Declarations. |

## I. DEFINITIONS

The Definitions section is amended as follows:

**A.** "The Act" refers to the Pennsylvania Motor Vehicle Financial Responsibility Law.

**B.** The following definitions are replaced:

    **1.** *"Bodily injury"* means accidental bodily harm to a person and that person's resulting illness, disease or death.

    **2.** *"Your covered auto"* means a *motor vehicle*:

        **a.** To which Auto Liability Coverage of this policy applies and for which a specific premium is charged; and

        **b.** For which First Party Benefits Coverage required by the Act is maintained.

    **C.** The following definition is added:

        *"Motor vehicle"* means a self-propelled vehicle operated or designed for use upon public roads. However, *motor vehicle* does not include a vehicle operated:

        **1.** By muscular power; or

Includes Copyrighted Material of Insurance Services Office with its permission.
Copyright, Insurance Services Office, Inc., 2017

**D.** *"Insured"* as used in this endorsement means:

**1.** You or any *family member.*

**2.** Any other person while:

**a.** *Occupying your covered auto;* or

**b.** Not *occupying* a *motor vehicle* if injured as a result of an accident in Pennsylvania involving *your covered auto.*

If *your covered auto* is parked and unoccupied it is not a *motor vehicle* involved in an accident unless it is parked in a manner which creates an unreasonable risk of injury.

## II. FIRST PARTY BENEFITS COVERAGE INSURING AGREEMENT

### A. BASIC FIRST PARTY BENEFITS

We will pay, in accordance with the Act, the Basic First Party Benefit to or for an *insured* who sustains *bodily injury.* The *bodily injury* must be caused by an accident arising out of the maintenance or use of a *motor vehicle.*

Subject to the limit shown in the Schedule or Declarations, the Basic First Party Benefit consists of:

Medical expenses. Reasonable and necessary medical expenses incurred for an *insured's*:

**1.** Care;

**2.** Recovery; or

**3.** Rehabilitation.

This includes remedial care and treatment rendered in accordance with a recognized religious method of healing.

Medical expenses will be paid if incurred within 18 months from the date of the accident causing *bodily injury.* However, if within 18 months from the date of the accident, it can be determined with reasonable medical probability that additional medical expenses may be incurred after this period, the 18 month time limit will not apply to the payment of the additional medical expenses.

### B. ADDED FIRST PARTY BENEFITS

If the Schedule or Declarations indicates that Added First Party Benefits apply, we will pay Added First Party Benefits instead of the Basic First Party Benefit to or for an *insured* who sustains *bodily injury.* The *bodily injury* must be caused by an accident arising out of the maintenance or use of a *motor vehicle.* These benefits are subject to the provisions of the Act.

Subject to the limits shown in the Schedule or Declarations, Added First Party Benefits consist of the following:

**1.** Medical expenses as described in the Basic First Party Benefit.

**2.** Work Loss.

**a.** Loss of income. Up to 80% of gross income actually lost by an *insured* as a result of the accident.

**b.** Reasonable expenses actually incurred to reduce loss of income by hiring:

**(1)** Special help, thereby enabling an *insured* to work; or

**(2)** A substitute to perform the work a self-employed *insured* would have performed.

However, work loss does not include:

**a.** Loss of expected income or expenses incurred for services performed after the death of an *insured*; or

**b.** Any loss of income, or expenses incurred for services performed, during the first 5 working days the *insured* did not work due to *bodily injury.*

**3.** Funeral expenses. Funeral or burial expenses actually incurred if *bodily injury* causes an *insured's* death within 24 months from the date of the accident.

**4.** Accidental death. A death benefit paid if *bodily injury* causes the death of you or any *family member* within 24 months from the date of the accident.

We will pay accidental death to the executor or administrator of the deceased *insured's* estate. If there is no executor or administrator, the benefit shall be paid to:

**a.** The deceased *insured's* surviving spouse; or

**b.** If there is no surviving spouse, the deceased *insured's* surviving children; or

**c.** If there is no surviving spouse or children, to the deceased *insured's* estate.

Copying Prohibited

## C. COMBINATION FIRST PARTY BENEFITS

If the Schedule or Declarations indicates that Combination First Party Benefits apply, we will pay Combination First Party Benefits instead of the Basic First Party Benefit to or for an *insured* who sustains *bodily injury*. The *bodily injury* must be caused by an accident arising out of the maintenance or use of a *motor vehicle*. These benefits are subject to the provisions of the Act.

Subject to the limits shown in the Schedule or Declarations, Combination First Party Benefits consist of the following, as described in the Basic First Party Benefit and Added First Party Benefits:

1. Medical expenses.

2. Work loss.

3. Funeral expenses.

4. Accidental death.

## EXCLUSIONS

A. We do not provide First Party Benefits Coverage for *bodily injury* sustained by any *insured*:

1. While intentionally causing or attempting to cause *bodily injury* to himself or any other person. We will not pay accidental death on behalf of that *insured*.

2. While committing a felony.

3. While seeking to elude lawful apprehension or arrest by a law enforcement official.

4. While maintaining or using a *motor vehicle* knowingly converted by that *insured*. This exclusion (A.4.) does not apply to:

   a. You; or

   b. Any *family member*.

5. Who, at the time of the accident, is:

   a. The owner of one or more registered *motor vehicles*, none of which have in effect the financial responsibility required by the Act; or

   b. *Occupying* a *motor vehicle* owned by that *insured* for which the financial responsibility required by the Act is not in effect.

6. Maintaining or using a *motor vehicle* while located for use as a residence or premises.

7. While *occupying* a:

   a. Recreational vehicle designed for use off public roads; or

   b. Motorcycle, moped or similar-type vehicle.

8. During any period of time a *motor vehicle* is being used by an *insured* who is logged into a *transportation network platform* as a driver, whether or not a passenger is *occupying* the vehicle.

B. We do not provide First Party Benefits Coverage for *bodily injury*:

1. Sustained by a pedestrian if the accident occurs outside of Pennsylvania. This exclusion (B.1.) does not apply to:

   a. You; or

   b. Any *family member*.

2. Caused by or as a consequence of:

   a. Discharge of a nuclear weapon (even if accidental);

   b. War (declared or undeclared);

   c. Civil war;

   d. Insurrection; or

   e. Rebellion or revolution.

3. From or as a consequence of the following, whether controlled or uncontrolled or however caused:

   a. Nuclear reaction;

   b. Radiation; or

   c. Radioactive contamination.

## LIMIT OF LIABILITY

A. The limits of liability shown in the Schedule or Declarations for the first party benefits that apply are the most we will pay to or for each *insured* as the result of any one accident, regardless of the number of:

1. Claims made;

2. Vehicles or premiums shown in the Declarations;

3. Vehicles involved in the accident; or

4. Insurers providing first party benefits.

B. If Combination First Party Benefits are afforded, we will make available at least the minimum limit required by the Act for the Basic First Party Benefit. This provision (B.) will not change our maximum limit of liability.

C. Any amounts payable under this coverage shall be excess over any amounts;

Copying Prohibited

**1.** Paid;

**2.** Payable; or

**3.** Required to be provided;

to an **insured** under any workers' compensation law or similar law.

## PRIORITIES OF POLICIES

**A.** We will pay first party benefits in accordance with the order of priorities set forth by the Act. We will not pay if there is another insurer at a higher level of priority. The "First" category listed below is the highest level of priority and the "Fourth" category is the lowest level of priority. The priority order is:

**First**    The insurer providing benefits to the **insured** as a named insured.

**Second**    The insurer providing benefits to the **insured** as a family member who is not a named insured under another policy providing coverage under the Act.

**Third**    The insurer of the **motor vehicle** which the **insured** is **occupying** at the time of the accident.

**Fourth**    The insurer of any **motor vehicle** involved in the accident if the **insured** is not:

  **a.** **Occupying** a **motor vehicle;** and

  **b.** Provided first party benefits under any other automobile policy.

An unoccupied parked **motor vehicle** is not a **motor vehicle** involved in an accident unless it is parked in a manner which creates an unreasonable risk of injury.

**B.** If 2 or more policies have equal priority within the highest applicable priority level:

**1.** The insurer against whom the claim is first made shall process and pay the claim as if wholly responsible. The insurer is then entitled to recover contribution pro rata from any other insurer for the benefits paid and the costs of processing the claim. If such contribution is sought among insurers under the Fourth priority, proration shall be based on the number of involved motor vehicles.

**2.** If we are the insurer against whom the claim is first made, our payment to or for an **insured** will not exceed the applicable limit of liability for First Party Benefits Coverage shown in the Schedule or Declarations.

**3.** The maximum recovery under all policies will not exceed the amount payable under the policy with the highest limit of liability.

## NON-DUPLICATION OF BENEFITS

No one will be entitled to recover duplicate payments for the same elements of loss under this or any other similar insurance including self-insurance.

## III. GENERAL PROVISIONS

The Our Right to Recover Payment (Subrogation) provision does not apply.

The terms of this endorsement apply to your policy as stated in the Declarations.

Copying Prohibited

## EXTRAORDINARY MEDICAL BENEFITS COVERAGE - PENNSYLVANIA

With respect to coverage provided by this endorsement, the provisions of the First Party Benefits Coverage - Pennsylvania endorsement apply unless modified by this endorsement.

**LIMITED BENEFITS**

**THIS ENDORSEMENT PROVIDES COVERAGE ONLY FOR MEDICAL EXPENSES.**

# WARNING:

# YOU SHOULD BE AWARE THAT EXTRAORDINARY MEDICAL BENEFITS COVERAGE DOES NOT APPLY TO THE FIRST $100,000 OF MEDICAL EXPENSES INCURRED BY AN "INSURED". YOU CAN AVOID HAVING TO PAY SOME OF YOUR OWN MEDICAL BILLS BY PURCHASING ADDED FIRST PARTY BENEFITS COVERAGE WITH A $100,000 LIMIT OF LIABILITY FOR MEDICAL EXPENSES.

**I.   EXTRAORDINARY MEDICAL BENEFITS COVERAGE**

**INSURING AGREEMENT**

We will pay, in accordance with the Act, extraordinary medical benefits to or for an **insured** who sustains **bodily injury**. The **bodily injury** must be caused by an accident arising out of the maintenance or use of a **motor vehicle**.

Subject to the limit shown in the Schedule or Declarations, extraordinary medical benefits consist of:

Medical expenses. Reasonable and necessary medical expenses incurred for an **insured's**:

   **1.**   Care;

   **2.**   Recovery; or

   **3.**   Rehabilitation.

This includes remedial care and treatment rendered in accordance with a recognized method of healing.

Regardless of whether you have purchased Basic, Added or Combination First Party Benefits Coverage under this policy, we will pay extraordinary medical benefits only after $100,000 of medical expenses has been incurred by any one **insured** as a result of any one accident.

**EXCLUSIONS**

The following exclusion is added:

We do not provide Extraordinary Medical Benefits Coverage for the first $100,000 of medical expenses incurred by an **insured** as a result of an accident.

**LIMIT OF LIABILITY**

**A.**   The limit of liability shown in the Schedule or Declarations for Extraordinary Medical Benefits Coverage is the most we will pay to or for each **insured** as the result of any one accident, regardless of the number of:

   **1.**   Claims made;

   **2.**   Vehicles or premiums shown in the Declarations;

   **3.**   Vehicles involved in the accident; or

   **4.**   Insurers providing extraordinary medical benefits.

Extraordinary medical benefits are subject to an annual limit of $50,000 for each **insured**. However, this limit does not apply to medical expenses incurred within 18 months from the date the **insured** incurs $100,000 of medical expenses as a result of the accident.

**B.**   Any amounts payable under this coverage shall be excess over any amounts available to an **insured** for medical expenses under Basic, Added or Combination First Party Benefits Coverage.

Includes Copyrighted Material of Insurance Services Office with its permission.
Copyright, Insurance Services Office, Inc., 1992

**C.** If an **insured** is eligible for benefits under both this coverage and the Catastrophic Loss Trust Fund, the total recovery under Extraordinary Medical Benefits Coverage and the Catastrophic Loss Trust Fund combined shall not exceed $1,000,000. In no event will the amount payable under Extraordinary Medical Benefits Coverage exceed the limit of liability shown in the Schedule or Declarations.

**D.** Any amounts payable under this coverage shall be excess over any amount:

    **1.** Paid;

    **2.** Payable; or

    **3.** Required to be provided;

to an **insured** under any workers' compensation law or similar law.

**II.   ADDITIONAL DUTIES**

The following is added:

The terms of this endorsement apply to your policy as stated in the Declarations, or by a Change Endorsement.

A person seeking Extraordinary Medical Benefits Coverage must submit proof, when required by us, that at least $100,000 of medical expenses has been incurred as the result of any one accident by an **insured**.

**III.   GENERAL PROVISIONS**

The following is added:

**STRUCTURED SETTLEMENTS**

If payment of medical expenses in the form of a structured settlement will be:

    **1.** Cost effective for us; and

    **2.** In the best interest of an **insured**;

we and the **insured,** may make an agreement, about the timing and amount of payments under this coverage, which is mutually satisfactory. This agreement may include annuities or other long-term payment arrangements.



**Company:**
AMERICAN SELECT INSURANCE COMPANY

**Name of Insured:**
FRED GORSTEIN

**Policy Number:** WNP 3780329

**Effective Date:** 04/02/21
**Expiration Date:** 04/02/22

**Vehicle:**
21  AUDI A4 2.0T PREM
WAUEAAF42MA075282

Copying Prohibited

Form 2097, 10/19

## Roadside Assistance
*from Westfield*

**WESTFIELD®**

## Call 877-787-9078

Roadside Assistance is provided for the vehicle shown on the reverse side of this card during the dates shown.

AC 1094 (10/06)

Copying Prohibited

## CERTIFICATE OF SERVICE

I, Alyce M. James, employee of Fowler Hirtzel McNulty & Spaulding do hereby state

that a true and correct copy of the foregoing document was sent via electronic mail and/or First

Class Mail Postage Pre-Paid upon the following individual(s) on the date set forth below:

Leonard A. Sloane, Esquire
Eckell, Sparks, Levy, Auerback, Monte, Sloane, Matthews & Auslander, P.C.
300 W. State Street, Suite 300
P.O. Box 319
Media, PA 19063
lsloane@eckellsparks.com
Counsel for Plaintiffs

Anthony Glenn
6607 Cedarhurst Street
Philadelphia, PA 19143


**FOWLER HIRTZEL McNULTY &
SPAULDING, LLP**


Date:  June 24, 2022              By:_____Alyce M. James_____
                                     Alyce M. James, Paralegal


{W1421825.1}